

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, NY 10016
Tel: 212-592-1400
Fax: 212-592-1500
Joshua J. Angel
Paul Rubin

Attorneys for the Defendants Calypso Mines LLC, Endymion, LLC, Tango LLC and
Foxtrot LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MERRILL LYNCH MORTGAGE CAPITAL    :   Electronically Filed
INC.,                                        :
                                               :
             Plaintiff,          :   Civil Action No.: 0 8 Civ. 5058 (NRB) (MHD)
                                               :
         -against-            :   <u>NOTICE OF REMOVAL</u>
                                               :
RALPH ESMERIAN, CALYPSO MINES LLC,   :
ENDYMION, LLC, R. ESMERIAN INC., TANGO : 
LLC and FOXTROT LLC,                    :
                                               :
            Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TO:    THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT,
        FOR THE SOUTHERN DISTRICT OF NEW YORK

       Defendants Calypso Mines LLC, ("Calypso"), Endymion, LLC, ("Endymion"), Tango

LLC ("Tango"), and Foxtrot LLC ("Foxtrot") (collectively, the "Defendants") by their attorneys,

Herrick, Feinstein LLP and proposed special litigation counsel, Phillips Nizer LLP, respectfully

apply for the removal (the "Notice of Removal") of this civil action to the United States District

Court for the Southern District of New York, with the intention that this action, upon removal,

shall be referred to the United States Bankruptcy Court for the Southern District of New York,

and in support thereof respectfully state as follows:

HF 4155463v.2 #13526/0002

1.       On April 15, 2008, Calypso, Endymion, Tango and Foxtrot, and four affiliates (collectively, "the Debtors")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Debtors' cases have been jointly administered under case number 08-11363 (RDD) (the "Bankruptcy Cases").

2.       In this Notice of Removal, the Defendants are exercising their right pursuant to 28 U.S.C. §§ 1441 *et. seq.* and 1452, *et. seq.,* and Rule 9027 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to remove a pending state court action entitled <u>Merrill Lynch Mortgage Capital Inc. v. Ralph Esmerian, Calypso Mines LLC, Endymion, LLC, R. Esmerian Inc., Tango LLC and Foxtrot LLC</u> [2], Index No. 600012/2008 (the "State Court Action") from the Supreme Court of the State of New York, County of New York (the "State Court"), to the United States District Court for the Southern District of New York, with the request that the State Court Action, upon removal, be transferred to the United States Bankruptcy Court for the Southern District of New York, (Honorable Robert D. Drain, U.S.B.J., presiding) for the reasons set forth herein.

3.       Plaintiff Merrill Lynch Mortgage Capital Inc. (the "Plaintiff" or "Merrill Lynch") filed the State Court Action on or about January 2, 2008. A copy of the Summons and Complaint from the State Court Action is attached as <u>Exhibit "A"</u> in accordance with Rule 9027(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). A copy of the Defendants' Answer in the State Court Action is annexed as <u>"Exhibit B"</u>. The scope and the

---

[1]  The following entities are debtors in these related Bankruptcy Cases (as defined below) : Fred Leighton LLC, Phoenix Nevada 1, LLC, Fred Leighton BH LLC, Calypso Mines LLC, Endymion, LLC, Foxtrot LLC, and Tango LLC.

breadth of the remaining docket entries in the State Court Action are quite voluminous. As such, the Defendants have attached a list of the titles of the docket entries current as of the date of this filing as <u>Exhibit "C"</u>. If any of the docket entries listed on <u>Exhibit "C"</u> are required or if additional documents relating to the State Court Action are required, the Defendants will submit such documents.

4.      In the State Court Action, Merrill Lynch sought replevin of certain alleged collateral, including antique and museum quality pieces, (the "Jewelry Collateral"). In its complaint, Merrill Lynch alleges that it is a secured lender to certain affiliated borrowers and guarantors (collectively, the "Loan Parties") under two credit agreements, the "Special Collection Credit Agreement" and the "Acquisition Credit Agreement" (together, the "Credit Agreements").

5.      The Loan Parties are the Debtors Ralph Esmerian, and R. Esmerian Inc. ("REI"). In its Complaint, Merrill Lynch asserts that the total amount of outstanding financing extended to the Loan Parties is $177,532,616.21.

6.      All of the Defendants counterclaimed against Merrill Lynch and asserted various affirmative defenses including breach of contract, breach of Merrill Lynch's obligation of good faith and fair dealing, and breach of Merrill Lynch's obligation to dispose of the unique, highly valuable Jewelry Collateral in a commercially reasonable manner. Defendants have also alleged that Merrill Lynch does not have a valid security interest in the Jewelry Collateral.

7.      The Southern District of New York encompasses New York County, which is where the State Court Action is pending.

---

[2]  The Defendants are advised that the other named defendants to the State Court Action, Ralph Esmerian and R. Esmerian Inc. consent to removal.

8.    The State Court Action was initiated prior to the commencement of the Bankruptcy Cases. This Notice of Removal is timely pursuant to Bankruptcy Rule 9027(a)(3) as it has been filed within 90 days of the filing of the Debtors' Bankruptcy Cases.

9.    The Debtors' Bankruptcy Cases are presently pending and being jointly administered before the Honorable Robert D. Drain, U.S.B.J., United States Bankruptcy Court for the Southern District of New York under lead case  In re: Fred Leighton Holding, Inc., chapter 11 case no. 08-11363 (RDD). The Defendants respectfully submit that the State Court Action should be removed to this Court pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027.

Bankruptcy Rule 9027(a) provides, in pertinent part, as follows:

(2)    *Time for Filing; Civil Action Initiated For Commencement of the Case Under The Code.* If the claim or cause of action in a civil action is pending when a case under the Code is commenced, a notice of removal may be filed only within the longest of (A) 90 days after the order for relief in the case under the Code, (B) 30 days after entry of an order terminating a stay, if the claim or cause of action in a civil action has been stayed under 5362 of the Code, or (C) 30 days after a trustee qualifies in a Chapter 11 reorganization case but not later than 180 days after the order for relief.

10.    At the time of the commencement of the Bankruptcy Cases, the State Court Action was pending and, until the filing of this Notice of Removal and the filing of a copy of this Notice of Removal with the State Court, continues to be pending before the State Court. However, upon the commencement of the Bankruptcy Cases the State Court Action was effectively stayed as to the Defendants pursuant to section 362(a)(1) of the Bankruptcy Code.

11.    Pursuant to 28 U.S.C. § 157 and the Standing Order of Reference from the United States District Court for the Southern District of New York dated July 10, 1984 referring all cases under the Bankruptcy Code and any or all proceedings arising under the Bankruptcy Code

or arising in or related to a case under the Bankruptcy Code to the Bankruptcy Court (Ward, Acting C.J.), (hereafter, the "Standing Order"), the Bankruptcy Court presiding over the Bankruptcy Case has jurisdiction over the causes of action asserted in the State Court Action under 28 U.S.C. § 1334.

12.     Although, as a procedural matter, removal must be to the District Court, upon removal to the District Court, pursuant to 28 U.S.C. § 157(a) and the Standing Order, the State Court Action should be automatically referred to the Bankruptcy Court. The Defendants respectfully submit that this Action should be thereafter referred to the Honorable Robert D. Drain, as His Honor is fully familiar with the facts and circumstances of the Debtors' Bankruptcy Cases.

### THIS COURT HAS JURISDICTION TO ADJUDICATE THE ACTION PURSUANT TO 28 U.S.C. § 1334 (b)

13.     The jurisdiction of the bankruptcy court is delineated in 28 U.S.C. § 1334(b), which states that "the district courts shall have original but not exclusive jurisdiction of all proceedings arising under title 11, or arising in or related to cases under title 11." Celotex Corp. v. Edwards, 514 U.S. 300, 307 (1995).

14.     Section 1334 provides the jurisdictional basis for removal of an action pursuant to 28 U.S.C. § 1452(a).  District courts (and bankruptcy courts) may exercise three types of jurisdiction pursuant to the statute.  They are "arising under" and "arising in" jurisdiction, which courts regard as a type of federal question jurisdiction, and "related to" jurisdiction. Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.), 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003).  A bankruptcy judge may hear and determine any "core proceeding" that "arises under" or "arises in" an action under title 11 but may only hear a "non-core" proceeding if it is "related to" a bankruptcy action. Union Turnpike, Inc. v. Howard Beach Fitness Center, Inc.,

209 B.R. 307, 310-11 (S.D.N.Y. 1997). The Second Circuit has construed a bankruptcy court's core jurisdiction "as broadly as possible" so as to be "close to or congruent with constitutional limits." Luan Investment S.E. v. Franklin 145 Corp. (*In re* Petrie Retail), 304 F.3d 223, 229 (2d Cir. 2002) (internal quotations and citations omitted). This jurisdictional reach is "essential to the efficient administration of bankruptcy proceedings." Id.

15.     The claims and causes of actions underlying the State Court Action are "core proceedings" within the meaning of *inter alia*, 28 U.S.C. §157(b)(2)(A),(B) and (C) in that the State Court Action concerns, *inter alia*, (i) matters concerning the administration of the Debtors' estates, (ii) the allowance or disallowance of claims of the Debtors' only secured creditor against the estates and (iii) counterclaims by the estates against the Debtors' largest creditor. The claims at issue turn on the conduct of the Debtors and Merrill Lynch as well as each party's allegations of incurred damages. Moreover, if the Complaint survives motion practice, the State Court Action will require substantial and likely costly discovery against the Debtors, as it involves the enforceability of the claims and security interests asserted by Merrill Lynch against the Debtors. The State Court Action involves claims for contractual damages, and the Defendants have asserted substantial counter-claims against the Plaintiff. For all these reasons, the Court has "arising in" jurisdiction.

16.     As set forth *supra*, this Court has original jurisdiction over this State Court Action pursuant to 28 U.S.C. § 1334(b), and it is hereby removed to this Court under the provisions of 28 U.S.C. §§ 1446 and 1452(a).

17.     28 U.S.C. § 1452(a) provides as follows:

> (a) A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit's police or regulatory

> power, to the district court where such civil action is pending, if
> such district court has jurisdiction of such claim or cause of action
> under section 1334 of this title

18.    The State Court Action, including all claims and causes of action asserted therein, is a civil action other than a proceeding before the United States Tax Court; and is not a civil action by a governmental unit to enforce such governmental unit's police or regulatory power.

19.    As the title to 28 U.S.C. § 1452 itself indicates, ("Removal of Claims related to "bankruptcy cases"), matters that can be removed include claims "related to" a bankruptcy case within the meaning of 28 U.S.C. § 1334(b).

20.    In addition, pursuant to 28 U.S.C. §1452(a), any civil action brought in a state court may also be subject to removal pursuant to 28 U.S.C. §1441(a), if applicable. The Defendants are exercising their rights as defendants to remove the State Court Action. See Things Remembered, Inc. v. Petrarca, 516 U.S. 124 (1995). 28 U.S.C. §1441(a) provides as follows:

> (a) Except as otherwise expressly provided by Act of Congress,
> any civil action brought in a State court of which the district courts
> of the United States have original jurisdiction, may be removed by
> the defendant or the defendants, to the district court of the United
> States for the district and division embracing the place where such
> action is pending. For purposes of removal under this chapter, the
> citizenship of defendants sued under fictitious names shall be
> disregarded.

With respect to removal pursuant to 28 U.S.C. §1441(a), 28 U.S.C. §1446 sets forth procedures very similar to those contained in Bankruptcy Rule 9027.

28 U.S.C. §1446(a) provides as follows:

> (a) A defendant or defendants desiring to remove any civil action
> or criminal prosecution from a State court shall file in the district
> court of the United States for the district and division within which
> such action is pending a notice of removal signed pursuant to Rule
> 11 of the Federal Rules of Civil Procedure and containing a short

and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.

21.    As stated in <u>California Public Employees' Retirement System v. Worldcom, Inc.</u>, 368 F.3d 86 (2d. Cir. 2004), "When Congress enacted Section 1452(a) in 1984,... 'Congress intended to grant comprehensive jurisdiction to bankruptcy courts so that they might deal efficiently and expeditiously with *all* matters connected with the bankruptcy estate' ... Accordingly, in its every detail, Section 1452(a) is designed to further Congress's purpose of centralizing bankruptcy litigation in a federal forum." <u>California Public Employees' Retirement System</u>, 268 F.3d at 103 (emphasis is original, quoting <u>Celotex v. Edwards</u>, 514 U.S. 300, 308 n. 5 (1995)). That premise is applicable in the instant case where the subject matter concerns the Debtors' jewelry business (and the Jewelry Collateral) which remain among the most significant assets in the Debtors' Bankruptcy Cases.

22.    Bankruptcy courts may also adjudicate state law claims pursuant to "arising in" jurisdiction when those claims are at the "heart" of the administration of the bankruptcy estate, as is the case here. <u>See</u>, <u>e.g.</u>, <u>Central Vermont Public Serv. Corp.</u>, 341 F.3d 186, 191 (2d Cir. 2003) (citing <u>In re Ben Cooper</u>, 896 F.2d 1394, 1399 (2d Cir. 1991)). The claims asserted by the Plaintiff and Defendants in the State Court Action will, no doubt, materially affect any proposed distribution and will have a significant effect on the proposed distributions to the Debtors' unsecured creditors. Further, the removal of this State Court Action will assist in administering the Debtors' estate by potentially avoiding concurrent proceedings addressing the same subject matter, as shown below.

23.    Here, although Plaintiff's claims may nominally be state law claims, the nature of the proceedings and the relief requested nevertheless provide this Court with "arising in," "arising

under," and "related to" jurisdiction over this action, pursuant to 28 U.S.C. § 1334(b).   This action "arises in" a case under Title 11 because it concerns, *inter alia*, the administration of the Debtors' estate which constitute "core proceedings" under 28 U.S.C. § 157(b).   Second, this State Court Action is "related to" a case under Title 11 because it will have a conceivable impact on the handling and administration of the Bankruptcy Cases in light of the significant damages requested by Plaintiff.

24.   Further, the Plaintiff no doubt intends to file a proof of claim in the Bankruptcy Cases to assert the claims which were included in the State Court Action.   The Debtors would object to any  proof(s) of claim which the Plaintiff may file.   If so, it will be necessary to resolve the claim objection.   Such attendant process is a core proceeding.   See 28 U.S.C. §157(a)(2)(B). If removal does not occur, resolution of that objection could result in duplication of litigation in the State Court Action.   That risk for duplication would justify consolidation of the claim objection proceeding with the claims set forth in the State Court Action.   Such consolidation would render the State Court Action a core proceeding and thus within the jurisdiction of this Court (and upon referral, the Bankruptcy Court).

25.   To the extent that the Bankruptcy Court does not possess core jurisdiction over Plaintiff's claims, it possesses "related-to" jurisdiction over them.   A proceeding meets the jurisdictional threshold of 28 U.S.C. § 1334(b) if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.   See, e.g., In re Cayahoga Equipment Corp., 980 F.2d 110, 114 (2d Cir. 1992) (stating the bankruptcy court has "related to" jurisdiction over any action that might have a "conceivable effect" on the bankrupt estate).   Here, at a minimum, the resolution of Plaintiff's claims will directly affect whether there

are additional monies available for distribution to the Debtors' creditors. Most of the claims set forth in the Complaint are intimately related to the Bankruptcy Cases.

26.    Merrill Lynch's claims against Mr. Esmerian and REI are "related to" the Bankruptcy Cases because the outcome of the litigation of said claims could conceivably have an effect upon the rights of Mr. Esmerian, REI and Merrill Lynch in the Bankruptcy Cases and upon the Debtors' estate.

27.    Although 28 U.S.C. § 1334(b) does not provide a definition for "related to" actions,[3] the Second Circuit applies the following test to determine if a third party action is related to a bankruptcy proceeding:

> The test for determining whether litigation has a significant connection with a pending bankruptcy proceeding is whether its outcome might have any *"conceivable effect"* on the bankruptcy estate.  If that question is answered affirmatively, the litigation falls within the "related to" jurisdiction of the bankruptcy court. (Emphasis supplied.)

Publicker Industries Inc. v. United States (*In re* Cuyahoga), 980 F.2d 110, 114 (2d Cir. 1992). See also Kerusa, Co. LLC v.W10Z/515 Real Estate Ltd. Partnership, No. 04 Civ. 708 (GEL), 2004 WL1048239 at *3 (S.D.N.Y. May 7, 2004) (claims against non-debtor were clearly "related to" bankruptcy case because they likely give rise to contribution or indemnity claims).

28.    In light of the foregoing, the Bankruptcy Court can and should adjudicate any claims arising from the proceedings held before it -- as the Bankruptcy Cases will be directly impacted from both the claims asserted by Merrill Lynch in its Complaint and the affirmative defenses and counterclaims asserted by the Defendants in their Answer.

---

[3]    Nemsa Establishment, S.A. v. Viral Testing Systems Corp., No. 95 Civ. 0277 (LAP), 1995 U.S. Dist. LEXIS 11650, at *5, 6 (S.D.N.Y. Aug. 14, 1995).

29.    No previous application has been made for this or any similar relief in connection with the State Court Action.  In accordance with 28 U.S.C. § 1452 and Bankruptcy Rule 9027(c), after the filing of this Notice of Removal, the Defendants shall promptly give written Notice of the Filing of the Notice of Removal to the Plaintiff (a copy of which proposed notice is annexed hereto as Exhibit "D"), and shall file a copy of the Filing of the Notice of Notice of Removal with the County Clerk of the Supreme Court of the State of New York, County of New York.

**WHEREFORE**, Defendants respectfully request that the matter of Merrill Lynch Mortgage Capital Inc. v. Ralph Esmerian, Calypso Mines LLC, Endymion, LLC, R. Esmerian Inc., Tango LLC and Foxtrot LLC, Index No. 600012/2008, presently pending in the Supreme Court of the State of New York, be removed to this Court, that this Court accept jurisdiction of said action and, upon acceptance of jurisdiction, that this matter thereupon be referred to the Honorable Robert D. Drain of the United States Bankruptcy Court for the Southern District of New York.

Dated:  June 2, 2008                         Respectfully submitted,

                                             HERRICK, FEINSTEIN LLP
                                             Attorneys for Defendants Calypso Mines LLC,
                                             Endymion, LLC, Tango LLC and Foxtrot LLC

                                             By:  _____
                                                  Joshua J. Angel
                                                  Paul Rubin
                                                  2 Park Avenue
                                                  New York, New York 10016
                                                  (212) 592-1400
                                                  jangel@herrick.com
                                                  prubin@herrick.com

EXHIBIT "A"

# ORIGINAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

MERRILL LYNCH MORTGAGE CAPITAL INC.,

Plaintiff,

- against -

RALPH ESMERIAN, CALYPSO MINES LLC,
ENDYMION, LLC, R. ESMERIAN INC., TANGO
LLC, and FOXTROT LLC,

Defendants.

---

Index No. **08600012**

Date Purchased:

Plaintiff designates New York
County as place of trial

## SUMMONS

Plaintiff has a place of business at
4 World Financial Center, New
York, New York

---

TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the verified complaint, copy of
which complaint is annexed hereto and herewith served upon you, in this action and to serve a
copy of your verified answer to the complaint on plaintiff's attorneys within twenty (20) days
after the service of this summons, exclusive of the day of service (or within thirty (30)) days after
service is complete if this summons and the annexed complaint is not delivered to you within the
State of New York). In case of your failure to appear or answer said complaint, judgment will be
taken against you by default for the relief demanded in the complaint.

As set forth in the complaint, the basis of venue in this action is CPLR § 503, in
that Plaintiff has a principal place of business in New York County.

**FILED**

JAN 02 2008

NEW YORK
COUNTY CLERK'S OFFICE

Dated:    New York, New York
          January 2, 2008

                                        CADWALADER, WICKERSHAM & TAFT

                                        By: _____
                                            Howard R. Hawkins, Jr.
                                            Ellen M. Halstead

                                        Office and Post Office Address:
                                        Cadwalader, Wickersham & Taft LLP
                                        One World Financial Center
                                        New York, New York 10281
                                        Telephone: (212) 504-6000
                                        Facsimile: (212) 504-6666

                                        *Attorneys for Plaintiff*

Defendants' Addresses:

          Ralph Esmerian
          1001 Park Avenue
          New York, New York

          Calypso Mines LLC
          610 Fifth Avenue, 4th Floor
          New York, New York
          Attention: Ralph Esmerian

          Endymion, LLC
          610 Fifth Avenue, 4th Floor
          New York, New York
          Attention: Ralph Esmerian

          R. Esmerian Inc.
          610 Fifth Avenue, 4th Floor
          New York, New York
          Attention: Ralph Esmerian

USActive 11455437.2                              2

Tango LLC
610 Fifth Avenue, 4th Floor
New York, New York
Attention: Ralph Esmerian

Foxtrot LLC
610 Fifth Avenue, 4th Floor
New York, New York
Attention: Ralph Esmerian

3

Supreme Court Records OnLine Library -  page 3 of 44

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

MERRILL LYNCH MORTGAGE CAPITAL INC.,

                                        Plaintiff,

        - against -

RALPH ESMERIAN, CALYPSO MINES LLC,
ENDYMION, LLC, , R. ESMERIAN INC., TANGO
LLC and FOXTROT LLC,

                                        Defendants.

Index No. 600012/2008

VERIFIED COMPLAINT

NEW YORK
COUNTY CLERKS OFFICE

JAN 0 2 2008

NOT COMPARED
WITH COPY FILE

Plaintiff Merrill Lynch Mortgage Capital Inc. ("Merrill Lynch") for its Verified

Complaint against Defendants Ralph Esmerian, Calypso Mines LLC, Endymion, LLC, R.

Esmerian Inc., Tango LLC and Foxtrot LLC alleges as follows:

## NATURE OF THE ACTION

1.      Merrill Lynch is a secured lender to certain affiliated borrowers and

guarantors (collectively, the "Loan Parties") under two credit agreements, the Special Collection

Credit Agreement and the Acquisition Credit Agreement (collectively, the "Credit Agreements").

The financings extended by Merrill Lynch pursuant to the Credit Agreements are secured by,

among other things, collateral held by the Loan Parties.

2.      Defendant Ralph Esmerian ("Esmerian") is the principal of and, directly

or indirectly, owns and controls all the other outstanding capital stock or membership interests,

as applicable,   the Loan Parties, including defendants Calypso Mines LLC ("Calypso"),

Endymion, LLC ("Endymion"), R. Esmerian Inc. ("REI"), Tango LLC ("Tango") and Foxtrot

LLC ("Foxtrot") (collectively, including Esmerian, the "Defendants").

3.     The total amount of outstanding financing extended to the Loan Parties by Merrill Lynch is $177,532,616.21.

4.     The financings extended by Merrill Lynch pursuant to the Credit Agreements are secured by, among other things, collateral held by the Loan Parties.  Some of the collateral, including the collateral that is the subject matter of this action (the "Jewelry Collateral"), includes unique and highly valuable jewelry.

5.     The Credit Agreements are secured by guarantee agreements (the "Guarantee Agreements"), which include a full recourse unconditional personal guarantee by defendant Esmerian and full recourse unconditional guarantees by defendants Endymion, REI, Tango and Foxtrot (collectively, including Esmerian, the "Guarantors").

6.     On September 10, 2007, certain of the Loan Parties failed to make interest payments due and owing to Merrill Lynch under the Credit Agreements totaling approximately $1.7 million and failed to make a payment on account of the Debt Service Reserve Amount required by the Acquisition Credit Agreement, in the total amount of approximately $2.0 million. These failures constituted Events of Default under the Credit Agreements.[1]

7.     As of December 31, 2007, approximately $7.75 million of interest payments, and the entire payment due on account of the Debt Service Reserve Account of $1,979,902, was still due and owing and in default.  The aggregate amount owed, including unpaid interest, to Merrill pursuant to the Credit Agreements is approximately $185.3 million plus attorneys' fees and costs of collection.

---

[1]     Unless defined herein, capitalized terms are defined terms in the Acquisition Credit Agreement.

8.    Pursuant to the Security Agreements and the Credit Agreements, as a remedy upon an Event of Default, Merrill Lynch may accelerate the entirety of the outstanding loans made in connection with the Credit Agreements and demand full payment thereof.

9.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

10.    On October 12, 2007, Merrill Lynch also made a demand of payment under the Guarantee Agreements.  No payment has been made.

11.    On October 3, 2007, Merrill Lynch and Defendants entered into an irrevocable consent agreement (the "Irrevocable Consent Agreement"), whereby Defendants, through Esmerian, irrevocably consented to the Merrill Lynch's taking physical possession of, seizing or otherwise exercising control over any property, including Jewelry Collateral, located at Esmerian's office at 610 Fifth Avenue, 4th Floor, New York, New York, in which Merrill Lynch has a security interest pursuant to the Credit Agreements or other Loan Documents. Defendants agreed that Merrill Lynch could exercise this right immediately and at any time hereafter.  In addition to the Irrevocable Consent Agreement, Merrill Lynch had the right pursuant to the Security Agreements to make demand upon Esmerian and the Loan Parties to assemble and make available to Merrill Lynch collateral held by the Loan Parties.  After allowing Merrill Lynch to collect some of the collateral, defendant Esmerian has failed to assemble the Jewelry Collateral and make the Jewelry Collateral available to Merrill Lynch. Merrill Lynch has demanded that Defendants identify the location of each item of the remaining Jewelry Collateral and deliver the same to Merrill Lynch.

3

12.    Due to the acceleration, the principal amount owed on the Special Collection Credit Agreement is $56,400,957.13 plus accrued but unpaid interest in the aggregate amount of $2,102,913.94 as of December 31, 2007, the total amount owed on the Acquisition Credit Agreement is $121,131,659.08 plus accrued but unpaid interest in the aggregate amount of $5,649,216.07 as of December 31, 2007, and the amount owed on the Debt Service Reserve Account is $1,979,902.  The aggregate amount owed, including unpaid interest, to Merrill pursuant to the Credit Agreements is $185,284,746.22 plus attorneys' fees and costs of collection.

13.    Pursuant to the Special Collection Security Agreement, the Acquisition Agreement, the REI Security Agreement and the Foxtrot Security Agreement (collectively, the "Security Agreements"), as a remedy upon an Event of Default, Merrill Lynch may collect certain collateral, including the Jewelry Collateral, from the Loan Parties.  The Loan Parties have failed to comply with Merrill Lynch's demand to allow it to collect the Jewelry Collateral.

14.    Merrill Lynch by this action seeks (a) replevin of the Jewelry Collateral, (b) the appointment of a receiver and (c) payment of the amount due under the Credit Agreement through enforcement of the Guarantee Agreements.  Merrill Lynch reserves all its other rights and remedies under the Security Agreements and the Credit Agreements.

## THE PARTIES

15.    Plaintiff Merrill Lynch Mortgage Capital Inc. ("Merrill Lynch") is a Delaware corporation with its principal place of business at 4 World Financial Center, New York, New York.  Merrill Lynch is in the business, among other things, of making secured loans to business enterprises.

4

16.    Upon information and belief, defendant Ralph Esmerian ("Esmerian") resides at 1001 Park Avenue, New York, New York.

17.    Defendant Calypso Mines LLC ("Calypso"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

18.    Defendant Endymion, LLC ("Endymion"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

19.    Defendant R. Esmerian Inc. ("REI"), is a New York corporation with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

20.    Defendant Tango LLC ("Tango"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

21.    Defendant Foxtrot LLC ("Foxtrot"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

### VENUE

22.    Venue is proper under CPLR § 503.  Plaintiff has a principal place of business in New York County.

### FACTS

23.    Defendant Esmerian is the principal of and, directly or indirectly owns and controls all the other outstanding capital stock or membership interests, as applicable, of the Loan Parties.  Esmerian is an international jewelry dealer.

5

24.    Upon information and belief, the purpose for the formation and existence of certain of the Loan Parties is to hold groups of jewelry.

25.    The collateral that is the security for the financings that Merrill Lynch made to the Loan Parties includes the Jewelry Collateral.

26.    The jewelry that makes up the Jewelry Collateral consists of highly valuable jewelry, including antique and museum-quality pieces. The estimated value of some pieces of the Jewelry Collateral is as high as several million dollars. Many of the pieces are small and easily concealed, moved or transported.

27.    Upon information and belief, collateral held by the Loan Parties, including the Jewelry Collateral, is stored in various locations or with certain consignees or both including at (1) Esmerian's office at 610 Fifth Avenue, 4th Floor, New York, New York; (2) a group of safety deposit boxes located in a vault at JP Morgan Chase Bank, N.A., 11 West 51st Street, New York, New York (the "Chase Vault"); (3) Brink's Global Services U.S.A., Inc., 184-45 147th Avenue, Springfield Gardens, New York; (4) one or more Saks Fifth Avenue locations, (5) one or more Neiman Marcus locations; (6) one or more Christie's locations; (7) Las Vegas, Nevada; and (8) other locations known and unknown to the plaintiff.

28.    The collateral in the Chase Vault can only be accessed by Esmerian if a representative of Merrill Lynch is present. Upon an Event of Default, pursuant to the relevant loan documents, Merrill Lynch has the right by power of attorney to remove Esmerian as signatory on the Chase Vault. Merrill Lynch is in the process of removing Esmerian as signatory on the Chase Vault and seizing the collateral in the Chase Vault.

29.    Upon information and belief, Esmerian does not have formal procedures to check-in and check-out the jewelry from the vault located in his office and other locations where the jewelry is stored. Further, since September 2007, Esmerian and other officers of

6

certain Loan Parties have failed to provide updated monthly schedules to Merrill Lynch on the location of Jewelry Collateral as required by the Credit Agreements, including the identity and location of Jewelry Collateral believed to be held by consignees. Esmerian may be the only individual with knowledge of the exact location of certain of the jewelry that makes up the Jewelry Collateral.

30.    Esmerian was born in Paris, travels outside of the United States carrying jewelry on his person in order to buy and sell jewelry, has numerous foreign contacts and maintains at least one Swiss bank account.

31.    Esmerian has also maintained at least six (6) bank accounts in the name of various Loan Parties without disclosing those accounts to Merrill Lynch and without entering into control agreements with respect to those accounts as required by the Credit Agreements.

32.    During the week of September 17, 2007, Esmerian had planned to travel to London with a pink diamond ring valued at approximately $8.5 million in order to meet a buyer for the ring. The pink diamond ring is part of a group of collateral held by one of the Loan Parties. Although Esmerian's trip to London was cancelled, this demonstrates that Esmerian has a practice of traveling to other countries with highly valuable jewelry on his person.

33.    On information and belief, between August and December 2007, certain of the Defendants sold Jewelry Collateral but did not either apply the net sale proceeds to repayment of the Special Collection Loan or the Acquisition Loan or both as required under the Credit Agreements or deposit the net sale proceeds into the collection account of Merrill Lynch as required under the applicable Security Agreement.

34.    Due to the unique and valuable nature of the jewelry, its small size and its portability, Esmerian's foreign contacts, Esmerian's actions in the recent months, his conduct of traveling outside of the country with jewelry, and the fact that some of the Jewelry Collateral is

7

already outside of New York in Las Vegas and other locations known and unknown to Merrill Lynch, unless the remedies of a receiver and replevin are granted, it is probable that some of the Jewelry Collateral will become unavailable by reason of being transferred, concealed, disposed of, or removed from the state.

A.    **The Special Collection Loan**

35.    On November 4, 2005, Merrill Lynch extended to Calypso $56,400,957 of senior term loan financing (the "Special Collection Loan") pursuant to the Special Collection Credit Agreement. Merrill Lynch and Calypso also entered into the Special Collection Security Agreement.

36.    The Special Collection Loan was secured by all of the assets owned by Calypso, which included jewelry held by Calypso (the "Calypso Jewelry").

37.    The Calypso Jewelry was formerly owned by Esmerian and contributed by Esmerian to Calypso prior to the closing of the Special Collection Loan. A substantial amount of the Calypso Jewelry is located in the Chase Vault. The Calypso Jewelry that has not been moved to the Chase Vault is a subject of this action.

38.    The Special Collection Loan was also secured by a pledge of 100% of the equity in Calypso by Esmerian.

39.    The Special Collection Loan was also secured by a full recourse unconditional personal guarantee by Esmerian (the "Esmerian Special Collection Guarantee").

40.    Pursuant to the Acquisition Security Agreement, the Special Collection Loan was also secured by all of the assets owned by Tango, which included jewelry held by Tango (the "Tango Jewelry"). The Tango Jewelry was formally owned by REI and contributed by REI to Tango pursuant to the grant of the security interest Tango.

8

41.    REI is an affiliate of Calypso and a corporation majority-owned and/or controlled by Esmerian. In connection with the Special Collection Loan, REI also granted to Merrill Lynch a negative pledge on certain jewelry (the "Specified REI Jewelry").

42.    The Special Collection Loan was secured by a full recourse guarantee by REI (the "REI Guarantee").

43.    Section 8 of Special Collection Credit Agreement provides, in part, the following Events of Default:

> (a)    The Borrower shall fail to pay any principal of any Loan when due in accordance with the terms thereof or hereof; or the *Borrower shall fail to pay any interest on any Loan*, or any other amount payable hereunder or under the other Loan Documents, within two (2) days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or . . . .

> (d)    The Borrower or any other Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of thirty (30) days; or . . . .

(emphasis added).

44.    Section 9 of Special Collection Security Agreement provides in part:

> [T]he Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Borrower or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), *may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral*, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best,

9

for cash or on credit or for future delivery without assumption of any credit risk. . . . *The Borrower further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender* at places which the Lender shall reasonably select, whether at the Borrower's premises or elsewhere. . . .

(emphasis added).

45.    Section 2 of the Esmerian Special Collection Guarantee provides in part:

(a)    The Guarantor hereby, *unconditionally and irrevocably*, guarantees to the Lender and its respective successors, indorsees, transferees and assigns, *the prompt and complete payment and performance by the Borrower when due. . . . of the Obligations.*

\*        \*        \*

(c)    The Guarantor further agrees to pay any and all reasonable expenses (including, without limitation, all fees and disbursements of counsel) which may be paid or incurred by the Lender in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guarantee.

(emphasis added).  Section 2 of the REI Guarantee includes substantially the same provision as above.

**B.    The Acquisition Loan**

46.    On March 29, 2006, Merrill Lynch extended an additional $110,000,000 of senior financing (the "Acquisition Loan") to a company then-known as Samba 1, Inc. ("Samba"), a corporation wholly-owned and/or controlled by Esmerian, pursuant to a separate credit agreement, the Acquisition Credit Agreement.

47.    Merrill Lynch, Samba, Endymion and Tango as well as two wholly-owned subsidiaries of Samba (the "Samba Subsidiaries"), also entered into the Acquisition Security Agreement.

48.    The Acquisition Loan was secured by certain collateral including all of the assets of Samba and the Samba Subsidiaries.

10

49.    The Acquisition Loan was also secured by a collection of jewelry (the "Endymion Jewelry") contributed by Esmerian to Endymion and the Tango Jewelry.

50.    The Acquisition Loan was also secured by a full recourse unconditional personal guarantee by Esmerian (the "Esmerian Acquisition Guarantee") and a full recourse unconditional guarantee by REI and Tango (the "REI Guarantee").

51.    The Acquisition Loan was also secured by a full recourse unconditional guarantee by Endymion (the "Endymion Guarantee").

52.    The Acquisition Loan was also secured by a full recourse unconditional guarantee by the Samba Subsidiaries.

53.    The Acquisition Loan was also secured by, among other things, a pledge by Esmerian of 100% of the equity in Samba and a pledge by Samba of 100% of the equity in the Samba Subsidiaries.

54.    The Acquisition Loan and the Special Collection Loan thereafter were cross-collateralized. Accordingly, all of the collateral securing the Acquisition Loan also secures the Special Collection Loan and all of the collateral securing the Special Collection Loan also secures the Acquisition Loan.

55.    Specifically, in connection with the Acquisition Loan, on March 29, 2006, the documentation for the Special Collection Loan was amended in order to (i) cause the collateral supporting the Special Collection Loan to secure the Acquisition Loan, (ii) cause the guarantees supporting the Special Collection Loan to guarantee the Acquisition Loan, (iii) permit the debt incurred under and liens granted in connection with the Acquisition Loan to constitute debts and liens under the Special Collection Loan and (iv) cause a default under the Acquisition Loan to trigger a default under the Special Collection Loan.

56.    Section 4.1(c) of the Acquisition Credit Agreement provides:

11

Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (b) of this Section shall be payable from time to time on demand.

57.    Section 4.14 of the Third Amendment to the Acquisition Credit Agreement provides:

The Borrower shall, from time to time (including without limitation upon any occurrence of a Rapid Amortization Event), but subject to Section 7.12(e), deposit into the Debt Service Reserve Account an amount sufficient so that the amount on deposit in the Debt Service Reserve Account shall be equal to the Debt Service Reserve Amount. At such time when any and all Rapid Amortization Events cease to exist, the amount deposited in the Debt Service Reserve Account in excess of the Debt Service Reserve Amount shall be released to the Borrower. Without limitation of the foregoing and notwithstanding the last sentence of Section 7.12(e), on or prior to each of the dates set forth below, the Borrower shall deposit the amount set forth opposite such date:

Date:                    Amount:
. . . .
September 10, 2007    The Excess DSR Amount

For purposes of this Section, "Excess DSR Amount" shall mean an amount equal to the Debt Service Reserve Amount less the amount on deposit in the Debt Service Reserve Account on the date thereof.

58.    Section 9 of the Acquisition Credit Agreement provides in part that an Event of Default occurs and is continuing if:

(a)    The Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or *the Borrower shall fail to pay any interest on any Loan,* or any other amount payable hereunder or under the other Loan Documents . . . , within two (2) days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

*        *        *

(d)    The Borrower or any other Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such

12

default shall continue unremedied for a period of thirty (30) days; or

(e)   Any Loan Party shall (i) default in any payment of principal of or interest of any Indebtedness (other than the Loans) or in the payment of any Guarantee Obligation, beyond the period of grace (not to exceed thirty (30) days), if any, provided in the instrument or agreement under which such Indebtedness or Guarantee Obligation was created, if the aggregate amount of the Indebtedness and/or Guarantee Obligations in respect of which such default or defaults shall have occurred is at least $500,000; or (ii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or such Guarantee Obligation to become payable; or . . . .

*       *       *

(n)   Any "Event of Default" (as defined in the Special Collection Credit Agreement) shall have occurred and be continuing; or . . . .

(emphasis added).

59.   Section 9 of the Acquisition Security Agreement provides in part that if an

Event of Default occurs and is continuing:

[T]he Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Grantors or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), *may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof*, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or

13

office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.... The Grantors further agree, at the Lender's request, to assemble the Collateral and make it available to the Lender at places which the Lender shall reasonably select, whether at the Grantors' premises or elsewhere ....

(emphasis added).

60.    Section 2 of the Esmerian Acquisition Guarantee provides in part:

(a)    The Guarantor hereby, unconditionally and irrevocably, guarantees to the Lender and its respective successors, indorsees, transferees and assigns, *the prompt and complete payment and performance by the Borrower when due. ... of the Obligations.*

\*       \*       \*

(c)    The Guarantor further agrees to pay any and all reasonable expenses (including, without limitation, all fees and disbursements of counsel) which may be paid or incurred by the Lender in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guarantee.

(emphasis added).  Section 2 of the Endymion Guarantee and Section 2 of the REI Guarantee all include substantially the same provision as above.

61.    On June 22, 2006, the documentation relating to the Acquisition Loan was amended, in part, to (i) increase the working capital revolving credit line by $10,000,000 to $35,000,000 and (ii) extend additional credit in the form of a $10,000,000 tranche B revolving credit facility to finance the purchase price of certain expensive gemstones, jewelry and jeweled objects.  Thereafter, Samba failed to comply with various obligations under the Acquisition Credit Agreement and other loan documents related thereto.

62.    On August 25, 2006, the documentation relating to the Acquisition Loan was amended to (i) modify certain financial covenants, (ii) provide Samba with a recovery

14

period during which Samba was not required to comply with the financial covenants, (iii) require Samba to deliver a business plan detailing the procedures Samba would implement to cause the financial covenants to be satisfied by the end of the recovery period, (iv) prohibit further borrowings, and (v) waive the existing defaults (the "August 25 Waiver").

63.    Thereafter, Samba defaulted on obligations under the Acquisition Credit Agreement, which had the effect of nullifying the waivers granted by Merrill Lynch in the August 25, 2006 Waiver.

## C.    Foxtrot Security Agreement

64.    On November 3, 2006, Samba and Merrill Lynch entered into a waiver and side letter (collectively, the "Side Letter") in connection with the Credit Agreements and other loan documents related thereto.

65.    The Side Letter required that (i) Merrill Lynch give Samba a recovery period during which Samba was not required to comply with certain financial covenants, (ii) Samba deposit all delinquent Debt Service Reserve amounts into the Debt Service Reserve Account on or prior to February 28, 2007, (iii) Esmerian fund all working capital shortfalls of Samba, (iv) no further borrowings were allowed, except for borrowings to fund the opening of new stores, (v) Esmerian make a $2,500,000 capital contribution to Samba to prepay the Acquisition Loan on or prior to November 15, 2006, (vi) the Acquisition Loan be prepaid by at least $20,000,000 on or prior to February 28, 2007 and (vii) Samba to deliver five-year projections to Merrill Lynch.

66.    The Side Letter also required that Esmerian provide an additional collection of jewelry (the "Foxtrot Jewelry") as collateral to secure the loans made in connection with the Credit Agreements.

67.    Thereafter, Esmerian defaulted on his obligation under the Side Letter, by failing to make the $2,500,000 capital contribution. This default nullified the waivers previously granted by Merrill Lynch in the Side Letter. On December 15, 2007, Esmerian made the payment to Merrill on the $2,500,000 capital contribution.

68.    On April 6, 2007, the documentation relating to the Acquisition Loan was amended to (i) reset the financial covenants based on the five-year projections delivered by Samba, (ii) change the dates that payments to the Debt Service Reserve Account were required, (iii) change the dates that contributions of inventory by Esmerian to Endymion were required, (iv) document Foxtrot's grant of a security interest to Merrill Lynch in the Foxtrot Jewelry, and (v) document Foxtrot's guarantee of the loans made in connection with the Credit Agreements. The documentation relating to the Special Collection Loan was also amended to make certain conforming changes.

69.    Section 9 of the Foxtrot Security Agreement provides in part that if an Event of Default occurs and is continuing:

> [T]he Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), *may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof,* and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. . . . *The Grantor further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender at places which the Lender shall reasonably select,* whether at the Grantor's premises or elsewhere. . . . Without limitation of

16

the foregoing, the Grantor acknowledges and agrees that in the event the Borrower fails to prepay at least $20,000,000 of Loans pursuant to Section 4.5(e) of the Credit Agreement (such amount or the amount of any deficiency, the "Shortfall Amount"), the Lender shall immediately have the right to liquidate the entire Foxtrot Collection in such manner as the Lender deems appropriate in its sole discretion.  A portion of the proceeds from such liquidation in an amount equal to the Shortfall Amount shall be applied to the prepayment of the Loans and, so long as no Event of Default has occurred and is continuing, the excess of such proceeds, if any, less all costs and expenses incurred by the Lender in enforcing its remedies hereunder, including, without limitation, the fees and disbursements of counsel to the Lender, shall be paid to the Borrower.

(emphasis added).

70.    Section 2 of the Foxtrot Guarantee provides in part:

(a)    The Guarantor hereby, unconditionally and irrevocably, guarantees to the Lender and its successors, transferees and assigns, *the prompt and complete payment and performance by the Borrower when due. . . . of the Obligations.*

\*        \*        \*

(c)    The Guarantor further agrees to pay any and all reasonable expenses (including, without limitation, all fees and disbursements of counsel) which may be paid or incurred by the Lender in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guarantee. . . .

(emphasis added).

71.    On July 11, 2007, REI entered into a security agreement (the "REI Security Agreement") in favor of Merrill Lynch and granted Merrill Lynch a security interest in all of REI's interest in the Endymion Jewelry and the Foxtrot Jewelry.  The REI Security Agreement was required by Merrill Lynch because Esmerian did not provide evidence of title showing that the Endymion Jewelry and the Foxtrot Jewelry were correctly transferred to Endymion and Foxtrot, respectively, by Esmerian.

17

72.     Upon information and belief, REI is holding certain collateral in which Merrill Lynch has a security interest (the "REI Jewelry") pursuant to the REI Security Agreement.

**D.     Activities of the Defendants and Loan Parties in Violation of the Loan Documents**

73.     On information and belief, between August and December 2007, certain of the Defendants sold Jewelry Collateral but did not either apply the net sale proceeds to repayment of the Special Collection Loan or the Acquisition Loan or both as required under the Credit Agreements or deposit the net sale proceeds into the collection account of Merrill Lynch as required under the applicable Security Agreement.

74.     Section 3(d) of the Acquisition Security Agreement provides in part:

> *All payments of Receivables, when collected by the Grantors, shall be forthwith deposited by the Grantors in the Collection Account in exact form received,* duly endorsed by the Grantors to the Lender if required, *in the Collection Account as provided in Section 7.12 of the Credit Agreement,* and until so turned over, shall be held by the Grantors in trust for the Lender, segregated from other funds of the Grantors. Each deposit of any such Proceeds shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit. . . . At the Lender's request, the Grantors shall deliver to the Lender all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables and Proceeds of Collateral, including, without limitation, all original orders, invoices and shipping receipts. At any time after the occurrence and during the continuance of an Event of Default upon the request of the Lender, the Grantors will cooperate with the Lender to establish a system of lockbox accounts, under the sole dominion and control of the Lender, into which all Receivables shall be paid and from which all collected funds will be transferred to the Collection Account.

(emphasis added).

18

75.    Specifically, Section 3(c) of the Special Collection Security Agreement provides in part:

*Any payments of Proceeds arising out of a Consignment, Recovery Event or otherwise out of the sale, auction, lease, transfer, assignment, loan or other disposition of an item or items of Eligible Jewelry* or any interest therein, when collected by the Borrower, *shall be forthwith* (and, in any event, within one (1) Business Day) *deposited by the Borrower in the exact form received*, duly endorsed by the Borrower to the Lender if required, in the Operating Account, and, until so turned over, shall be held by the Borrower in trust for the Lender, segregated from other funds of the Borrower. Each deposit of any such Proceeds shall be accompanied by a report, substantially in the form attached as Annex II to the Credit Agreement, identifying in reasonable detail the nature and source of the payments included in the deposit. . . . . Upon the occurrence of any Default or Event of Default, at the Lender's request, the Borrower shall deliver to the Lender all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Proceeds, including, without limitation, all original orders, invoices and shipping receipts.

(emphasis added).

76.    Thus, by not applying or depositing into the collection account of Merrill Lynch, the net sale proceeds from Jewelry Collateral, one or more of the Defendants violated certain provisions of the Security Agreements.

77.    In November 2007, Merrill Lynch discovered that defendant Esmerian had opened several bank accounts at First Republic Bank in the name of the Loan Parties. These bank accounts were opened without authorization of Merrill Lynch in violation of certain of the Loan Documents. The following accounts were opened without knowledge or authorization of Merrill Lynch:

- Account #: 97900060843
- Account #: 97900063565
- Account #: 97900063573

19

- Account #: 97900063581
- Account #: 97900063599
- Account #: 97900062005

78.     Section 7.12 of the Acquisition Credit Agreement provides in part that

Defendants are obligated:

(a)     Maintain each Operating Account and the Debt Service Reserve Account. *The Loan Parties shall not change any Bank Account, or open any new Bank Account, into which any revenues of the Loan Parties . . . may* be deposited without the prior written consent of the Lender.

(b)     Deposit or cause to be deposited all gross collections, receipts and proceeds from the operation of its business (including any proceeds of any Collateral) into the applicable Operating Account. So long as no Default or Event of Default shall have then occurred and be continuing, each Combined Party shall have access to the funds deposited in the Operating Accounts pursuant to this Section 7.12(b).

(emphasis added).

79.     Section 5(a) of the Acquisition Security Agreement and Section 5(a) of the Foxtrot Security Agreement both provide in part:

At any time and from time to time, upon the written request of the Lender, and at the sole expense of the Grantor, the Grantor will promptly and duly execute and deliver such further instruments and documents and take such further action as the lender may reasonably request for the purpose of obtaining or preserving the full benefits of this Security Agreement and of the rights and powers herein granted, including, without limitation . . . . (ii) in the case of Deposit Accounts, Letter-of-Credit Rights and any other relevant Collateral, taking any actions (including, without limitation, entering into, and using its best efforts to cause any relevant third party to enter into, one or more Control Agreements) necessary to enable the Lender to obtain "control" (within the meaning of the applicable Uniform Commercial Code) with respect thereto.

Section 5(a) of the Special Collection Security Agreement includes substantially the same provision as above.

20

80.     The actions of defendant Esmerian in causing certain of the Loan Parties to open bank accounts at First Republic Bank were in violation of Section 7.12(a) of the Acquisition Credit Agreement because Merrill Lynch had not given its prior written consent for these Loan Parties to open such accounts.  Upon information and belief, proceeds from the sale of collateral held by the Loan Parties has been deposited into these accounts or into other accounts unknown to the plaintiff.  As a consequence of the actions of defendant Esmerian, Merrill Lynch was not provided control of these accounts as authorized by Section 5(a)(ii) of the Security Agreements.

81.     Defendant Esmerian and other officers of certain of the Loan Parties have failed to provide Merrill Lynch with updated monthly schedules as to the identity and the location of the Jewelry Collateral since August 2007, including Jewelry Collateral believed to be held by consignees, in violation of the Loan Documents.

82.     Section 6.2(b) of the Special Collection Credit Agreement provides that the Borrower shall furnish to the Lender:

> within five (5) days following the end of each calendar month, *a Status Report updating Schedule 1.1 to reflect any revisions to the information contained therein, including without limitation any sales and changes in location,* certified as true, correct and complete by a Responsible Officer of the Borrower, and including a certification by a Responsible Officer of the Borrower that, to the best of such officer's knowledge, during such month the Borrower has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to be observed, performed or satisfied by it, and that the Borrower has obtained no knowledge of any Default or Event of Default except as specified in such Status Report;

(emphasis added).

83.     Section 7.2(c) of the Acquisition Credit Agreement provides in part that the Borrower shall furnish to the Lender:

> within five (5) Business Days following the end of each calendar month, a Borrowing Base Certificate (i) showing (A) the outstanding principal amount of the Loans, (B) the TTM Gross Profit Margin, (C) the Large Precious Stones Gross Profit Margin (D) the value of the Eligible Inventory at the lower of cost or market, (E) the Borrowing Base, together with a calculation thereof, (F) *the Current Value of all items subject to Permitted Consignments, together with a schedule listing such items, their respective Current Values, the name and address of each Permitted Consignee holding such items,* (G) the Current Value of all items subject to Permitted Memo-Out Transactions, together with a schedule listing such items, their respective Current Values, the name and address of each Permitted Memo-Out Transferee holding such items, and including a representation regarding additional insurance requirements, (H) the total sales attributable to Memo-In Jewelry, . . . .

(emphasis added).

84.     By their failure to disclose to Merrill Lynch the current location of Jewelry Collateral, Defendants violated Section 6.2(b) of the Special Collection Credit Agreement and Section 7.2(c) of the Acquisition Credit Agreement.  As a result of the actions of defendant Esmerian and other officers, Merrill Lynch does not know the location of some of the Jewelry Collateral, including Jewelry Collateral believed to be held by consignees.

**E.     Event of Default and Demand for Loan Parties' Jewelry Collateral**

85.     Beginning on or around May 5, 2006, the Loan Parties failed to comply with various provisions in the Credit Agreements and other loan documents related thereto. However, prior to August 2007, the Loan Parties made the periodic interest payments required under the Credit Agreements.

86.     As set forth above, on September 10, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay interest then due on

the Special Collection Loan in the amount of $507,221. Calypso's failure constituted an Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement. On September 20, 2007, Merrill Lynch notified Calypso of the Event of Default and reserved its right to take action under the Security Agreements.

87.     On September 10, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay interest then due on the Acquisition Loan in the amount of $1,166,154. Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement. On September 20, 2007, Merrill Lynch notified Samba of the Event of Default and reserved its right to take action under the Security Agreements.

88.     On September 10, 2007, Samba failed to comply with Section 4.14 of the Acquisition Credit Agreement as it failed to pay the excess Debt Service Reserve amount of approximately $2.0 million. On September 27, 2007, Merrill Lynch notified Samba of this further Event of Default and reserved its right to take action under the Security Agreements.

89.     On September 18 and 20, 2007, the Loan Parties tendered a partial interest payment to Merrill Lynch in an aggregate amount of approximately $750,000. On September 27, 2007, Merrill Lynch acknowledged receipt of the partial interest payment, but provided additional notice of the existing Events of Default and reserved its rights under the Credit Agreements and other loan documents related thereto, as the Loan Parties still owed $923,375 of interest payments and $1,979,902 of payments due on account of the Debt Service Reserve Amount were still due and owing and in default.

90.     On September 28, 2007, at Merrill Lynch's request, Esmerian caused certain of the Loan Parties to transfer approximately $27,000,000 of collateral (based on valuations determined in accordance with the Credit Agreements) to the Chase Vault pursuant to Merrill Lynch's right to collect collateral under the Security Agreements.

.91.    On October 10, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay interest then due on the Special Collection Loan in the amount of $526,364.21. Calypso's failure constituted a further Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement. On October 12, 2007, Merrill Lynch notified Calypso of the Event of Default and reserved its right to take action under the Security Agreements.

92.    On October 10, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay interest then due on the Acquisition Loan in the amount of $1,305,650.36. Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement. On October 12, 2007, Merrill Lynch notified Samba of the Event of Default and reserved its right to take action under the Security Agreements.

93.    On November 13, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay additional interest then due on the Special Collection Loan in the amount of $653,424.31. Calypso's failure constituted an Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement.

94.    On November 13, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay additional interest then due on the Acquisition Loan in the amount of $1,417,346.28. Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement.

95.    On December 10, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay additional interest then due on the Special Collection Loan. Calypso's failure constituted an Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement.

96.    On December 10, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay additional interest then due on the Acquisition Loan.    Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement.

97.    As of December 31, 2007, approximately $7,752,130.01 of interest payments, and the entire payment due on account of the Debt Service Reserve Account of $1,979,902, was due and owing and in default.

98.    On October 12, 2007, due to Esmerian's defaults, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan.  The entire principal and interest thereunder is now due and owing.

99.    Due to the acceleration, the principal amount owed on the Special Collection Credit Agreement is $56,400,957.13 plus accrued but unpaid interest in the aggregate amount of $2,102,913.94 as of December 31, 2007, the total amount owed on the Acquisition Credit Agreement is $121,131,659.08 plus accrued but unpaid interest in the aggregate amount of $5,649,216.07 as of December 31, 2007, and the amount owed on the Debt Service Reserve Account is $1,979,902.  The aggregate amount owed, including unpaid interest, to Merrill pursuant to the Credit Agreements is $185,284,746.22 plus attorneys' fees and costs of collection.

100.    On October 12, 2007, Merrill Lynch made demand upon Esmerian and certain of the Loan Parties for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

101.    On October 12, 2007, Merrill Lynch also made demand of payment of pursuant to the respective Guarantee Agreements including those by Esmerian, Endymion, REI, Tango and Foxtrot.  No payment has been made.

102.    On October 3, 2007, Merrill Lynch and Defendants entered into an Irrevocable Consent Agreement, whereby Defendants, through Esmerian, irrevocably consented to the Merrill Lynch's taking physical possession of, seizing or otherwise exercising control over any property, including Jewelry Collateral, located at Esmerian's office at 610 Fifth Avenue, 4th Floor, New York, New York, in which Merrill Lynch has a security interest pursuant to the Credit Agreements or other Loan Documents.    Defendants agreed that Merrill Lynch could exercise this right immediately and at any time hereafter.

103.    In addition to the Irrevocable Consent Agreement, Merrill Lynch had the right to make demand upon Esmerian and the Loan Parties to assemble and make available to Merrill Lynch collateral held by the Loan Parties, including the Jewelry Collateral upon an Event of Default pursuant to Section 10 of the Special Collection Security Agreement, Section 10 of Acquisition Security Agreement, Section 10 of the Foxtrot Security Agreement and Section 10 of the REI Security Agreement.

104.    After allowing Merrill Lynch to collect some of the collateral, defendant Esmerian have failed to assemble the Jewelry Collateral and make the Jewelry Collateral available to Merrill Lynch.    Merrill Lynch has demanded that Defendants identify the location of each item of the remaining Jewelry Collateral and deliver the same to Merrill Lynch.

105.    Due to the unique and valuable nature of the Jewelry Collateral, the number of small items, its portability, Esmerian's foreign contacts, Esmerian's conduct in recent months of not depositing proceeds of sales from collateral into Merrill Lynch control accounts, the opening of unauthorized bank accounts and the failure to provide control thereof to Merrill Lynch, Esmerian's and other officers' failure to provide updated monthly schedules to Merrill Lynch as to the identity and the location of the Jewelry Collateral, Esmerian's travel outside of the country with jewelry, and the fact that jewelry constituting other collateral as to which

26

Merrill Lynch has a security interest already is outside of New York in Las Vegas, Nevada, unless a receiver and replevin is granted by this Court, it is probable that some or all of the Jewelry Collateral will become unavailable by reason of being transferred, concealed, disposed of, or removed from the State.

### FIRST CAUSE OF ACTION
#### (Replevin of the Calypso Jewelry)

106.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

107.    Pursuant to the Special Collection Security Agreement, Calypso granted Merrill Lynch a security interest in the Calypso Jewelry. A substantial amount of the Calypso Jewelry is located in the Chase Vault. The Calypso Jewelry that has not been moved to the Chase Vault and makes up the Jewelry Collateral is the subject of this cause of action.

108.    Merrill Lynch perfected its security interest in the Calypso Jewelry in accordance with the Uniform Commercial Code.

109.    The Credit Agreements and Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Calypso Jewelry.

110.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire principal and interest thereunder is now due and owing. As a result, Events of Default exist and are continuing, and pursuant to the Special Collection Security Agreement, Merrill Lynch is entitled to collect the Calypso Jewelry from Calypso.

111.    On information and belief, Calypso is holding Calypso Jewelry to which Merrill Lynch is entitled. The Calypso Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

112.    Merrill Lynch has demanded that Calypso allow it to collect the Calypso Jewelry. Calypso has failed to perform its obligations under the Special Collection Security Agreement to assemble the Calypso Jewelry and make it available to Merrill Lynch so that the Calypso Jewelry may be transferred to a secure location under the control of Merrill Lynch.

### SECOND CAUSE OF ACTION
#### (Replevin of the Endymion Jewelry)

113.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

114.    Pursuant to the Acquisition Security Agreement, Endymion granted Merrill Lynch a security interest in the Endymion Jewelry. The Endymion Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

115.    Merrill Lynch perfected its security interest in the Endymion Jewelry in accordance with the Uniform Commercial Code.

116.    The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Endymion Jewelry.

117.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire principal and interest thereunder is now due and owing. As a result, Events of Default exist and are continuing, and pursuant to the Acquisition Security Agreement and Endymion's pledge of

the Endymion Jewelry, Merrill Lynch is entitled to collect the Endymion Jewelry from Endymion.

118.   On information and belief, Endymion is holding Endymion Jewelry to which Merrill Lynch is entitled.  The Endymion Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

119.   Merrill Lynch has demanded that Endymion allow it to collect the Endymion Jewelry.  Endymion has failed to perform its obligations under the Acquisition Security Agreement to assemble the Endymion Jewelry and make it available to Merrill Lynch so that the Endymion Jewelry may be transferred to a secure location under the control of Merrill Lynch.

### THIRD CAUSE OF ACTION
(Replevin of the Tango Jewelry)

120.   Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

121.   Pursuant to the Acquisition Security Agreement, Tango granted Merrill Lynch a security interest in the Tango Jewelry.  The Tango Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

122.   Merrill Lynch perfected its security interest in the Tango Jewelry in accordance with the Uniform Commercial Code.

123.   The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Tango Jewelry.

124.   On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements.  As a result,

29

Events of Default exist and are continuing, and pursuant to the Acquisition Security Agreement and Tango's pledge of the Tango Jewelry, Merrill Lynch is entitled to collect the Tango Jewelry from Tango.

125.    On information and belief, Tango is holding Tango Collateral to which Merrill Lynch is entitled.  The Tango Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

126.    Merrill Lynch has demanded that Tango allow it to collect the Tango Jewelry.  Tango has failed to perform its obligations under the Acquisition Security Agreement to assemble the Tango Jewelry and make it available to Merrill Lynch so that the Tango Jewelry may be transferred to a secure location under the control of Merrill Lynch.

## FOURTH CAUSE OF ACTION
### (Replevin of the Foxtrot Jewelry)

127.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

128.    Pursuant to the Foxtrot Security Agreement, Foxtrot granted Merrill Lynch a security interest in the Foxtrot Jewelry.  The Foxtrot Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

129.    Merrill Lynch duly perfected its security interest in the Foxtrot Jewelry in accordance with the Uniform Commercial Code.

130.    The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Foxtrot Jewelry.

131.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire

principal and interest thereunder is now due and owing. As a result, Events of Default exist and are continuing, and pursuant to the Foxtrot Security Agreement and Foxtrot's pledge of the Foxtrot Jewelry, Merrill Lynch is entitled to collect the Foxtrot Jewelry from Foxtrot.

132.    On information and belief, Foxtrot is holding Foxtrot Jewelry to which Merrill Lynch is entitled. The Foxtrot Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

133.    Merrill Lynch has demanded that Foxtrot allow it to collect the Foxtrot Jewelry. Foxtrot has failed to perform its obligations under the Foxtrot Security Agreement to assemble the Foxtrot Jewelry and make it available to Merrill Lynch so that the Foxtrot Jewelry may be transferred to a secure location under the control of Merrill Lynch.

## FIFTH CAUSE OF ACTION
### (Replevin of the REI Jewelry)

134.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

135.    Pursuant to the REI Security Agreement, REI granted Merrill Lynch a security interest in the REI Jewelry. The REI Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

136.    Merrill Lynch duly perfected its security interest in the REI Jewelry in accordance with the Uniform Commercial Code.

137.    The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the REI Jewelry.

138.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire

31

principal and interest thereunder is now due and owing. As a result, Events of Default exist and are continuing, and pursuant to the REI Security Agreement and REI's pledge of the REI Jewelry, Merrill Lynch is entitled to collect the REI Jewelry from REI.

139.    On information and belief, REI is holding REI Jewelry to which Merrill Lynch is entitled. The REI Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

140.    Merrill Lynch has demanded that REI allow it to collect the REI Jewelry. REI has failed to perform its obligations under the REI Security Agreement to assemble the REI Jewelry and make it available to Merrill Lynch so that the REI Jewelry may be transferred to a secure location under the control of Merrill Lynch.

**SIXTH CAUSE OF ACTION**
**(Appointment of a receiver)**

141.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

142.    Merrill Lynch faces a substantial risk of losing the Jewelry Collateral as a consequence of his recent conduct including (a) Esmerian's failure to make the Jewelry Collateral available to Merrill Lynch as required by the Loan Documents; (b) Esmerian's failure to deposit proceeds of sales from collateral into Merrill Lynch control accounts; (c) opening unauthorized bank accounts over which Merrill Lynch lacks control; and (d) Esmerian's failure to provide updated monthly schedules to Merrill Lynch of the location of the Jewelry Collateral.

143.    The Jewelry Collateral consists of a number of pieces that are small and easily concealed, portable, subject to removal from one place to another without significant effort, and capable of being transferred, concealed, disposed of, or removed from the state, thus placing the Jewelry Collateral beyond the reach of Merrill Lynch. Some of the Jewelry

Collateral is already outside of New York in Las Vegas and other locations known and unknown to Merrill Lynch.

144.    Pursuant to CPLR § 6401, the appointment of a receiver to take control of the business of the Defendants is necessary and appropriate.

### SEVENTH CAUSE OF ACTION
### (Guarantee by Esmerian)

145.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

146.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

147.    On October 12, 2007, Merrill Lynch also made a demand of payment to Esmerian under the Esmerian Special Collection Guarantee and Esmerian Acquisition Guarantee.

148.    Esmerian is obligated under the terms of the Esmerian Special Collection Guarantee to pay Merrill Lynch the outstanding balance of the Special Collection Loan.

149.    Esmerian is obligated under the terms of the Esmerian Acquisition Guarantee to pay Merrill Lynch the outstanding balance of the Acquisition Loan.

### EIGHTH CAUSE OF ACTION
### (Guarantee by Endymion, LLC)

150.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

33

151.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Acquisition Loan.  No payment has been made.

152.    On October 12, 2007, Merrill Lynch also made a demand of payment to Endymion under the Endymion Guarantee.

153.    Endymion is obligated under the terms of the Endymion Guarantee to pay Merrill Lynch the outstanding balance of the Acquisition Loan.

### NINTH CAUSE OF ACTION
#### (Guarantee by REI)

154.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

155.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

156.    On October 12, 2007, Merrill Lynch also made a demand of payment to REI under the REI/Tango Guarantee.

157.    REI is obligated under the terms of the REI/Tango Guarantee to pay Merrill Lynch the outstanding balance of the Special Collection Loan and the outstanding balance of the Acquisition Loan.

34

## TENTH CAUSE OF ACTION
### (Guarantee by Tango)

158.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

159.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

160.    On October 12, 2007, Merrill Lynch also made a demand of payment to Tango under the REI/Tango Guarantee.

161.    Tango is obligated under the terms of the REI/Tango Guarantee to pay Merrill Lynch the outstanding balance of the Special Collection Loan and the outstanding balance of the Acquisition Loan.

## ELEVENTH CAUSE OF ACTION
### (Guarantee by Foxtrot)

162.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

163.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Acquisition Loan.  No payment has been made.

164.    On October 12, 2007, Merrill Lynch also made a demand of payment to Foxtrot under the Foxtrot Guarantee.

165.    Foxtrot is obligated under the terms of the Foxtrot Guarantee to pay Merrill Lynch the outstanding balance of the Acquisition Loan.

### TWELFTH CAUSE OF ACTION
#### (Accounting)

166.   Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

167.   Between October and December 2007, Defendants have sold Jewelry Collateral but did not deposit the proceeds over to Merrill Lynch trust accounts as the Loan Parties were required to do pursuant to the Security Agreements.

168.   In November 2007, Merrill Lynch discovered that defendant Esmerian had opened several bank accounts at First Republic Bank in the name of the Loan Parties.  These bank accounts were opened without authorization of Merrill Lynch in violation of certain of the Loan Documents.

169.   Between August and December 2007, defendant Esmerian and other officers have failed to provide Merrill Lynch with updated monthly schedules as to the identity and the location of the Jewelry Collateral, including Jewelry Collateral believed to be held by the consignees, in violation of the Credit Agreements.

170.   Merrill Lynch seeks an accounting from Defendants of (a) the amount of proceeds from sales of the Jewelry Collateral that have not been previously accounted for; (b) a description, including bank, account number and balance information, of any bank accounts opened without Merrill Lynch's authority; and (c) the identity and the location of each piece of the Jewelry Collateral.

### RELIEF DEMANDED

WHEREFORE, plaintiff Merrill Lynch demand judgment:

(a)   On the first cause of action, declaring that Merrill Lynch is entitled to possession of the Calypso Jewelry that makes up the Jewelry Collateral and to immediate

36

possession thereof; that the Calypso Jewelry be assembled and made available to Merrill Lynch, and that, in the case possession of any portion thereof cannot be given to Merrill Lynch, that Merrill Lynch have judgment against the Defendants for a sum in the amount of the value thereof with interest thereon according to law;

      (b)    On the second cause of action, declaring that Merrill Lynch is entitled to possession of the Endymion Jewelry that makes up the Jewelry Collateral and to immediate possession thereof; that the Endymion Jewelry be assembled and made available to Merrill Lynch, and that, in the case possession of any portion thereof cannot be given to Merrill Lynch, that Merrill Lynch have judgment against the Defendants for a sum in the amount of the value thereof with interest thereon according to law;

      (c)    On the third cause of action, declaring that Merrill Lynch is entitled to possession of the Tango Jewelry that makes up the Jewelry Collateral and to immediate possession thereof; that the Tango Jewelry be assembled and made available to Merrill Lynch, and that, in the case possession of any portion thereof cannot be given to Merrill Lynch, that Merrill Lynch have judgment against the Defendants for a sum in the amount of the value thereof with interest thereon according to law;

      (d)    On the fourth cause of action, declaring that Merrill Lynch is entitled to possession of the Foxtrot Jewelry that makes up the Jewelry Collateral and to immediate possession thereof; that the Foxtrot Jewelry be assembled and made available to Merrill Lynch, and that, in the case possession of any portion thereof cannot be given to Merrill Lynch, that Merrill Lynch have judgment against the Defendants for a sum in the amount of the value thereof with interest thereon according to law;

      (e)    On the fifth cause of action, declaring that Merrill Lynch is entitled to possession of the REI Jewelry that makes up the Jewelry Collateral and to immediate possession

thereof; that the REI Jewelry be assembled and made available to Merrill Lynch, and that, in the case possession of any portion thereof cannot be given to Merrill Lynch, that Merrill Lynch have judgment against the Defendants for a sum in the amount of the value thereof with interest thereon according to law;

(f)    On the sixth cause of action, appointing a receiver to take control of the business of the Defendants for the benefit of Merrill Lynch;

(g)    On the seventh cause of action for the amount owed pursuant to the Esmerian Special Collection Guarantee and the Esmerian Acquisition Guarantee and accrued but unpaid interest in the aggregate amount of $185,284,746.22 as of December 31, 2007 plus attorneys' fees and the costs of collection to be assessed against Esmerian;

(h)    On the eighth cause of action for the amount owed pursuant to the Endymion Guarantee and accrued but unpaid interest in the aggregate amount of $126,780,875.15 as of December 31, 2007 plus attorneys' fees and the costs of collection to be assessed against Endymion;

(i)    On the ninth cause of action for the amount owed pursuant to the REI/Tango Guarantee and accrued but unpaid interest in the aggregate amount of $185,284,746.22 as of December 31, 2007 plus attorneys' fees and the costs of collection to be assessed against REI;

(j)    On the tenth cause of action for the amount owed pursuant to the REI/Tango Guarantee and accrued but unpaid interest in the aggregate amount of $185,284,746.22 as of December 31, 2007 plus attorneys' fees and the costs of collection to be assessed against Tango;

(k)    On the eleventh cause of action for the amount owed pursuant to the Foxtrot Guarantee and accrued but unpaid interest in the aggregate amount of $126,780,875.15

38

as of December 31, 2007 plus attorneys' fees and the costs of collection to be assessed against Foxtrot;

(l)     On the twelfth cause of action for an accounting ordering the Defendants to provide a detailed accounting to Merrill Lynch with respect to (i) the amount of proceeds from sales of the Jewelry Collateral that have not been previously accounted for; (ii) a description, including bank, account number and balance information, of any bank accounts opened without Merrill Lynch's authority; and (iii) the identity and the location of each piece of the Jewelry Collateral;

(m)     Granting Merrill Lynch costs and disbursements, including reasonable attorneys' fees and expenses of this action, for the replevin of the Jewelry Collateral, the appointment of a receiver and accounting; and

(n)     Granting such other and further relief as the Court deems just and proper.

Dated:     New York, New York
           January 2, 2008

CADWALADER, WICKERSHAM & TAFT LLP

By: _____
           Howard R. Hawkins, Jr.
           Ellen M. Halstead

Office and Post Office Address:
One World Financial Center
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

*Attorneys for Plaintiff*

<u>**VERIFICATION**</u>

STATE OF NEW YORK     )
                        : ss.:
COUNTY OF NEW YORK  )

        RYAN BELL, being duly sworn, deposes and says:

    1.     I am a Vice President at Merrill Lynch Mortgage Capital Inc.

    .2.    I have read the foregoing Complaint and know the contents thereof.

    3.     The same is true to my own knowledge, except as to matters stated to be
alleged on information and belief and, as to those matters, I believe them to be true.

                                            RYAN BELL

Sworn to before me this
2 day of January 2008

JENNIFER H. REYNOLDS
Notary Public, State of New York
No. 01RE6136877
Qualified in New York County
Commission Expires September 11, 2010

EXHIBIT "B"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MERRILL LYNCH MORTGAGE CAPITAL INC.,

Plaintiff,

- against -

RALPH ESMERIAN, CALYPSO MINES LLC,
ENDYMION, LLC, R. ESMERIAN INC., TANGO
LLC and FOXTROT LLC,

Defendants.

Index No. 600012/2008

**VERIFIED ANSWER AND
COUNTERCLAIMS**

Defendants, by their attorneys, Phillips Nizer LLP. as and for their Counterclaims, allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.    Merrill Lynch is a secured lender to certain affiliated borrowers and guarantors (collectively, the "Loan Parties") under two credit agreements, the Special Collection Credit Agreement and the Acquisition Credit Agreement (collectively, the "Credit Agreements"). The financings extended by Merrill Lynch pursuant to the Credit Agreements are secured by, among other things, collateral held by the Loan Parties.

**Answer:   Admit the allegations of the first sentence of paragraph 1.   Deny the allegations of the second sentence of paragraph 1.**

2.    Defendant Ralph Esmerian ("Esmerian") is the principal of and, directly or indirectly, owns and controls all the other outstanding capital stock or membership interests, as applicable, the Loan Parties, including defendants Calypso Mines LLC ("Calypso"), Endymion,

LLC ("Endymion"), R. Esmerian Inc. ("REI"), Tango LLC ("Tango") and Foxtrot LLC ("Foxtrot") (collectively, including Esmerian, the "Defendants").

**Answer: Admit the allegations of paragraph 2.**

3.    The total amount of outstanding financing extended to the Loan Parties by Merrill Lynch is $177,532,616.21.

**Answer: Admit the allegations of paragraph 3.**

4.    The financings extended by Merrill Lynch pursuant to the Credit Agreements are secured by, among other things, collateral held by the Loan Parties.  Some of the collateral, including the collateral that is the subject matter of this action (the "Jewelry Collateral"), includes unique and highly valuable jewelry.

**Answer:  Deny the allegation of the first sentence of paragraph 4.  Admit the allegations of the second sentence of paragraph 4.**

5.    The Credit Agreements are secured by guarantee agreements (the "Guarantee Agreements"), which include a full recourse unconditional personal guarantee by defendant Esmerian and full recourse unconditional guarantees by defendants Endymion, REI, Tango and Foxtrot (collectively, including Esmerian, the "Guarantors").

**Answer:  Deny the allegations of paragraph 5.  The Guarantee Agreements are subject to the Lender's obligation of good faith and fair dealing and to the Lender's obligation to dispose of this unique, highly valuable jewelry in a commercially reasonable manner -- both of which obligations have been breached by Merrill Lynch, thereby discharging the Guarantees.**

6.    On September 10, 2007, certain of the Loan Parties failed to make interest payments due and owing to Merrill Lynch under the Credit Agreements totaling approximately

$1.7 million and failed to make a payment on account of the Debt Service Reserve Amount required by the Acquisition Credit Agreement, in the total amount of approximately $2.0 million. These failures constituted Events of Default under the Credit Agreements.[1]

**Answer: Deny the allegations of paragraph 6. With respect to the September 10, 2007 payment that was due, Esmerian informed Merrill Lynch that he could make half of the required payment in a timely manner and that he needed a slight extension of two weeks for the balance of the amount due because there was a delay with respect to some of his funds. This request was perfectly reasonable, considering the context of the relationship and the unique circumstances of this loan relationship, and the two-week delay in partial payment was not a material default. Merrill Lynch's declaration of a default and refusal to accept Esmerian's proposal was an act of bad faith motivated by circumstances at Merrill Lynch for which Esmerian bore no responsibility, *i.e.*, Merrill Lynch's improvident investment in over $20 billion of subprime loan portfolios.**

7.    As of December 31, 2007, approximately $7.75 million of interest payments, and the entire payment due on account of the Debt Service Reserve Account of $1,979,902, was still due and owing and in default. The aggregate amount owed, including unpaid interest, to Merrill pursuant to the Credit Agreements is approximately $185.3 million plus attorneys' fees and costs of collection.

**Answer: Deny. The failure to pay interest payments was totally due to Merrill Lynch's refusal to accept a two-week delay in 50% of the interest payment due on September 10, 2007. Esmerian had requested that Merrill Lynch accept the late interest**

---

[1] Unless defined herein, capitalized terms are defined terms in the Acquisition Credit Agreement.

3

**payment and offered to keep the loan current if the late interest payment was accepted. Thus, any subsequent default was entirely the responsibility of Merrill Lynch.**

8.    Pursuant to the Security Agreements and the Credit Agreements, as a remedy upon an Event of Default, Merrill Lynch may accelerate the entirety of the outstanding loans made in connection with the Credit Agreements and demand full payment thereof.

**Answer:    Deny because, in this instance, Merrill Lynch's bad faith conduct precluded it from accelerating the loan and demanding full payment.**

9.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

**Answer:  Admit that Merrill Lynch gave notice of default and accelerated the loans but deny that the entire principal balance and interest is due, given Merrill Lynch's breach of the obligation of good faith and fair dealing and its insistence upon disposing of the collateral in a reckless manner.**

10.    On October 12, 2007, Merrill Lynch also made a demand of payment under the Guarantee Agreements.  No payment has been made.

**Answer:  Admit the allegations of paragraph 10 but refer to the prior answers for the reason why no payment has been made.**

11.    On October 3, 2007, Merrill Lynch and Defendants entered into an irrevocable consent agreement (the "Irrevocable Consent Agreement"), whereby Defendants, through Esmerian, irrevocably consented to the Merrill Lynch's taking physical possession of, seizing or otherwise exercising control over any property, including Jewelry Collateral, located at

4

Esmerian's office at 610 Fifth Avenue, 4th Floor, New York, New York, in which Merrill Lynch has a security interest pursuant to the Credit Agreements or other Loan Documents. Defendants agreed that Merrill Lynch could exercise this right immediately and at any time hereafter. In addition to the Irrevocable Consent Agreement, Merrill Lynch had the right pursuant to the Security Agreements to make demand upon Esmerian and the Loan Parties to assemble and make available to Merrill Lynch collateral held by the Loan Parties. After allowing Merrill Lynch to collect some of the collateral, defendant Esmerian has failed to assemble the Jewelry Collateral and make the Jewelry Collateral available to Merrill Lynch. Merrill Lynch has demanded that Defendants identify the location of each item of the remaining Jewelry Collateral and deliver the same to Merrill Lynch.

**Answer:** Deny the allegations of paragraph 11. Merrill Lynch personnel lured Esmerian to the offices of Cadwalader, Wickersham & Taft LLP ("CWT") under false pretenses (promising that no CWT personnel would attend the meeting between Merrill Lynch and Esmerian. Esmerian relied upon that representation and attended the meeting. When he arrived at CWT's offices, he was confronted with several CWT attorneys including Howard R. Hawkins, Jr., Steven Cohen, and John Rapisardi. The attorneys demanded that Esmerian sign the Irrevocable Consent Agreement (the "Document"). Esmerian objected on the grounds that (a) he had been lured to CWT's offices on false pretenses; (b) his attorney had not seen the Document; and (c) he had not read the document and could not understand its significance. Esmerian insisted that he be able to speak to his attorney and his attorney advised him not to sign the Document. Esmerian informed the CWT attorneys that he would not sign the Document. Hawkins told Esmerian that CWT would prevent Esmerian leaving the building unless he signed the

5

**document. Esmerian was not capable of engaging in a physical battle when he was surrounded by CWT and Merrill Lynch personnel. He stated that he would sign the Document under duress, which he did.      Despite the shocking behavior of CWT, for which Merrill Lynch is fully responsible, Esmerian cooperated in allowing Merrill Lynch to take physical possession of the most valuable Jewelry Collateral. However, Esmerian has consistently informed Merrill Lynch that it is impossible for him to sell the Jewelry Collateral when he does not have possession of it. Thus, as a result of Merrill Lynch's conduct, Esmerian has been unable to sell any of the Jewelry Collateral that has been in Merrill Lynch's possession.**

12. Due to the acceleration, the principal amount owed on the Special Collection Credit Agreement is $56,400,957.13 plus accrued but unpaid interest in the aggregate amount of $2,102,913.94 as of December 31, 2007, the total amount owed on the Acquisition Credit Agreement is $121,131,659.08 plus accrued but unpaid interest in the aggregate amount of $5,649,216.07 as of December 31, 2007, and the amount owed on the Debt Service Reserve Account is $1,979,902. The aggregate amount owed, including unpaid interest, to Merrill pursuant to the Credit Agreements is $185,284,746.22 plus attorneys' fees and costs of collection.

**Answer: Deny the allegations of paragraph 12 and leave Merrill Lynch to its proof as to the calculation of the amount owed. Moreover, the amount owed to Merrill Lynch must be reduced by virtue of the damages that Merrill Lynch has caused the defendants by its outrageous conduct throughout the loan relationship.**

13. Pursuant to the Special Collection Security Agreement, the Acquisition Agreement, the REI Security Agreement and the Foxtrot Security Agreement (collectively, the

6

"Security Agreements"), as a remedy upon an Event of Default, Merrill Lynch may collect certain collateral, including the Jewelry Collateral, from the Loan Parties. The Loan Parties have failed to comply with Merrill Lynch's demand to allow it to collect the Jewelry Collateral.

**Answer: Deny the allegations of paragraph 13. Merrill Lynch does not have a security interest in much of the Jewelry Collateral due to deficiencies in the documentation. Moreover, the last sentence of paragraph 13 is untrue.**

14.    Merrill Lynch by this action seeks (a) replevin of the Jewelry Collateral, (b) the appointment of a receiver and (c) payment of the amount due under the Credit Agreement through enforcement of the Guarantee Agreements. Merrill Lynch reserves all its other rights and remedies under the Security Agreements and the Credit Agreements.

**Answer: The allegations of paragraph 14 require no response except that Merrill Lynch is not entitled to the relief it seeks.**

## THE PARTIES

15.    Plaintiff Merrill Lynch Mortgage Capital Inc. ("Merrill Lynch") is a Delaware corporation with its principal place of business at 4 World Financial Center, New York, New York. Merrill Lynch is in the business, among other things, of making secured loans to business enterprises.

**Answer: Admit the allegations of paragraph 15.**

16.    Upon information and belief, defendant Ralph Esmerian ("Esmerian") resides at 1001 Park Avenue, New York, New York.

**Answer: Admit the allegations of paragraph 16.**

17.    Defendant Calypso Mines LLC ("Calypso"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

**Answer:  Admit the allegations of paragraph 17.**

18.    Defendant Endymion, LLC ("Endymion"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

**Answer:  Admit the allegations of paragraph 18.**

19.    Defendant R. Esmerian Inc. ("REI"), is a New York corporation with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

**Answer:  Admit the allegations of paragraph 19.**

20.    Defendant Tango LLC ("Tango"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

**Answer:  Admit the allegations of paragraph 20.**

21.    Defendant Foxtrot LLC ("Foxtrot"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

**Answer:  Admit the allegations of paragraph 21.**

## <u>VENUE</u>

22.    Venue is proper under CPLR § 503.  Plaintiff has a principal place of business in New York County.

**Answer:  Admit the allegations of paragraph 22.**

8

1031777.1

## FACTS

23.    Defendant Esmerian is the principal of and, directly or indirectly owns and controls all the other outstanding capital stock or membership interests, as applicable, of the Loan Parties.  Esmerian is an international jewelry dealer.

**Answer:  Admit the allegations of paragraph 23 except deny that Esmerian owns all the outstanding capital stock of defendant REI.  Some of Esmerian's relatives own 35% of the stock of REI.**

24.    Upon information and belief, the purpose for the formation and existence of certain of the Loan Parties is to hold groups of jewelry.

**Answer:  Admit that, at Merrill Lynch's request, Esmerian formed Foxtrot, Tango, Endymion and Calypso .**

25.    The collateral that is the security for the financings that Merrill Lynch made to the Loan Parties includes the Jewelry Collateral.

**Answer:   Deny the allegations of paragraph 25.   Merrill Lynch has a security interest in only some of the Jewelry Collateral.**

26.    The jewelry that makes up the Jewelry Collateral consists of highly valuable jewelry, including antique and museum-quality pieces.  The estimated value of some pieces of the Jewelry Collateral is as high as several million dollars.  Many of the pieces are small and easily concealed, moved or transported.

**Answer:  Admit the allegations of paragraph 26 but deny the inference that the defendants have concealed or lost any of the Jewelry Collateral.   This is a baseless insinuation advanced by Merrill Lynch for improper purposes and with full knowledge of its falsity.  Indeed, despite the deficiencies in Merrill Lynch's security interest, Esmerian**

9

**has done everything within his power to assure Merrill Lynch that the Jewelry Collateral is in tact. Indeed, he has allowed Merrill Lynch to conduct repeated audits of the Jewelry Collateral (at his expense); he has allowed Merrill Lynch to take possession of those pieces of Jewelry Collateral that Merrill Lynch asked to possess; and he has offered to give Merrill Lynch his passport to resolve its baseless concern that Esmerian will travel abroad and take the Jewelry Collateral with him. In over two years, Merrill Lynch has not found a single piece of Jewelry Collateral unaccounted for, despite its frequent audits, all at defendants' expense.**

27.    Upon information and belief, collateral held by the Loan Parties, including the Jewelry Collateral, is stored in various locations or with certain consignees or both including at (1) Esmerian's office at 610 Fifth Avenue, 4th Floor, New York, New York; (2) a group of safety deposit boxes located in a vault at JP Morgan Chase Bank, N.A., 11 West 51st Street, New York, New York (the "Chase Vault"); (3) Brink's Global Services U.S.A., Inc., 184-45 147th Avenue, Springfield Gardens, New York; (4) one or more Saks Fifth Avenue locations, (5) one or more Neiman Marcus locations; (6) one or more Christie's locations; (7) Las Vegas, Nevada; and (8) other locations known and unknown to the plaintiff.

**Answer:  With Merrill Lynch's knowledge, some of the less valuable items of the Jewelry Collateral have been placed in various locations because defendants are in the business of selling jewelry through consignees. At Merrill Lynch's insistence, other pieces of Jewelry Collateral have been placed in certain vaults.**

28.    The collateral in the Chase Vault can only be accessed by Esmerian if a representative of Merrill Lynch is present. Upon an Event of Default, pursuant to the relevant loan documents, Merrill Lynch has the right by power of attorney to remove Esmerian as

10

signatory on the Chase Vault. Merrill Lynch is in the process of removing Esmerian as signatory on the Chase Vault and seizing the collateral in the Chase Vault.

**Answer: Admit the allegations of paragraph 28 except that Merrill Lynch has claimed that it now has sole power to access the Chase Vault.**

29.     Upon information and belief, Esmerian does not have formal procedures to check-in and check-out the jewelry from the vault located in his office and other locations where the jewelry is stored. Further, since September 2007, Esmerian and other officers of certain Loan Parties have failed to provide updated monthly schedules to Merrill Lynch on the location of Jewelry Collateral as required by the Credit Agreements, including the identity and location of Jewelry Collateral believed to be held by consignees. Esmerian may be the only individual with knowledge of the exact location of certain of the jewelry that makes up the Jewelry Collateral.

**Answer: Deny the allegations of paragraph 29.**

30.     Esmerian was born in Paris, travels outside of the United States carrying jewelry on his person in order to buy and sell jewelry, has numerous foreign contacts and maintains at least one Swiss bank account.

**Answer: Admit the allegations of paragraph 30 but absolutely deny the baseless and malicious inference that Merrill Lynch has advanced with full knowledge of its falsity solely to advance its litigation position. Defendants have never failed to account for a single piece of jewelry. Moreover, despite the defects in Merrill Lynch's security interest, defendants have never failed to cooperate with Merrill Lynch in its obsession to take possession of the Jewelry Collateral. Defendants have simply tried to restrain Merrill Lynch from recklessly disposing of the Jewelry Collateral which they have demonstrated their intention to do.**

11

31.    Esmerian has also maintained at least six (6) bank accounts in the name of various Loan Parties without disclosing those accounts to Merrill Lynch and without entering into control agreements with respect to those accounts as required by the Credit Agreements.

**Answer:  Deny the allegations of paragraph 31.   The existence of the referenced accounts was fully and voluntarily disclosed by Satyajit Bose, the chief financial officer of one of the Credit Parties, in the course of negotiations with Merrill Lynch over the terms of a forbearance agreement.   As disclosed by Bose, some of these accounts were set up at the specific instruction of Merrill Lynch; some of these accounts were required by credit card companies.   In each instance, except for payroll accounts, 100% of the funds in these accounts are transferred into accounts as to which Merrill Lynch has account control agreements in place.  Thus, again, Merrill Lynch is deliberately making false allegations in order to advance its litigation position.**

32.    During the week of September 17, 2007, Esmerian had planned to travel to London with a pink diamond ring valued at approximately $8.5 million in order to meet a buyer for the ring.   The pink diamond ring is part of a group of collateral held by one of the Loan Parties.  Although Esmerian's trip to London was cancelled, this demonstrates that Esmerian has a practice of traveling to other countries with highly valuable jewelry on his person.

**Answer:  Deny the allegations of paragraph 32.   Merrill Lynch is seeking to bolster its baseless position by suggesting to the Court facts which it knows to be untrue.   While Esmerian does, on occasion, travel abroad to show potential buyers certain items, there is not a single instance where an item of Jewelry Collateral that Esmerian took abroad disappeared.**

12

33.    On information and belief, between August and December 2007, certain of the Defendants sold Jewelry Collateral but did not either apply the net sale proceeds to repayment of the Special Collection Loan or the Acquisition Loan or both as required under the Credit Agreements or deposit the net sale proceeds into the collection account of Merrill Lynch as required under the applicable Security Agreement.

**Answer:  Deny the allegations of paragraph 33.  During the course of the negotiations on a forbearance agreement, Merrill Lynch deliberately allowed the defendants to utilize the proceeds of jewelry sales for their business operations, as it had in the past.  In any event, at most, if Merrill Lynch had not breached its obligations to defendants and had properly declared a default and accelerated the indebtedness, Merrill Lynch would be entitled to the Net Sale Proceeds  (as defined in the Credit Agreements) from Jewelry Collateral in which Merrill Lynch had a valid security interest.**

34.    Due to the unique and valuable nature of the jewelry, its small size and its portability, Esmerian's foreign contacts, Esmerian's actions in the recent months, his conduct of traveling outside of the country with jewelry, and the fact that some of the Jewelry Collateral is already outside of New York in Las Vegas and other locations known and unknown to Merrill Lynch, unless the remedies of a receiver and replevin are granted, it is probable that some of the Jewelry Collateral will become unavailable by reason of being transferred, concealed, disposed of, or removed from the state.

**Answer:  Deny the allegations of paragraph 34 for the reasons previously stated. There is absolutely no basis for the appointment of a receiver in this case and Merrill Lynch's request for a receiver is one of numerous examples of Merrill Lynch's utter**

13

disregard for defendants' property.   Merrill Lynch is grossly over-secured and it is dissipating defendants' assets out of malice and incompetence.

A.    <u>The Special Collection Loan</u>

35.      On November 4, 2005, Merrill Lynch extended to Calypso $56,400,957 of senior term loan financing (the "Special Collection Loan") pursuant to the Special Collection Credit Agreement.   Merrill Lynch and Calypso also entered into the Special Collection Security Agreement.

**Answer: Admit.**

36.     The Special Collection Loan was secured by all of the assets owned by Calypso, which included jewelry held by Calypso (the "Calypso Jewelry").

**Answer:   Admit except that Calypso owns no assets other than jewelry and its claims against Merrill Lynch.**

37.     The Calypso Jewelry was formerly owned by Esmerian and contributed by Esmerian to Calypso prior to the closing of the Special Collection Loan.  A substantial amount of the Calypso Jewelry is located in the Chase Vault. The Calypso Jewelry that has not been moved to the Chase Vault is a subject of this action.

**Answer:  Admit except that all of the Calypso Jewelry is a subject of this action.**

38.     The Special Collection Loan was also secured by a pledge of 100% of the equity in Calypso by Esmerian.

**Answer: Admit.**

39.     The Special Collection Loan was also secured by a full recourse unconditional personal guarantee by Esmerian (the "Esmerian Special Collection Guarantee").

14

**Answer: Deny. The Esmerian Special Collection Guarantee is subject to Merrill Lynch's obligation of good faith and fair dealing and to its obligation to dispose of the collateral in a commercially reasonable manner, both of which obligations Merrill Lynch has breached, thereby discharging the Guarantes.**

40.    Pursuant to the Acquisition Security Agreement, the Special Collection Loan was also secured by all of the assets owned by Tango, which included jewelry held by Tango (the "Tango Jewelry"). The Tango Jewelry was formally owned by REI and contributed by REI to Tango pursuant to the grant of the security interest Tango.

**Answer: Admit the allegations of paragraph 40.**

41.    REI is an affiliate of Calypso and a corporation majority-owned and/or controlled by Esmerian. In connection with the Special Collection Loan, REI also granted to Merrill Lynch a negative pledge on certain jewelry (the "Specified REI Jewelry").

**Answer: Admit.**

42.    The Special Collection Loan was secured by a full recourse guarantee by REI (the "REI Guarantee").

43.    Section 8 of Special Collection Credit Agreement provides, in part, the following Events of Default:

> (a) The Borrower shall fail to pay any principal of any Loan when due in accordance with the terms thereof or hereof; or the *Borrower shall fail to pay any interest on any Loan*, or any other amount payable hereunder or under the other Loan Documents, within two (2) days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or....

> (d) The Borrower or any other Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such

default shall continue unremedied for a period of thirty (30) days; or....

(emphasis added).

Answer: **Deny the allegations of paragraph 43 and refer to the documents for their full terms and meaning.**

44.    Section 9 of Special Collection Security Agreement provides in part:

[T]he Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Borrower or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), *may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral*, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk....  *The Borrower further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender* at places which the Lender shall reasonably select, whether at the Borrower's premises or elsewhere....

(emphasis added).

Answer: **Deny the allegations of paragraph 44 and refer to the documents for their full terms and meaning.**

45.    Section 2 of the Esmerian Special Collection Guarantee provides in part:

(a) The Guarantor hereby, *unconditionally and irrevocably*, guarantees to the Lender and its respective successors, indorsees, transferees and assigns, *the prompt and complete payment and performance by the Borrower when due.... of the Obligations.*

\*    \*    \*

(c) The Guarantor further agrees to pay any and all reasonable expenses (including, without limitation, all fees and disbursements

16

1031777.1

of counsel) which may be paid or incurred by the Lender in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guarantee.

(emphasis added). Section 2 of the REI Guarantee includes substantially the same provision as above.

**Answer: Deny the allegations of paragraph 45 and refer to the documents for their full terms and meaning. In addition, under New York law a guarantor cannot waive the lender's obligations of good faith and fair dealing and to dispose of the collateral in a commercially reasonable manner, both of which obligations Merrill Lynch has breached, thereby discharging the Guarantee.**

**B.      The Acquisition Loan**

46.      On March 29, 2006, Merrill Lynch extended an additional $110,000,000 of senior financing (the "Acquisition Loan") to a company then-known as Samba 1, Inc. ("Samba"), a corporation wholly-owned and/or controlled by Esmerian, pursuant to a separate credit agreement, the Acquisition Credit Agreement.

**Answer: Admit.**

47.      Merrill Lynch, Samba, Endymion and Tango as well as two wholly-owned subsidiaries of Samba (the "Samba Subsidiaries"), also entered into the Acquisition Security Agreement.

**Answer: Admit.**

48.      The Acquisition Loan was secured by certain collateral including all of the assets of Samba and the Samba Subsidiaries.

**Answer: Admit.**

17

1031777.1

49.    The Acquisition Loan was also secured by a collection of jewelry (the "Endymion Jewelry") contributed by Esmerian to Endymion and the Tango Jewelry.

**Answer:  Deny.  The Acquisition Loan was secured by the Tango Jewelry but Endymion owned no jewelry at the time it executed the Security Agreement.**

50.    The Acquisition Loan was also secured by a full recourse unconditional personal guarantee by Esmerian (the "Esmerian Acquisition Guarantee") and a full recourse unconditional guarantee by REI and Tango (the "REI Guarantee").

**Answer:  Deny the allegations of paragraph 50 and refer to the documents for their full terms and meaning.  In addition, under New York law a guarantor cannot waive the lender's obligations of good faith and fair dealing and to dispose of the collateral in a commercially reasonable manner, both of which obligations Merrill Lynch has breached, thereby discharging the Guarantee.**

51.    The Acquisition Loan was also secured by a full recourse unconditional guarantee by Endymion (the "Endymion Guarantee").

**Answer:  Deny the allegations of paragraph 45 and refer to the documents for their full terms and meaning.  In addition, under New York law a guarantor cannot waive the lender's obligations of good faith and fair dealing and to dispose of the collateral in a commercially reasonable manner, both of which obligations Merrill Lynch has breached, thereby discharging the Guarantee.**

52.    The Acquisition Loan was also secured by a full recourse unconditional guarantee by the Samba Subsidiaries.

**Answer:  Deny the allegations of paragraph 52 and refer to the documents for their full terms and meaning.  In addition, under New York law a guarantor cannot waive the**

18

lender's obligations of good faith and fair dealing and to dispose of the collateral in a commercially reasonable manner, both of which obligations Merrill Lynch has breached, thereby discharging the Guarantee.

53.    The Acquisition Loan was also secured by, among other things, a pledge by Esmerian of 100% of the equity in Samba and a pledge by Samba of 100% of the equity in the Samba Subsidiaries.

**Answer: Deny the allegations of paragraph 53 and refer to the documents for their full terms and meaning. In addition, under New York law a borrower or guarantor cannot waive the lender's obligations of good faith and fair dealing and to dispose of the collateral in a commercially reasonable manner, both of which obligations Merrill Lynch has breached, thereby discharging the indebtedness.**

54.    The Acquisition Loan and the Special Collection Loan thereafter were cross-collateralized. Accordingly, all of the collateral securing the Acquisition Loan also secures the Special Collection Loan and all of the collateral securing the Special Collection Loan also secures the Acquisition Loan.

**Answer: Deny the allegations of paragraph 54 and refer to the documents for their full terms and meaning. In addition, under New York law a borrower or guarantor cannot waive the lender's obligations of good faith and fair dealing and to dispose of the collateral in a commercially reasonable manner, both of which obligations Merrill Lynch has breached, thereby discharging the indebtedness.**

55.    Specifically, in connection with the Acquisition Loan, on March 29, 2006, the documentation for the Special Collection Loan was amended in order to (i) cause the collateral supporting the Special Collection Loan to secure the Acquisition Loan, (ii) cause the guarantees

19

supporting the Special Collection Loan to guarantee the Acquisition Loan, (iii) permit the debt incurred under and liens granted in connection with the Acquisition Loan to constitute debts and liens under the Special Collection Loan and (iv) cause a default under the Acquisition Loan to trigger a default under the Special Collection Loan.

**Answer:  Deny the allegations of paragraph 55.  In addition, the March 29, 2006 documents are void for lack of consideration.**

56.    Section 4.1(c) of the Acquisition Credit Agreement provides:

> Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (b) of this Section shall be payable from time to time on demand.

**Answer:  Deny the allegations of paragraph 56 and refer to the documents for their full terms and meaning.**

57.    Section 4.14 of the Third Amendment to the Acquisition Credit Agreement provides:

> The Borrower shall, from time to time (including without limitation upon any occurrence of a Rapid Amortization Event), but subject to Section 7.12(e), deposit into the Debt Service Reserve Account an amount sufficient so that the amount on deposit in the Debt Service Reserve Account shall be equal to the Debt Service Reserve Amount.  At such time when any and all Rapid Amortization Events cease to exist, the amount deposited in the Debt Service Reserve Account in excess of the Debt Service Reserve Amount shall be released to the Borrower.  Without limitation of the foregoing and notwithstanding the last sentence of Section 7.12(e), on or prior to each of the dates set forth below, the Borrower shall deposit the amount set forth opposite such date:
>
> | Date: | Amount: |
> |---|---|
> | .... | |
> | September 10, 2007 | The Excess DSR Amount |
>
> For purposes of this Section, "Excess DSR Amount" shall mean an amount equal to the Debt Service Reserve Amount less the amount on deposit in the Debt Service Reserve Account on the date thereof.

20

**Answer:  Deny the allegations of paragraph 57 and refer to the documents for their full terms and meaning.**

58.    Section 9 of the Acquisition Credit Agreement provides in part that an Event of Default occurs and is continuing if:

> (a) The Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or *the Borrower shall fail to pay any interest on any Loan*, or any other amount payable hereunder or under the other Loan Documents . . . , within two (2) days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

> \*    \*    \*

> (d) The Borrower or any other Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of thirty (30) days; or

> (e) Any Loan Party shall (i) default in any payment of principal of or interest of any Indebtedness (other than the Loans) or in the payment of any Guarantee Obligation, beyond the period of grace (not to exceed thirty (30) days), if any, provided in the instrument or agreement under which such Indebtedness or Guarantee Obligation was created, if the aggregate amount of the Indebtedness and/or Guarantee Obligations in respect of which such default or defaults shall have occurred is at least $500,000; or (ii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or such Guarantee Obligation to become payable; or....

> (n) Any "Event of Default"(as defined in the Special Collection Credit Agreement) shall have occurred and be continuing; or ....

21

(emphasis added).

**Answer:  Deny the allegations of paragraph 58 and refer to the documents for their full terms and meaning.**

59.    Section 9 of the Acquisition Security Agreement provides in part that if an Event of Default occurs and is continuing:

> [T]he Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Grantors or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), *may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof,* and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk....  The Grantors further agree, at the Lender's request, to assemble the Collateral and make it available to the Lender at places which the Lender shall reasonably select, whether at the Grantors' premises or elsewhere ....

(emphasis added).

**Answer:  Deny the allegations of paragraph 59 and refer to the documents for their full terms and meaning.**

60.    Section 2 of the Esmerian Acquisition Guarantee provides in part:

> (a) The Guarantor hereby, unconditionally and irrevocably, guarantees to the Lender and its respective successors, indorsees, transferees and assigns, *the prompt and complete payment and performance by the Borrower when due.... of the Obligations.*
>
> *       *       *
>
> (c) The Guarantor further agrees to pay any and all reasonable expenses (including, without limitation, all fees and disbursements of counsel) which may be paid or incurred by the Lender in

22

> enforcing, or obtaining advice of counsel in respect of, any rights
> with respect to, or collecting, any or all of the Obligations and/or
> enforcing any rights with respect to, or collecting against, the
> Guarantor under this Guarantee.

(emphasis added).  Section 2 of the Endymion Guarantee and Section 2 of the REI Guarantee all

include substantially the same provision as above.

**Answer:  Deny the allegations of paragraph 60 and refer to the documents for their full terms and meaning.  In addition, under New York law a borrower or guarantor cannot waive the lender's obligations of good faith and fair dealing and to dispose of the collateral in a commercially reasonable manner, both of which obligations Merrill Lynch has breached, thereby discharging the indebtedness.**

61.    On June 22, 2006, the documentation relating to the Acquisition Loan was amended, in part, to (i) increase the working capital revolving credit line by $10,000,000 to $35,000,000 and (ii) extend additional credit in the form of a $10,000,000 tranche B revolving credit facility to finance the purchase price of certain expensive gemstones, jewelry and jeweled objects.  Thereafter, Samba failed to comply with various obligations under the Acquisition Credit Agreement and other loan documents related thereto.

**Answer:  Deny the allegations of paragraph 61.**

62.    On August 25, 2006, the documentation relating to the Acquisition Loan was amended to (i) modify certain financial covenants, (ii) provide Samba with a recovery period during which Samba was not required to comply with the financial covenants, (iii) require Samba to deliver a business plan detailing the procedures Samba would implement to cause the financial covenants to be satisfied by the end of the recovery period, (iv) prohibit further borrowings, and (v) waive the existing defaults (the "August 25 Waiver").

1031777.1

**Answer:  Deny the allegations of paragraph 62.  Any operations problems Samba had were caused by Merrill Lynch's interference with Samba's operations.  Such interference included dictating who would be the chief executive officer of Samba and what lawyer would represent Samba.**

63.    Thereafter, Samba defaulted on obligations under the Acquisition Credit Agreement, which had the effect of nullifying the waivers granted by Merrill Lynch in the August 25, 2006 Waiver.

**Answer:  Deny the allegations of paragraph 63.**

C.    **Foxtrot Security Agreement**

64.    On November 3, 2006, Samba and Merrill Lynch entered into a waiver and side letter (collectively, the "Side Letter") in connection with the Credit Agreements and other loan documents related thereto.

**Answer:  Deny the allegations of paragraph 64 and refer to the documents for their terms and full meaning.**

65.    The Side Letter required that (i) Merrill Lynch give Samba a recovery period during which Samba was not required to comply with certain financial covenants, (ii) Samba deposit all delinquent Debt Service Reserve amounts into the Debt Service Reserve Account on or prior to February 28, 2007, (iii) Esmerian fund all working capital shortfalls of Samba, (iv) no further borrowings were allowed, except for borrowings to fund the opening of new stores, (v) Esmerian make a $2,500,000 capital contribution to Samba to prepay the Acquisition Loan on or prior to November 15, 2006, (vi) the Acquisition Loan be prepaid by at least $20,000,000 on or prior to February 28, 2007 and (vii) Samba to deliver five-year projections to Merrill Lynch.

24

**Answer: Deny the allegations of paragraph 65. Any operations problems Samba had were caused by Merrill Lynch's interference with Samba's operations. Such interference included dictating who would be the chief executive officer of Samba and what lawyer would represent Samba.**

66.   The Side Letter also required that Esmerian provide an additional collection of jewelry (the "Foxtrot Jewelry") as collateral to secure the loans made in connection with the Credit Agreements.

**Answer: Deny the allegations of paragraph 66 and refer to the documents for their full terms and meaning.**

67.   Thereafter, Esmerian defaulted on his obligation under the Side Letter, by failing to make the $2,500,000 capital contribution. This default nullified the waivers previously granted by Merrill Lynch in the Side Letter. On December 15, 2007, Esmerian made the payment to Merrill on the $2,500,000 capital contribution.

**Answer: Deny the allegations of paragraph 67.**

68.   On April 6, 2007, the documentation relating to the Acquisition Loan was amended to (i) reset the financial covenants based on the five-year projections delivered by Samba, (ii) change the dates that payments to the Debt Service Reserve Account were required, (iii) change the dates that contributions of inventory by Esmerian to Endymion were required, (iv) document Foxtrot's grant of a security interest to Merrill Lynch in the Foxtrot Jewelry, and (v) document Foxtrot's guarantee of the loans made in connection with the Credit Agreements. The documentation relating to the Special Collection Loan was also amended to make certain conforming changes.

25

1031777.1

**Answer: Deny the allegations of paragraph 68 and refer to the documents for their full terms and meaning.**

69.     Section 9 of the Foxtrot Security Agreement provides in part that if an Event of Default occurs and is continuing:

> [T]he Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), *may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof,* and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.... *The Grantor further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender at places which the Lender shall reasonably select,* whether at the Grantor's premises or elsewhere.... Without limitation of the foregoing, the Grantor acknowledges and agrees that in the event the Borrower fails to prepay at least $20,000,000 of Loans pursuant to Section 4.5(e) of the Credit Agreement (such amount or the amount of any deficiency, the "Shortfall Amount"), the Lender shall immediately have the right to liquidate the entire Foxtrot Collection in such manner as the Lender deems appropriate in its sole discretion. A portion of the proceeds from such liquidation in an amount equal to the Shortfall Amount shall be applied to the prepayment of the Loans and, so long as no Event of Default has occurred and is continuing, the excess of such proceeds, if any, less all costs and expenses incurred by the Lender in enforcing its remedies hereunder, including, without limitation, the fees and disbursements of counsel to the Lender, shall be paid to the Borrower.

(emphasis added).

**Answer: Deny the allegations of paragraph 69 and refer to the documents for their full terms and meaning.**

26

70.    Section 2 of the Foxtrot Guarantee provides in part:

(a) The Guarantor hereby, unconditionally and irrevocably, guarantees to the Lender and its successors, transferees and assigns, *the prompt and complete payment and performance by the Borrower when due.... of the Obligations.*

*    *    *

(c) The Guarantor further agrees to pay any and all reasonable expenses (including, without limitation, all fees and disbursements of counsel) which may be paid or incurred by the Lender in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guarantee....

(emphasis added).

**Answer:  Deny the allegations of paragraph 70 and refer to the documents for their full terms and meaning.**

71.    On July 11, 2007, REI entered into a security agreement (the "REI Security Agreement") in favor of Merrill Lynch and granted Merrill Lynch a security interest in all of REI's interest in the Endymion Jewelry and the Foxtrot Jewelry.  The REI Security Agreement was required by Merrill Lynch because Esmerian did not provide evidence of title showing that the Endymion Jewelry and the Foxtrot Jewelry were correctly transferred to Endymion and Foxtrot, respectively, by Esmerian.

**Answer:  Deny the allegations of paragraph 71.  Merrill Lynch never had, and still does not have, a valid security interest in the jewelry of Endymion and Foxtrot, as conceded by Merrill Lynch and CWT on December 4, 2007.**

72.    Upon information and belief, REI is holding certain collateral in which Merrill Lynch has a security interest (the "REI Jewelry") pursuant to the REI Security Agreement.

**Answer: Deny.**

27

1031777.1

D.    **Activities of the Defendants and Loan Parties in Violation of the Loan Documents**

73.    On information and belief, between August and December 2007, certain of the Defendants sold Jewelry Collateral but did not either apply the net sale proceeds to repayment of the Special Collection Loan or the Acquisition Loan or both as required under the Credit Agreements or deposit the net sale proceeds into the collection account of Merrill Lynch as required under the applicable Security Agreement.

**Answer:  Deny.**

74.    Section 3(d) of the Acquisition Security Agreement provides in part:

> *All payments of Receivables, when collected by the Grantors, shall be forthwith deposited by the Grantors in the Collection Account in exact form received*, duly endorsed by the Grantors to the Lender if required, *in the Collection Account as provided in Section 7.12 of the Credit Agreement*, and until so turned over, shall be held by the Grantors in trust for the Lender, segregated from other funds of the Grantors.  Each deposit of any such Proceeds shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit....  At the Lender's request, the Grantors shall deliver to the Lender all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables and Proceeds of Collateral, including, without limitation, all original orders, invoices and shipping receipts.  At any time after the occurrence and during the continuance of an Event of Default upon the request of the Lender, the Grantors will cooperate with the Lender to establish a system of lockbox accounts, under the sole dominion and control of the Lender, into which all Receivables shall be paid and from which all collected funds will be transferred to the Collection Account.

(emphasis added).

**Answer:  Deny and refer to the documents for their full terms and meaning.**

75.    Specifically, Section 3(c) of the Special Collection Security Agreement provides in part:

> *Any payments of Proceeds arising out of a Consignment, Recovery Event or otherwise out of the sale, auction, lease, transfer,*

28

> *assignment, loan or other disposition of an item or items of Eligible Jewelry* or any interest therein, when collected by the Borrower, *shall be forthwith* (and, in any event, within one (1) Business Day) *deposited by the Borrower in the exact form received*, duly endorsed by the Borrower to the Lender if required, in the Operating Account, and, until so turned over, shall be held by the Borrower in trust for the Lender, segregated from other funds of the Borrower. Each deposit of any such Proceeds shall be accompanied by a report, substantially in the form attached as Annex II to the Credit Agreement, identifying in reasonable detail the nature and source of the payments included in the deposit . . . . Upon the occurrence of any Default or Event of Default, at the Lender's request, the Borrower shall deliver to the Lender all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Proceeds, including, without limitation, all original orders, invoices and shipping receipts.

(emphasis added).

**Answer: Deny and refer to the documents for their full terms and meaning.**

76.    Thus, by not applying or depositing into the collection account of Merrill Lynch, the net sale proceeds from Jewelry Collateral, one or more of the Defendants violated certain provisions of the Security Agreements.

**Answer: Deny.**

77.    In November 2007, Merrill Lynch discovered that defendant Esmerian had opened several bank accounts at First Republic Bank in the name of the Loan Parties. These bank accounts were opened without authorization of Merrill Lynch in violation of certain of the Loan Documents. The following accounts were opened without knowledge or authorization of Merrill Lynch:

- Account #: 97900060843

- Account #: 97900063565

- Account #: 97900063573

- Account #: 97900063581

29

- Account #: 97900063599

- Account #: 97900062005

Answer: Deny the allegations of paragraph 77. These allegations are deliberately false and misleading and are intended to fabricate a justification for Merrill Lynch's wrongful conduct. As Merrill Lynch knows, Esmerian does not handle the opening of bank accounts. Those activities are handled by Samba's chief financial officer, Satyajit Bose, who freely and voluntarily disclosed the existence and purpose of these accounts to Merrill Lynch in the course of negotiations on a forbearance agreement.

Account # 97900060843 is a Samba payroll account which, as a matter of law, Merrill Lynch can have no interest in.

Account # 9790063565 is a Samba merchant account for deposit of funds from American Express for Samba's Las Vegas store. This account was set up so that the funds from this account are transferred to an account subject to a Merrill Lynch account control agreement as would be obvious to Merrill Lynch if it simply looked at the statements for the accounts over which it has control.

Account # 97900063573 is a Samba merchant account for deposit of funds from Visa. Again, this account was set up so that all of the funds from this account are transferred to an account subject to a Merrill Lynch account control agreement as would be obvious to Merrill Lynch if it simply looked at the statements for the accounts over which it has control.

Account # 97900063581 is a Samba merchant account for deposit of funds from American Express. Again, this account was set up so that all of the funds from this account would be transferred to an account subject to a Merrill Lynch account control agreement

30

as would be obvious to Merrill Lynch if it simply looked at the statements for the accounts over which it has control.

Account # 97900063599 is a Samba merchant account for deposit of funds from Visa for Samba's Las Vegas store. Again, this account was set up so that all of the funds from this account would be transferred to an account subject to a Merrill Lynch account control agreement, as would be obvious to Merrill Lynch if it simply looked at the statements for the accounts over which it has control.

Account #: 97900062005 is a Samba payroll account for the Las Vegas store which, as a matter of law, Merrill Lynch can have no interest in.

78.    Section 7.12 of the Acquisition Credit Agreement provides in part that Defendants are obligated:

> (a) Maintain each Operating Account and the Debt Service Reserve Account. *The Loan Parties shall not change any Bank Account, or open any new Bank Account, into which any revenues of the Loan Parties* ... may be deposited without the prior written consent of the Lender.

*   *   *

> (b) Deposit or cause to be deposited all gross collections, receipts and proceeds from the operation of its business (including any proceeds of any Collateral) into the applicable Operating Account. So long as no Default or Event of Default shall have then occurred and be continuing, each Combined Party shall have access to the funds deposited in the Operating Accounts pursuant to this Section 7.12(b).

(emphasis added).

**Answer: Deny and refer to the documents for their full terms and meaning.**

79.    Section 5(a) of the Acquisition Security Agreement and Section 5(a) of the Foxtrot Security Agreement both provide in part:

31

1031777.1

> At any time and from time to time, upon the written request of the Lender, and at the sole expense of the Grantor, the Grantor will promptly and duly execute and deliver such further instruments and documents and take such further action as the lender may reasonably request for the purpose of obtaining or preserving the full benefits of this Security Agreement and of the rights and powers herein granted, including, without limitation .... (ii) in the case of Deposit Accounts, Letter-of-Credit Rights and any other relevant Collateral, taking any actions (including, without limitation, entering into, and using its best efforts to cause any relevant third party to enter into, one or more Control Agreements) necessary to enable the Lender to obtain "control"(within the meaning of the applicable Uniform Commercial Code) with respect thereto.

Section 5(a) of the Special Collection Security Agreement includes substantially the same provision as above.

**Answer: Deny and refer to the documents for their full terms and meaning.**

80.      The actions of defendant Esmerian in causing certain of the Loan Parties to open bank accounts at First Republic Bank were in violation of Section 7.12(a) of the Acquisition Credit Agreement because Merrill Lynch had not given its prior written consent for these Loan Parties to open such accounts.  Upon information and belief, proceeds from the sale of collateral held by the Loan Parties has been deposited into these accounts or into other accounts unknown to the plaintiff. As a consequence of the actions of defendant Esmerian, Merrill Lynch was not provided control of these accounts as authorized by Section 5(a)(ii) of the Security Agreements.

**Answer: Deny.**

81.      Defendant Esmerian and other officers of certain of the Loan Parties have failed to provide Merrill Lynch with updated monthly schedules as to the identity and the location of the Jewelry Collateral since August 2007, including Jewelry Collateral believed to be held by consignees, in violation of the Loan Documents.

32

**Answer:** **During the entire period from September through December, Merrill Lynch did not request updated monthly schedules of the location of the Jewelry Collateral. However, Merrill Lynch requested that all of Samba's jewelry be audited and defendants cooperated with that request. Not a single item of jewelry was missing. With respect to the Jewelry Collateral, Merrill Lynch took possession of whatever Jewelry Collateral it wanted.**

82.    Section 6.2(b) of the Special Collection Credit Agreement provides that the Borrower shall furnish to the Lender:

> within five (5) days following the end of each calendar month, *a Status Report updating Schedule 1.1 to reflect any revisions to the information contained therein, including without limitation any sales and changes in location,* certified as true, correct and complete by a Responsible Officer of the Borrower, and including a certification by a Responsible Officer of the Borrower that, to the best of such officer's knowledge, during such month the Borrower has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to be observed, performed or satisfied by it, and that the Borrower has obtained no knowledge of any Default or Event of Default except as specified in such Status Report;

(emphasis added).

**Answer: Deny and refer to the document for its full terms and meaning.**

83.    Section 7.2(c) of the Acquisition Credit Agreement provides in part that the Borrower shall furnish to the Lender:

> within five (5) Business Days following the end of each calendar month, a Borrowing Base Certificate (i) showing (A) the outstanding principal amount of the Loans, (B) the TTM Gross Profit Margin, (C) the Large Precious Stones Gross Profit Margin (D) the value of the Eligible Inventory at the lower of cost or market, (E) the Borrowing Base, together with a calculation thereof, (F) *the Current Value of all items subject to Permitted Consignments, together with a schedule listing such items, their*

33

*respective Current Values, the name and address of each Permitted Consignee holding such items,* (G) the Current Value of all items subject to Permitted Memo-Out Transactions, together with a schedule listing such items, their respective Current Values, the name and address of each Permitted Memo-Out Transferee holding such items, and including a representation regarding additional insurance requirements, (H) the total sales attributable to Memo-In Jewelry, ... .

(emphasis added).

**Answer:  Deny and refer to the document for its full terms and meaning.**

84.    By their failure to disclose to Merrill Lynch the current location of Jewelry Collateral, Defendants violated Section 6.2(b) of the Special Collection Credit Agreement and Section 7.2(c) of the Acquisition Credit Agreement.  As a result of the actions of defendant Esmerian and other officers, Merrill Lynch does not know the location of some of the Jewelry Collateral, including Jewelry Collateral believed to be held by consignees.

**Answer:  Deny.  During the entire period from September through December 2007, Merrill Lynch waived its right to any of this information.**

E.    **Event of Default and Demand for Loan Parties' Jewelry Collateral**

85.    Beginning on or around May 5, 2006, the Loan Parties failed to comply with various provisions in the Credit Agreements and other loan documents related thereto.  However, prior to August 2007, the Loan Parties made the periodic interest payments required under the Credit Agreements.

**Answer:  Admit.  However, Merrill Lynch made the loans to defendants with the intention of ultimately taking over defendants' businesses.  In order to control defendants' business operations, Merrill Lynch inserted into the loan documents provisions as to which defendants were in default from the day the loan closed.  By this means, Merrill Lynch deliberately controlled and directed the operations of the defendants.  Merrill Lynch's**

34

directions included dictating who would be the chief executive officer of Samba, who the defendants could choose as their lawyers and accountants, where they could sell their jewelry, and other matters.

86.    As set forth above, on September 10, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay interest then due on the Special Collection Loan in the amount of $507,221.  Calypso's failure constituted an Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement. On September 20, 2007, Merrill Lynch notified Calypso of the Event of Default and reserved its right to take action under the Security Agreements.

**Answer: Deny. Esmerian specifically offered to make the Calypso interest payment and Merrill Lynch rejected this payment.**

87.    On September 10, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay interest then due on the Acquisition Loan in the amount of $1,166,154.  Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement. On September 20, 2007, Merrill Lynch notified Samba of the Event of Default and reserved its right to take action under the Security Agreements.

**Answer: Deny. Merrill Lynch dictated to Samba whom  it could hire as chief executive officer. This person was incompetent for the position and caused Samba to suffer severe losses in its business. As a result, Samba needed a two week extension to make the September 10, 2007 interest payment. Given Merrill Lynch's responsibility for Samba's business difficulties, it was a breach of the obligation of good faith and fair dealing for Merrill Lynch to declare a default rather than allow the requested two week extension for the interest payment.**

35

1031777.1

88.    On September 10, 2007, Samba failed to comply with Section 4.14 of the Acquisition Credit Agreement as it failed to pay the excess Debt Service Reserve amount of approximately $2.0 million.  On September 27, 2007, Merrill Lynch notified Samba of this further Event of Default and reserved its right to take action under the Security Agreements.

**Answer:  Deny for the reasons stated in answer to paragraph 87.**

89.    On September 18 and 20, 2007, the Loan Parties tendered a partial interest payment to Merrill Lynch in an aggregate amount of approximately $750,000. On September 27, 2007, Merrill Lynch acknowledged receipt of the partial interest payment, but provided additional notice of the existing Events of Default and reserved its rights under the Credit Agreements and other loan documents related thereto, as the Loan Parties still owed $923,375 of interest payments and $1,979,902 of payments due on account of the Debt Service Reserve Amount were still due and owing and in default.

**Answer:  Admit the allegations of paragraph 89 which demonstrate Merrill Lynch's bad faith in its dealings with defendants.**

90.    On September 28, 2007, at Merrill Lynch's request, Esmerian caused certain of the Loan Parties to transfer approximately $27,000,000 of collateral (based on valuations determined in accordance with the Credit Agreements) to the Chase Vault pursuant to Merrill Lynch's right to collect collateral under the Security Agreements.

**Answer:   Deny the allegations of paragraph 90.   Merrill Lynch arrived at Esmerian's office and demanded to take possession of approximately $60 million of Jewelry Collateral on the baseless theory that, absent taking possession, the collateral would disappear.  By taking the jewelry, Merrill Lynch prevented Esmerian from showing the jewelry to prospective purchasers in the ordinary course of business.**

36

91.    On October 10, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay interest then due on the Special Collection Loan in the amount of $526,364.21. Calypso's failure constituted a further Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement. On October 12, 2007, Merrill Lynch notified Calypso of the Event of Default and reserved its right to take action under the Security Agreements.

**Answer: Deny the allegations of paragraph 91. During the entire period from October through the end of December 2007 the parties engaged in negotiations on a forbearance agreement which contemplated that all unpaid debt service would be capitalized. With Merrill Lynch's knowledge and consent, defendants made no further debt service payments after September 20, 2007.**

92.    On October 10, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay interest then due on the Acquisition Loan in the amount of $1,305,650.36. Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement. On October 12, 2007, Merrill Lynch notified Samba of the Event of Default and reserved its right to take action under the Security Agreements.

**Answer: Deny the allegations of paragraph 92 for the reasons previously stated.**

93.    On November 13, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay additional interest then due on the Special Collection Loan in the amount of $653,424.31. Calypso's failure constituted an Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement.

**Answer: Deny the allegations of paragraph 93 for the reasons previously stated.**

37

94.    On November 13, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay additional interest then due on the Acquisition Loan in the amount of $1,417,346.28. Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement.

**Answer:  Deny the allegations of paragraph 94 for the reasons previously stated.**

95.    On December 10, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay additional interest then due on the Special Collection Loan.  Calypso's failure constituted an Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement.

**Answer:  Deny the allegations of paragraph 95 for the reasons previously stated.**

96.    On December 10, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay additional interest then due on the Acquisition Loan.  Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement.

**Answer:  Deny the allegations of paragraph 96 for the reasons previously stated.**

97.    As of December 31, 2007, approximately $7,752,130.01 of interest payments, and the entire payment due on account of the Debt Service Reserve Account of $1,979,902, was due and owing and in default.

**Answer:  Deny the allegations of paragraph 97 for the reasons previously stated.**

98.    On October 12, 2007, due to Esmerian's defaults, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan. The entire principal and interest thereunder is now due and owing.

**Answer:  Deny the allegations of paragraph 98 for the reasons heretofore stated.**

38

99.    Due to the acceleration, the principal amount owed on the Special Collection Credit Agreement is $56,400,957.13 plus accrued but unpaid interest in the aggregate amount of $2,102,913.94 as of December 31, 2007, the total amount owed on the Acquisition Credit Agreement is $121,131,659.08 plus accrued but unpaid interest in the aggregate amount of $5,649,216.07 as of December 31, 2007, and the amount owed on the Debt Service Reserve Account is $1,979,902.  The aggregate amount owed, including unpaid interest, to Merrill pursuant to the Credit Agreements is $185,284,746.22 plus attorneys' fees and costs of collection.

**Answer:  Deny the allegations of paragraph 99 and leave Merrill Lynch to its proof as to the amount of the indebtedness and the reasonable attorneys' fees and costs of collection.**

100.    On October 12, 2007, Merrill Lynch made demand upon Esmerian and certain of the Loan Parties for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

**Answer:   Deny the allegations of paragraph 100.  During the entire period from October through the end of December 2007 the parties engaged in negotiations on a forbearance agreement which contemplated that all unpaid debt service would be capitalized.  With Merrill Lynch's knowledge and consent, defendants made no further debt service payments after September 20, 2007.**

101.    On October 12, 2007, Merrill Lynch also made demand of payment of pursuant to the respective Guarantee Agreements including those by Esmerian, Endymion, REI, Tango and Foxtrot.  No payment has been made.

39

**Answer: Deny the allegations of paragraph 101. During the entire period from October through the end of December 2007 the parties engaged in negotiations on a forbearance agreement which contemplated that all unpaid debt service would be capitalized. With Merrill Lynch's knowledge and consent, defendants made no further debt service payments after September 20, 2007.**

102.    On October 3, 2007, Merrill Lynch and Defendants entered into an Irrevocable Consent Agreement, whereby Defendants, through Esmerian, irrevocably consented to the Merrill Lynch's taking physical possession of, seizing or otherwise exercising control over any property, including Jewelry Collateral, located at Esmerian's office at 610 Fifth Avenue, 4th Floor, New York, New York, in which Merrill Lynch has a security interest pursuant to the Credit Agreements or other Loan Documents.  Defendants agreed that Merrill Lynch could exercise this right immediately and at any time hereafter.

**Answer:  Deny the allegations of paragraph 102.  On October 3, 2007, Merrill Lynch personnel lured Esmerian to the offices of Cadwalader, Wickersham & Taft LLP ("CWT") under false pretenses, promising that no CWT personnel would attend the meeting between Merrill Lynch and Esmerian.  Esmerian relied upon that representation and attended the meeting.  When he arrived at CWT's offices, he was confronted with several CWT attorneys including Howard R. Hawkins, Jr., Steven Cohen, and John Rapisardi.  The attorneys demanded that Esmerian sign the Irrevocable Consent Agreement (the "Document").  Esmerian objected on the grounds that (a) he had been lured to CWT's offices on false pretenses; (b) his attorney had not seen the Document; and (c) he had not read the document and could not understand its significance.  Esmerian insisted that he be able to speak to his attorney and his attorney advised him not to sign the**

40

Document. Esmerian informed the CWT attorneys that he would not sign the Document. Hawkins told Esmerian that CWT would prevent Esmerian leaving the building unless he signed the document. Esmerian was not capable of engaging in a physical battle when he was surrounded by CWT and Merrill Lynch personnel. He stated that he would sign the Document under duress, which he did.

103.    In addition to the Irrevocable Consent Agreement, Merrill Lynch had the right to make demand upon Esmerian and the Loan Parties to assemble and make available to Merrill Lynch collateral held by the Loan Parties, including the Jewelry Collateral upon an Event of Default pursuant to Section 10 of the Special Collection Security Agreement, Section 10 of Acquisition Security Agreement, Section 10 of the Foxtrot Security Agreement and Section 10 of the REI Security Agreement.

**Answer:  Deny the allegations of paragraph 103.  Surely, if Merrill Lynch had the right to seize the Jewelry Collateral, it would not have unlawfully coerced Esmerian into signing the Irrevocable Consent Agreement.**

104.    After allowing Merrill Lynch to collect some of the collateral, defendant Esmerian have failed to assemble the Jewelry Collateral and make the Jewelry Collateral available to Merrill Lynch. Merrill Lynch has demanded that Defendants identify the location of each item of the remaining Jewelry Collateral and deliver the same to Merrill Lynch.

**Answer:  Deny the allegations of paragraph 104 as false and misleading.  The parties engaged in negotiations over a forbearance agreement during the months of October through December 2007, during which time Merrill Lynch did not request lists of the location of all the Jewelry Collateral, although it did do an audit of a major portion of the jewelry (and found that not a single piece was missing).  When it became clear that**

41

defendants would not sign the document dictated by Merrill Lynch, Merrill Lynch, in January 2008, demanded that defendants identify the location of the Jewelry Collateral. Defendants responded that the person with knowledge of the location of each item of collateral was on vacation and that such lists could not possibly be provided prior to the end of the second week in January. Defendants' counsel has notified CWT that defendants are in the process of assembling the lists and that they will be provided as quickly as possible.

105.    Due to the unique and valuable nature of the Jewelry Collateral, the number of small items, its portability, Esmerian's foreign contacts, Esmerian's conduct in recent months of not depositing proceeds of sales from collateral into Merrill Lynch control accounts, the opening of unauthorized bank accounts and the failure to provide control thereof to Merrill Lynch, Esmerian's and other officers' failure to provide updated monthly schedules to Merrill Lynch as to the identity and the location of the Jewelry Collateral, Esmerian's travel outside of the country with jewelry, and the fact that jewelry constituting other collateral as to which Merrill Lynch has a security interest already is outside of New York in Las Vegas, Nevada, unless a receiver and replevin is granted by this Court, it is probable that some or all of the Jewelry Collateral will become unavailable by reason of being transferred, concealed, disposed of, or removed from the State.

Answer:  Deny the allegations of paragraph 105 which constitute a disgraceful attempt to pander to the interests of the Court through fabrication of information. Esmerian offered to give his passport to Merrill Lynch and Merrill Lynch declined to take it. Despite its frequent audits of the Jewelry Collateral, Merrill Lynch has never found a

42

1031777.1

single item of collateral to be missing.  Moreover, the collateral in Las Vegas belongs to a non-party and this Court has no jurisdiction over the property of a non-party.

## FIRST CAUSE OF ACTION
### (Replevin of the Calypso Jewelry)

106.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer:  Defendants repeat the answers heretofore stated.**

107.    Pursuant to the Special Collection Security Agreement, Calypso granted Merrill Lynch a security interest in the Calypso Jewelry.  A substantial amount of the Calypso Jewelry is located in the Chase Vault.  The Calypso Jewelry that has not been moved to the Chase Vault and makes up the Jewelry Collateral is the subject of this cause of action.

**Answer:  Admit.**

108.    Merrill Lynch perfected its security interest in the Calypso Jewelry in accordance with the Uniform Commercial Code.

**Answer:  Lack knowledge sufficient to form a belief as to the truth of falsity of the allegations of paragraph 108.**

109.    The Credit Agreements and Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Calypso Jewelry.

**Answer:  Deny and refer to the applicable documents for their full terms and meaning.**

110.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire principal and interest thereunder is now due and owing.  As a result, Events of Default exist and are

continuing, and pursuant to the Special Collection Security Agreement, Merrill Lynch is entitled to collect the Calypso Jewelry from Calypso.

**Answer: Deny.**

111.    On information and belief, Calypso is holding Calypso Jewelry to which Merrill Lynch is entitled.  The Calypso Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

**Answer:**

112.    Merrill Lynch has demanded that Calypso allow it to collect the Calypso Jewelry. Calypso has failed to perform its obligations under the Special Collection Security Agreement to assemble the Calypso Jewelry and make it available to Merrill Lynch so that the Calypso Jewelry may be transferred to a secure location under the control of Merrill Lynch.

**Answer:**

## SECOND CAUSE OF ACTION
### (Replevin of the Endymion Jewelry)

113.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer:  Repeat the answers heretofore stated.**

114.    Pursuant to the Acquisition Security Agreement, Endymion granted Merrill Lynch a security interest in the Endymion Jewelry.  The Endymion Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

**Answer:  Deny.  Merrill Lynch does not have a security interest in the Endymion Jewelry.**

115.    Merrill Lynch perfected its security interest in the Endymion Jewelry in accordance with the Uniform Commercial Code.

44

**Answer:  Lack knowledge sufficient to form a belief as to the truth of falsity of the allegations of paragraph 115.**

116.    The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Endymion Jewelry.

**Answer:  Deny and refer to the applicable documents for their full terms and meaning.**

117.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire principal and interest thereunder is now due and owing.  As a result, Events of Default exist and are continuing, and pursuant to the Acquisition Security Agreement and Endymion's pledge of the Endymion Jewelry, Merrill Lynch is entitled to collect the Endymion Jewelry from Endymion.

**Answer: Deny.**

118.    On information and belief, Endymion is holding Endymion Jewelry to which Merrill Lynch is entitled.  The Endymion Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

**Answer:  Deny.  Merrill Lynch does not have a security interest in the Endymion Jewelry.**

119.    Merrill Lynch has demanded that Endymion allow it to collect the Endymion Jewelry.  Endymion has failed to perform its obligations under the Acquisition Security Agreement to assemble the Endymion Jewelry and make it available to Merrill Lynch so that the Endymion Jewelry may be transferred to a secure location under the control of Merrill Lynch.

**Answer:  Deny.**

45

1031777.1

## THIRD CAUSE OF ACTION
### (Replevin of the Tango Jewelry)

120.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer: Repeat the answers heretofore stated.**

121.    Pursuant to the Acquisition Security Agreement, Tango granted Merrill Lynch a security interest in the Tango Jewelry.  The Tango Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

**Answer: Admit.**

122.    Merrill Lynch perfected its security interest in the Tango Jewelry in accordance with the Uniform Commercial Code.

**Answer: Lack knowledge sufficient to form a belief as to the truth or falsity of the allegations of paragraph 122.**

123.    The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Tango Jewelry.

**Answer: Deny.**

124.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements.  As a result, Events of Default exist and are continuing, and pursuant to the Acquisition Security Agreement and Tango's pledge of the Tango Jewelry, Merrill Lynch is entitled to collect the Tango Jewelry from Tango.

**Answer: Deny.**

46

125.    On information and belief, Tango is holding Tango Collateral to which Merrill Lynch is entitled.  The Tango Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

**Answer: Deny.**

126.    Merrill Lynch has demanded that Tango allow it to collect the Tango Jewelry. Tango has failed to perform its obligations under the Acquisition Security Agreement to assemble the Tango Jewelry and make it available to Merrill Lynch so that the Tango Jewelry may be transferred to a secure location under the control of Merrill Lynch.

**Answer: Deny.**

### FOURTH CAUSE OF ACTION
### (Replevin of the Foxtrot Jewelry)

127.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer: Repeat the answers heretofore stated.**

128.    Pursuant to the Foxtrot Security Agreement, Foxtrot granted Merrill Lynch a security interest in the Foxtrot Jewelry.  The Foxtrot Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

**Answer: Deny.**

129.    Merrill Lynch duly perfected its security interest in the Foxtrot Jewelry in accordance with the Uniform Commercial Code.

**Answer: Lack knowledge sufficient to form a belief as to the truth of the allegations of paragraph 129.**

130.  The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Foxtrot Jewelry.

**Answer: Deny.**

131.  On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire principal and interest thereunder is now due and owing.  As a result, Events of Default exist and are continuing, and pursuant to the Foxtrot Security Agreement and Foxtrot's pledge of the Foxtrot Jewelry, Merrill Lynch is entitled to collect the Foxtrot Jewelry from Foxtrot.

**Answer: Deny.**

132.  On information and belief, Foxtrot is holding Foxtrot Jewelry to which Merrill Lynch is entitled.  The Foxtrot Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

**Answer: Deny.**

133.  Merrill Lynch has demanded that Foxtrot allow it to collect the Foxtrot Jewelry. Foxtrot has failed to perform its obligations under the Foxtrot Security Agreement to assemble the Foxtrot Jewelry and make it available to Merrill Lynch so that the Foxtrot Jewelry may be transferred to a secure location under the control of Merrill Lynch.

**Answer: Deny.**

## FIFTH CAUSE OF ACTION
### (Replevin of the REI Jewelry)

134.  Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer: Repeat the answers heretofore stated.**

48

1031777.1

135.    Pursuant to the REI Security Agreement, REI granted Merrill Lynch a security interest in the REI Jewelry.  The REI Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

**Answer:  Deny.**

136.    Merrill Lynch duly perfected its security interest in the REI Jewelry in accordance with the Uniform Commercial Code.

**Answer:  Lack knowledge sufficient to form a belief as to the truth or falsity of the allegations of paragraph 136.**

137.    The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the REI Jewelry.

**Answer:  Deny and refer to the documents for their full terms and meaning.**

138.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire principal and interest thereunder is now due and owing.  As a result, Events of Default exist and are continuing, and pursuant to the REI Security Agreement and REI's pledge of the REI Jewelry, Merrill Lynch is entitled to collect the REI Jewelry from REI.

**Answer:  Deny.**

139.    On information and belief, REI is holding REI Jewelry to which Merrill Lynch is entitled.  The REI Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

**Answer:  Deny.**

49

140.    Merrill Lynch has demanded that REI allow it to collect the REI Jewelry. REI has failed to perform its obligations under the REI Security Agreement to assemble the REI Jewelry and make it available to Merrill Lynch so that the REI Jewelry may be transferred to a secure location under the control of Merrill Lynch.

**Answer: Deny.**

## SIXTH CAUSE OF ACTION
### (Appointment of a receiver)

141.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer: Repeat the answers heretofore stated.**

142.    Merrill Lynch faces a substantial risk of losing the Jewelry Collateral as a consequence of his recent conduct including (a) Esmerian's failure to make the Jewelry Collateral available to Merrill Lynch as required by the Loan Documents; (b) Esmerian's failure to deposit proceeds of sales from collateral into Merrill Lynch control accounts; (c) opening unauthorized bank accounts over which Merrill Lynch lacks control; and (d) Esmerian's failure to provide updated monthly schedules to Merrill Lynch of the location of the Jewelry Collateral.

**Answer: Deny.**

143.    The Jewelry Collateral consists of a number of pieces that are small and easily concealed, portable, subject to removal from one place to another without significant effort, and capable of being transferred, concealed, disposed of, or removed from the state, thus placing the Jewelry Collateral beyond the reach of Merrill Lynch.  Some of the Jewelry Collateral is already outside of New York in Las Vegas and other locations known and unknown to Merrill Lynch.

**Answer: Deny.**

50

144.    Pursuant to CPLR § 6401, the appointment of a receiver to take control of the business of the Defendants is necessary and appropriate.

**Answer: Deny.**

<u>**SEVENTH CAUSE OF ACTION**</u>
<u>**(Guarantee by Esmerian)**</u>

145.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer: Repeat the answers heretofore stated.**

146.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing. Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan. No payment has been made.

**Answer: Admit that demand was made but deny that payment is due.**

147.    On October 12, 2007, Merrill Lynch also made a demand of payment to Esmerian under the Esmerian Special Collection Guarantee and Esmerian Acquisition Guarantee.

**Answer: Admit.**

148.    Esmerian is obligated under the terms of the Esmerian Special Collection Guarantee to pay Merrill Lynch the outstanding balance of the Special Collection Loan.

**Answer: Deny.**

149.    Esmerian is obligated under the terms of the Esmerian Acquisition Guarantee to pay Merrill Lynch the outstanding balance of the Acquisition Loan.

**Answer: Deny.**

51

## EIGHTH CAUSE OF ACTION
### (Guarantee by Endymion, LLC)

150.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer: Repeat the answers heretofore stated.**

151.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Acquisition Loan. No payment has been made.

**Answer: Admit that demand was made but deny that payment is due.**

152.    On October 12, 2007, Merrill Lynch also made a demand of payment to Endymion under the Endymion Guarantee.

**Answer: Admit.**

153.    Endymion is obligated under the terms of the Endymion Guarantee to pay Merrill Lynch the outstanding balance of the Acquisition Loan.

**Answer: Deny.**

## NINTH CAUSE OF ACTION
### (Guarantee by REI)

154.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer: Repeat the answers heretofore stated.**

155.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing. Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan. No payment has been made.

**Answer: Admit that demand was made but deny that payment is due.**

156.    On October 12, 2007, Merrill Lynch also made a demand of payment to REI under the REI/Tango Guarantee.

**Answer: Admit.**

157.    REI is obligated under the terms of the REI/Tango Guarantee to pay Merrill Lynch the outstanding balance of the Special Collection Loan and the outstanding balance of the Acquisition Loan.

**Answer: Deny.**

## TENTH CAUSE OF ACTION
### (Guarantee by Tango)

158.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer: Repeat the answers heretofore stated.**

159.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

**Answer: Admit that demand was made but deny that payment is due.**

160.    On October 12, 2007, Merrill Lynch also made a demand of payment to Tango under the REI/Tango Guarantee.

**Answer: Admit.**

161.    Tango is obligated under the terms of the REI/Tango Guarantee to pay Merrill Lynch the outstanding balance of the Special Collection Loan and the outstanding balance of the Acquisition Loan.

53

**Answer: Deny.**

## ELEVENTH CAUSE OF ACTION
### (Guarantee by Foxtrot)

162.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer: Repeat the answers heretofore stated.**

163.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Acquisition Loan. No payment has been made.

**Answer: Deny.**

164.    On October 12, 2007, Merrill Lynch also made a demand of payment to Foxtrot under the Foxtrot Guarantee.

**Answer: Admit.**

165.    Foxtrot is obligated under the terms of the Foxtrot Guarantee to pay Merrill Lynch the outstanding balance of the Acquisition Loan.

**Answer: Deny.**

## TWELFTH CAUSE OF ACTION
### (Accounting)

166.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

**Answer: Repeat the answers heretofore stated.**

167.    Between October and December 2007, Defendants have sold Jewelry Collateral but did not deposit the proceeds over to Merrill Lynch trust accounts as the Loan Parties were required to do pursuant to the Security Agreements.

1031777.1

**Answer:  Deny for the reasons heretofore stated.**

168.    In November 2007, Merrill Lynch discovered that defendant Esmerian had opened several bank accounts at First Republic Bank in the name of the Loan Parties.  These bank accounts were opened without authorization of Merrill Lynch in violation of certain of the Loan Documents.

**Answer:  Deny for the reasons heretofore stated.**

169.    Between August and December 2007, defendant Esmerian and other officers have failed to provide Merrill Lynch with updated monthly schedules as to the identity and the location of the Jewelry Collateral, including Jewelry Collateral believed to be held by the consignees, in violation of the Credit Agreements.

**Answer:  Deny.  Between August and December 2007, Merrill Lynch did not request updated monthly schedules but, during that time, Merrill Lynch conducted an audit of a substantial portion of the collateral and took possession of the most valuable collateral.**

170.    Merrill Lynch seeks an accounting from Defendants of (a) the amount of proceeds from sales of the Jewelry Collateral that have not been previously accounted for; (b) a description, including bank, account number and balance information, of any bank accounts opened without Merrill Lynch's authority; and (c) the identity and the location of each piece of the Jewelry Collateral.

**Answer:  This allegation requires no response.**

55

## AFFIRMATIVE DEFENSES

1.      Merrill Lynch does not have a valid security interest in any of the Jewelry Collateral because the collateral is not identified with sufficient specificity in either the Security Agreements or the related UCC-1's.

2.      Merrill Lynch has discharged the indebtedness of all the defendants by its reckless and unreasonable conduct.

3.      Merrill Lynch has discharged the indebtedness of all the Loan Parties by its conduct in dealing with the Jewelry Collateral in a commercially unreasonable manner.

4.      Merrill Lynch has discharged the indebtedness of all the Loan Parties by its conduct in preventing defendants from operating their businesses so as to sell the Jewelry Collateral for its fair market value.

5.      The REI Security Agreement is void for lack of consideration.

6.      The Endymion Security Agreement is void because Endymion did not own any of the alleged collateral.

7.      The Foxtrot Security Agreement is void because Foxtrot did not own any of the alleged collateral.

8.      Merrill Lynch has discharged the indebtedness of all the defendants by its bad faith conduct including, without limitation, the following conduct:

a.      On January 5, 2007, Merrill Lynch directed Samba to hire Simon Critchel as chief executive officer – an appointment that caused Samba significant losses for which Merrill Lynch is liable.

b.      On January 5, 2007, Merrill Lynch directed defendants to replace their attorney.

56

1031777.1

c.    On December 17, 2007, Merrill Lynch directed its attorneys not to speak to defendants' new attorney, Helen Davis Chaitman.

d.    On October 3, 2007, Merrill Lynch lured Esmerian to CWT's offices under false pretenses and, through the conduct of CWT which Merrill Lynch directed, coerced Esmerian into signing the October 3, 2007 document.

e.    In early January 2008, upon information and belief, Merrill Lynch obstructed defendants in their efforts to refinance the indebtedness by telling a prospective lender that Merrill Lynch is not interested in selling the defendants' loans without "a premium over par." By its conduct, Merrill Lynch breached the loan documents and thereby excused any failure to perform by the defendants.

f.    In January 2008, Merrill Lynch sent false and fraudulent letters to alleged consignees of the Jewelry Collateral.

g.    Throughout the loan relationship, Merrill Lynch has imposed upon the defendants extravagant and unnecessary legal and auditing expenses.

57

## COUNTERCLAIMS

Defendants-Counterclaim Plaintiffs ("defendants"), for their counterclaims against Merrill Lynch Mortgage Capital Inc. ("Merrill Lynch"), allege as follows:

### First Counterclaim for Breach of Contract

1.    Ralph O. Esmerian resides at 1001 Park Avenue, New York, New York.

2.    Calypso Mines LLC ("Calypso"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

3.    Endymion, LLC ("Endymion") is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

4.    R. Esmerian Inc. ("REI") is a New York corporation with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

5.    Tango LLC ("Tango"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

6.    Foxtrot LLC ("Foxtrot"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

7.    Esmerian is the principal of and, directly or indirectly, owns and controls all the membership interests of Calypso, Endymion, Tango, and Foxtrot.

8.    Esmerian is the 65% shareholder of REI.

9.    Merrill Lynch is a Delaware corporation with its principal place of business at 4 World Financial Center, New York, New York.

10.    Merrill Lynch is a secured lender to the Loan Parties under two credit agreements, the Special Collection Credit Agreement and the Acquisition Credit Agreement.

11.    In connection with the Credit Agreements, Merrill Lynch entered into Security Agreements with the defendants.

12.    In entering into the Security Agreements, Merrill Lynch knew that it was taking collateral of a highly unique and valuable nature, *i.e.,* museum quality and rare antique and vintage jewelry.

13.    In view of the unique nature of the collateral, each of the Security Agreements requires Merrill Lynch to preserve the collateral in its possession and to "deal with it in the manner provided in the Protocols and otherwise in the manner as the Lender deals with similar property for its own account."

14.    On information and belief, Merrill Lynch has not treated the collateral "in the manner" that Merrill Lynch "deals with similar property for its own account."

15.    On information and belief, Merrill Lynch entered into the Credit Agreements because it had a desire to acquire the defendants' property and businesses.

16.    By entering into the various agreements with the defendants, Merrill Lynch assumed an obligation to preserve the value of the collateral for the benefit of the defendants.

17.    As a matter of law, Merrill Lynch has an obligation to deal with the collateral in a commercially reasonable manner.

18.    Merrill Lynch has failed and refused to comply with its obligations under section 11 of the Endymion Security Agreement and under Section 10 of the Tango, Foxtrot and Calypso Security Agreements.

19.    Among the actions that Merrill Lynch has taken in violation of its obligations under the Security Agreements are the following:

1031777.1

20.    In October 2007, Merrill Lynch insisted upon taking possession of the Special Collection which has a value of approximately $86 million.

21.    Although Merrill Lynch has released certain items for exhibition, Merrill Lynch has prevented defendants from being able to show the major portion of the items of the Special Collection to potential purchasers in the ordinary course of business during the Christmas 2007 season.

22.    If Merrill Lynch had not taken possession of the Special Collection, defendants would have had the opportunity to privately sell pieces of the Special Collection and substantially reduce their indebtedness to Merrill Lynch.

23.    Merrill Lynch contacted consignees of defendants and demanded information about the jewelry that defendants had consigned to third parties.

24.    On information and belief, in many instances, Merrill Lynch deliberately misrepresented the extent of its security interest in its communications with third parties.

25.    By its communications with consignees, Merrill Lynch deliberately interfered with defendants' ability to sell consigned items.

26.    Merrill Lynch has consistently threatened to dispose of the collateral in a commercially reckless manner.

27.    By its conduct, Merrill Lynch has unreasonably and unlawfully interfered with defendants' businesses.

28.    On information and belief, Merrill Lynch has pandered to the auction houses, Sotheby's and Christie's, in order to induce their support in Merrill Lynch's efforts to sell the collateral in a commercially reckless manner.

60

29.    On information and belief, Merrill Lynch invested tens of billions of dollars in subprime mortgages and other leveraged investments which caused Merrill Lynch to write down $16.7 billion of assets in the fourth quarter of 2007 and take a fourth quarter loss of $9.8 billion, thereby wiping out four years of earnings.

30.    On information and belief, these losses have caused massive upheaval and layoffs at Merrill Lynch.

31.    On information and belief, the losses and massive layoffs have caused chaos among Merrill Lynch personnel.

32.    On information and belief, Merrill Lynch's treatment of defendants has been irrational and reckless because of the general hysteria at Merrill Lynch caused by its improvident investment of its own assets.

33.    Merrill Lynch's conduct is a breach of the Security Agreements.

**34.**    By virtue of Merrill Lynch's conduct, Defendants-Counterclaim Plaintiffs have been damaged in an amount that cannot presently be calculated, but believed to be in excess of $200 million.

## Second Counterclaim for Injunctive Relief

35.    Defendants-Counterclaim Plaintiffs repeat the allegations heretofore stated.

36.    The collateral is of unique and irreplaceable value.

37.    By its conduct, Merrill Lynch has threatened to cause defendants irreparable injury.

38.    Defendants have no adequate remedy at law.

39.    Defendants have a likelihood of success on the merits.

40.    The equities are totally in defendants' favor.

61

41.    Defendants are entitled to a preliminary and permanent injunction barring Merrill Lynch from disposing of the collateral in a commercially unreasonable manner.

### Third Counterclaim for Breach of the Obligation of Good Faith and Fair Dealing

42.    Defendants repeat the allegations heretofore stated.

43.    There is implied in every contract under New York law an obligation of good faith and fair dealing.

44.    The Agreements at issue are subject to Merrill Lynch's obligation of good faith and fair dealing.

45.    The Agreements at issue are subject to Merrill Lynch's obligation to dispose of the unique, highly valuable jewelry in a commercially reasonable manner.

46.    The Agreements at issue are subject to Merrill Lynch's obligation to insure that the spirit and purpose of the Agreements are not frustrated.

47.    The Agreements at issue are subject to Merrill Lynch's obligation not to deliberately destroy the viability of defendants' businesses.

48.    The Agreements at issue are subject to Merrill Lynch's obligation to assure that defendants enjoy the fruits of their bargain.

49.    Merrill Lynch has breached its duty of good faith and fair dealing implied in each of the Agreements by, *inter alia*: (a) exercising its discretion under the Agreements to prevent defendants from operating their businesses in a manner fully consistent with their experience and expertise in the industry; (b) threatening to sell, intending to sell, selling and/or causing to sell all, or a portion of the Collateral in a reckless and commercially unreasonable manner; (c) improperly controlling and otherwise interfering with the defendants' business operations by , *inter alia*, dictating to defendants whom they can retain as attorneys and accountants and whom

62

1031777.1

they should hire as Samba's chief executive officer; (d) communicating deliberately false information to defendants' consignees and thereby causing turmoil in defendants' businesses; (e) imposing burdensome and unreasonable legal, auditing and other fees upon the defendants and generally squandering defendants' money; and (f) frustrating defendants' ability to refinance their debt by representing to at least one lender that Merrill Lynch will not sell the loans unless it receives a premium therefore.

     50.    By reason of Merrill Lynch's conduct, defendants have been damaged in an amount that cannot presently be calculated, but is believed to be in excess of $200 million.

### Fourth Counterclaim for Fraud

     51.    Defendants repeat the allegations heretofore stated.

     52.    On information and belief, in January 2008 Ryan Bell, a Vice President of Merrill Lynch, communicated orally and in writing with numerous jewelry retailers, museums, and possibly others, stating that REI has pledged all of its inventory to Merrill Lynch.

     53.    This statement is false.

     54.    Ryan Bell knew, at the time he made this statement, that REI has never pledged all of its inventory to Merrill Lynch.

     55.    On information and belief, recipients of these communications from Bell have relied upon Bell's statements and assumed their truthfulness.

     56.    Given the seriousness of the statements made by Bell, the consignees' reliance was reasonable.

     57.    By making his false and reckless statements, Bell and Merrill Lynch have caused and are continuing to cause REI's consignees to refuse to sell jewelry on REI's behalf, thus causing severe injury to REI's business and reputation in the industry.

58.    In addition to sending letters to consignees, Merrill Lynch has sent to at least some consignees, on information and belief, complete lists of the collateral.

59.    There is no commercial justification for Merrill Lynch to have disclosed defendants' inventory to competitors.

60.    By doing so, Merrill Lynch has recklessly exposed defendants to economic injury.

61.    By doing so, Merrill Lynch has recklessly exposed Esmerian and defendants' employees to physical risk because the jewelry industry is highly vulnerable to theft.

62.    By reason of Merrill Lynch's conduct, defendants have been damaged in an amount that cannot presently be calculated, but is believed to be in excess of $100 million.

### Fifth Counterclaim for a Declaratory Judgment

63.    Defendants repeat the allegations heretofore stated.

64.    In order to have a valid security interest under New York law, the collateral must be identified with specificity.

65.    The Tango and Calypso Security Agreements and related UCC-1's contain impermissibly vague descriptions of the collateral.

66.    These descriptions are insufficient to give Merrill Lynch a valid security interest in any of the Tango and Calypso collateral.

67.    The Endymion and Foxtrot Security Agreements are a nullity because neither entity owned any jewelry at the time the Security Agreements were executed.

68.    The REI Security Agreement is invalid for lack of consideration.

69.    Merrill Lynch claims it has a security interest in the Jewelry Collateral.

70.    A controversy exists as to the validity of Merrill Lynch's security interest in all of the collateral it claims.

71.    By reason of the above, the defendants seek a declaratory judgment that Merrill Lynch does not have a valid security interest in any of the Jewelry Collateral.

WHEREFORE, defendants demand judgment as follows:

(a)    Dismissing the Verified Complaint in its entirety with prejudice;

(b)    On the First Counterclaim, awarding defendants damages in an amount to be determined at trial, but believed to be in excess of $200 million;

(c)    On the Second Counterclaim, entering a preliminary and permanent injunction against Merrill Lynch to prevent the commercially unreasonable disposition of the collateral;

(d)    On the Third Counterclaim, awarding defendants damages in an amount to be determined at trial, but believed to be in excess of $200 million;

(e)    On the Fourth Counterclaim, awarding defendants damages in an amount to be determined at trial, but believed to be in excess of $100 million in compensatory damages and $500 million in punitive damages;

(e)    On the Fifth Counterclaim, issuing a judgment declaring that Merrill Lynch does not have a valid security interest in any of the Jewelry Collateral.

(f)    On all Counterclaims, awarding defendants their costs and disbursements, including attorney's fees, and such other and further relief as the Court deems just and equitable.

65

January 23, 2008

PHILLIPS NIZER LLP

By: _____

Helen Davis Chaitman

666 Fifth Avenue
New York, NY 10103-0084
(212) 977-9700

*Attorneys for Defendant*

66

**VERIFICATION**

STATE OF NEW YORK          )

                                      : ss.:

COUNTY OF NEW YORK    )


RALPH O. ESMERIAN, being duly sworn, deposes and says:

1.        I am a defendant in this action.

2.        I have read the foregoing Answer to the Complaint and the Counterclaims and know the contents thereof.

3.        The same are true to my own knowledge, except as to matters stated to be alleged on information and belief and, as to those matters, I believe them to be true.

RALPH O. ESMERIAN


Sworn to before me this
23rd day of January 2008

Notary Public

PILAR BARANAUSKAS
NOTARY PUBLIC, State of New York
No. 01BA4649092
Qualified in Westchester County
Commission Expires July 31, 200_9

1031777.1

EXHIBIT "C"

Minutes

INDEX NO.:              600012-2008E
PLAINTIFF:              MERRILL LYNCH MORTGAGE
DEFENDANT:              ESMERIAN, RALPH
CASE STATUS:            ACTIVE
ACTION:                 E-FILED OTHER COMMERCIAL
LAST UPDATE:            06-02-2008 3:00PM
JUSTICE:                FREEDMAN, H. E.

Home / SCROLL / COUNTY CLERK MINUTES

| DATE | DOCUMENT TYPE |
|---|---|
| 01-02-2008 | SUMMONS AND VERIFIED COMPLAINT |
| 01-10-2008 | AFFIDAVIT OF SERVICE |
| 01-23-2008 | VERIFIED ANSWER |
| 03-11-2008 | SO ORDERED STIPULATION |
| 03-15-2008 | ORDER IAS PART 39 SEQ 003(SEE ORDER TO SHOW CAUSE) |
| 03-27-2008 | ORDER IAS PART 39 SEQ 004 WITHDRAWN |
| 04-09-2008 | ORDER TO SHOW CAUSE (ORIGINAL RETURNED TO RM 119 - MOTION SUPPORT OFFICE) |
| 04-09-2008 | NOTICE OF APPEAL # 00960 |
| 04-11-2008 | NOTICE OF ENTRY |
| 04-15-2008 | ORDER PT 39 (ORIGINAL RETURNED TO PART 39 - J. FREEDMAN) |
| 04-15-2008 | NOTICE OF ENTRY |
| 04-16-2008 | NOTICE OF APPEAL #1036 |
| 04-21-2008 | APPELLATE DIVISION RECEIPT |
| 04-24-2008 | ORDER IAS PART 39 SEQ 005 DECIDED AS PER ORDER ON RECORD & IS STAYED BY B/RUPTCY COURT |

Minutes

| | |
|---|---|
| 04-25-2008 | ORDER IAS PART 39 SEQ 001 STAYED |
| 05-02-2008 | STIPULATION AND ORDER |
| 05-27-2008 | ORDER/STIPULATION |

BACK    NEW SEARCH

**COUNTY CLERK MINUTES:** The minutes of the County Clerk in chronological order reflecting all documents filed with the County Clerk. Motion papers are filed with the order therein and are not separately identified.

60 Centre Street, New York NY 10007
Copyright © 2006 Unified Court System

EXHIBIT "D"

HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, NY 10016
Tel: 212-592-1400
Fax: 212-592-1500
Joshua J. Angel
Paul Rubin

Attorneys for the Defendants Calypso Mines LLC, Endymion, LLC, Tango LLC and Foxtrot LLC

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| MERRILL LYNCH MORTGAGE CAPITAL INC., | : | Index No. 600012/2008 |
| | : | |
| Plaintiff, | : | <u>Civil Action</u> |
| | : | |
| -against- | : | |
| | : | **NOTICE OF FILING OF** |
| RALPH ESMERIAN, CALYPSO MINES LLC, | : | **NOTICE OF REMOVAL** |
| ENDYMION, LLC, R. ESMERIAN INC., TANGO | : | |
| LLC and FOXTROT LLC, | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TO:    THE CLERK OF THE SUPREME COURT:

PLEASE TAKE NOTICE that the within matter has been removed on June 2, 2008 to the United States District Court for the Southern District of New York based upon the Notice of Removal (the "Notice") annexed hereto as Exhibit "A". Upon filing the Notice, Defendants Calypso Mines LLC, Endymion, LLC, Tango LLC and Foxtrot LLC have effected removal pursuant to 28 U.S.C. §§ 1441, 1446 and 1452.

Dated:  June _____, 2008

Respectfully submitted,

HERRICK, FEINSTEIN LLP
Attorneys for Defendants Calypso Mines LLC,
Endymion, LLC, Tango LLC, and Foxtrot LLC

By:     _____
        Joshua J. Angel
        Paul Rubin
        jangel@herrick.com
        prubin@herrick.com
        2 Park Avenue
        New York, New York 10016
        (212) 592-1400