EXHIBIT "A"

# ORIGINAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| MERRILL LYNCH MORTGAGE CAPITAL INC., | Index No. 08600012 |
| Plaintiff, | Date Purchased: |
| - against - | Plaintiff designates New York County as place of trial |
| RALPH ESMERIAN, CALYPSO MINES LLC, ENDYMION, LLC, R. ESMERIAN INC., TANGO LLC, and FOXTROT LLC, | **SUMMONS** |
| Defendants. | Plaintiff has a place of business at 4 World Financial Center, New York, New York |

TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the verified complaint, copy of which complaint is annexed hereto and herewith served upon you, in this action and to serve a copy of your verified answer to the complaint on plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30)) days after service is complete if this summons and the annexed complaint is not delivered to you within the State of New York). In case of your failure to appear or answer said complaint, judgment will be taken against you by default for the relief demanded in the complaint.

As set forth in the complaint, the basis of venue in this action is CPLR § 503, in that Plaintiff has a principal place of business in New York County.

**FILED**

JAN 02 2008

NEW YORK
COUNTY CLERK'S OFFICE

Dated:   New York, New York
         January 2, 2008

                                CADWALADER, WICKERSHAM & TAFT

                                By:
                                    Howard R. Hawkins, Jr.
                                    Ellen M. Halstead

                                Office and Post Office Address:
                                Cadwalader, Wickersham & Taft LLP
                                One World Financial Center
                                New York, New York 10281
                                Telephone: (212) 504-6000
                                Facsimile: (212) 504-6666

                                *Attorneys for Plaintiff*

Defendants' Addresses:

         Ralph Esmerian
         1001 Park Avenue
         New York, New York

         Calypso Mines LLC
         610 Fifth Avenue, 4th Floor
         New York, New York
         Attention: Ralph Esmerian

         Endymion, LLC
         610 Fifth Avenue, 4th Floor
         New York, New York
         Attention: Ralph Esmerian

         R. Esmerian Inc.
         610 Fifth Avenue, 4th Floor
         New York, New York
         Attention: Ralph Esmerian

USActive 11455437.2                        2

Tango LLC
610 Fifth Avenue, 4th Floor
New York, New York
Attention:  Ralph Esmerian

Foxtrot LLC
610 Fifth Avenue, 4th Floor
New York, New York
Attention:  Ralph Esmerian

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MERRILL LYNCH MORTGAGE CAPITAL INC.,

Plaintiff,

- against -

RALPH ESMERIAN, CALYPSO MINES LLC,
ENDYMION, LLC, , R. ESMERIAN INC., TANGO
LLC and FOXTROT LLC,

Defendants.

Index No. 600012/2008

VERIFIED COMPLAINT

NEW YORK
COUNTY CLERKS OFFICE

JAN 02 2008

NOT COMPARED
WITH COPY FILE

Plaintiff Merrill Lynch Mortgage Capital Inc. ("Merrill Lynch") for its Verified

Complaint against Defendants Ralph Esmerian, Calypso Mines LLC, Endymion, LLC, R.

Esmerian Inc., Tango LLC and Foxtrot LLC alleges as follows:

## NATURE OF THE ACTION

1.      Merrill Lynch is a secured lender to certain affiliated borrowers and

guarantors (collectively, the "Loan Parties") under two credit agreements, the Special Collection

Credit Agreement and the Acquisition Credit Agreement (collectively, the "Credit Agreements").

The financings extended by Merrill Lynch pursuant to the Credit Agreements are secured by,

among other things, collateral held by the Loan Parties.

2.      Defendant Ralph Esmerian ("Esmerian") is the principal of and, directly

or indirectly, owns and controls all the other outstanding capital stock or membership interests,

as applicable,   the Loan Parties, including defendants Calypso Mines LLC ("Calypso"),

Endymion, LLC ("Endymion"), R. Esmerian Inc. ("REI"), Tango LLC ("Tango") and Foxtrot

LLC ("Foxtrot") (collectively, including Esmerian, the "Defendants").

3.     The total amount of outstanding financing extended to the Loan Parties by Merrill Lynch is $177,532,616.21.

4.     The financings extended by Merrill Lynch pursuant to the Credit Agreements are secured by, among other things, collateral held by the Loan Parties.  Some of the collateral, including the collateral that is the subject matter of this action (the "Jewelry Collateral"), includes unique and highly valuable jewelry.

5.     The Credit Agreements are secured by guarantee agreements (the "Guarantee Agreements"), which include a full recourse unconditional personal guarantee by defendant Esmerian and full recourse unconditional guarantees by defendants Endymion, REI, Tango and Foxtrot (collectively, including Esmerian, the "Guarantors").

6.     On September 10, 2007, certain of the Loan Parties failed to make interest payments due and owing to Merrill Lynch under the Credit Agreements totaling approximately $1.7 million and failed to make a payment on account of the Debt Service Reserve Amount required by the Acquisition Credit Agreement, in the total amount of approximately $2.0 million. These failures constituted Events of Default under the Credit Agreements.[1]

7.     As of December 31, 2007, approximately $7.75 million of interest payments, and the entire payment due on account of the Debt Service Reserve Account of $1,979,902, was still due and owing and in default.  The aggregate amount owed, including unpaid interest, to Merrill pursuant to the Credit Agreements is approximately $185.3 million plus attorneys' fees and costs of collection.

---

[1]     Unless defined herein, capitalized terms are defined terms in the Acquisition Credit Agreement.

2

8.     Pursuant to the Security Agreements and the Credit Agreements, as a remedy upon an Event of Default, Merrill Lynch may accelerate the entirety of the outstanding loans made in connection with the Credit Agreements and demand full payment thereof.

9.     On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

10.    On October 12, 2007, Merrill Lynch also made a demand of payment under the Guarantee Agreements.  No payment has been made.

11.    On October 3, 2007, Merrill Lynch and Defendants entered into an irrevocable consent agreement (the "Irrevocable Consent Agreement"), whereby Defendants, through Esmerian, irrevocably consented to the Merrill Lynch's taking physical possession of, seizing or otherwise exercising control over any property, including Jewelry Collateral, located at Esmerian's office at 610 Fifth Avenue, 4th Floor, New York, New York, in which Merrill Lynch has a security interest pursuant to the Credit Agreements or other Loan Documents. Defendants agreed that Merrill Lynch could exercise this right immediately and at any time hereafter.  In addition to the Irrevocable Consent Agreement, Merrill Lynch had the right pursuant to the Security Agreements to make demand upon Esmerian and the Loan Parties to assemble and make available to Merrill Lynch collateral held by the Loan Parties.  After allowing Merrill Lynch to collect some of the collateral, defendant Esmerian has failed to assemble the Jewelry Collateral and make the Jewelry Collateral available to Merrill Lynch. Merrill Lynch has demanded that Defendants identify the location of each item of the remaining Jewelry Collateral and deliver the same to Merrill Lynch.

3

12. Due to the acceleration, the principal amount owed on the Special Collection Credit Agreement is $56,400,957.13 plus accrued but unpaid interest in the aggregate amount of $2,102,913.94 as of December 31, 2007, the total amount owed on the Acquisition Credit Agreement is $121,131,659.08 plus accrued but unpaid interest in the aggregate amount of $5,649,216.07 as of December 31, 2007, and the amount owed on the Debt Service Reserve Account is $1,979,902. The aggregate amount owed, including unpaid interest, to Merrill pursuant to the Credit Agreements is $185,284,746.22 plus attorneys' fees and costs of collection.

13. Pursuant to the Special Collection Security Agreement, the Acquisition Agreement, the REI Security Agreement and the Foxtrot Security Agreement (collectively, the "Security Agreements"), as a remedy upon an Event of Default, Merrill Lynch may collect certain collateral, including the Jewelry Collateral, from the Loan Parties. The Loan Parties have failed to comply with Merrill Lynch's demand to allow it to collect the Jewelry Collateral.

14. Merrill Lynch by this action seeks (a) replevin of the Jewelry Collateral, (b) the appointment of a receiver and (c) payment of the amount due under the Credit Agreement through enforcement of the Guarantee Agreements. Merrill Lynch reserves all its other rights and remedies under the Security Agreements and the Credit Agreements.

## THE PARTIES

15. Plaintiff Merrill Lynch Mortgage Capital Inc. ("Merrill Lynch") is a Delaware corporation with its principal place of business at 4 World Financial Center, New York, New York. Merrill Lynch is in the business, among other things, of making secured loans to business enterprises.

4

16.     Upon information and belief, defendant Ralph Esmerian ("Esmerian") resides at 1001 Park Avenue, New York, New York.

17.     Defendant Calypso Mines LLC ("Calypso"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

18.     Defendant Endymion, LLC ("Endymion"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

19.     Defendant R. Esmerian Inc. ("REI"), is a New York corporation with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

20.     Defendant Tango LLC ("Tango"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

21.     Defendant Foxtrot LLC ("Foxtrot"), is a New York limited liability company with its principal place of business at 610 Fifth Avenue, 4th Floor, New York, New York.

### VENUE

22.     Venue is proper under CPLR § 503.  Plaintiff has a principal place of business in New York County.

### FACTS

23.     Defendant Esmerian is the principal of and, directly or indirectly owns and controls all the other outstanding capital stock or membership interests, as applicable, of the Loan Parties.  Esmerian is an international jewelry dealer.

24.     Upon information and belief, the purpose for the formation and existence of certain of the Loan Parties is to hold groups of jewelry.

25.     The collateral that is the security for the financings that Merrill Lynch made to the Loan Parties includes the Jewelry Collateral.

26.     The jewelry that makes up the Jewelry Collateral consists of highly valuable jewelry, including antique and museum-quality pieces.  The estimated value of some pieces of the Jewelry Collateral is as high as several million dollars.  Many of the pieces are small and easily concealed, moved or transported.

27.     Upon information and belief, collateral held by the Loan Parties, including the Jewelry Collateral, is stored in various locations or with certain consignees or both including at (1) Esmerian's office at 610 Fifth Avenue, 4th Floor, New York, New York; (2) a group of safety deposit boxes located in a vault at JP Morgan Chase Bank, N.A., 11 West 51st Street, New York, New York (the "Chase Vault"); (3) Brink's Global Services U.S.A., Inc., 184-45 147th Avenue, Springfield Gardens, New York; (4) one or more Saks Fifth Avenue locations, (5) one or more Neiman Marcus locations; (6) one or more Christie's locations; (7) Las Vegas, Nevada; and (8) other locations known and unknown to the plaintiff.

28.     The collateral in the Chase Vault can only be accessed by Esmerian if a representative of Merrill Lynch is present.  Upon an Event of Default, pursuant to the relevant loan documents, Merrill Lynch has the right by power of attorney to remove Esmerian as signatory on the Chase Vault.  Merrill Lynch is in the process of removing Esmerian as signatory on the Chase Vault and seizing the collateral in the Chase Vault.

29.     Upon information and belief, Esmerian does not have formal procedures to check-in and check-out the jewelry from the vault located in his office and other locations where the jewelry is stored.  Further, since September 2007, Esmerian and other officers of

6

certain Loan Parties have failed to provide updated monthly schedules to Merrill Lynch on the location of Jewelry Collateral as required by the Credit Agreements, including the identity and location of Jewelry Collateral believed to be held by consignees.   Esmerian may be the only individual with knowledge of the exact location of certain of the jewelry that makes up the Jewelry Collateral.

30.     Esmerian was born in Paris, travels outside of the United States carrying jewelry on his person in order to buy and sell jewelry, has numerous foreign contacts and maintains at least one Swiss bank account.

31.     Esmerian has also maintained at least six (6) bank accounts in the name of various Loan Parties without disclosing those accounts to Merrill Lynch and without entering into control agreements with respect to those accounts as required by the Credit Agreements.

32.     During the week of September 17, 2007, Esmerian had planned to travel to London with a pink diamond ring valued at approximately $8.5 million in order to meet a buyer for the ring.   The pink diamond ring is part of a group of collateral held by one of the Loan Parties.   Although Esmerian's trip to London was cancelled, this demonstrates that Esmerian has a practice of traveling to other countries with highly valuable jewelry on his person.

33.     On information and belief, between August and December 2007, certain of the Defendants sold Jewelry Collateral but did not either apply the net sale proceeds to repayment of the Special Collection Loan or the Acquisition Loan or both as required under the Credit Agreements or deposit the net sale proceeds into the collection account of Merrill Lynch as required under the applicable Security Agreement.

34.     Due to the unique and valuable nature of the jewelry, its small size and its portability, Esmerian's foreign contacts, Esmerian's actions in the recent months, his conduct of traveling outside of the country with jewelry, and the fact that some of the Jewelry Collateral is

7

already outside of New York in Las Vegas and other locations known and unknown to Merrill Lynch, unless the remedies of a receiver and replevin are granted, it is probable that some of the Jewelry Collateral will become unavailable by reason of being transferred, concealed, disposed of, or removed from the state.

A.    **The Special Collection Loan**

        35.    On November 4, 2005, Merrill Lynch extended to Calypso $56,400,957 of senior term loan financing (the "Special Collection Loan") pursuant to the Special Collection Credit Agreement. Merrill Lynch and Calypso also entered into the Special Collection Security Agreement.

        36.    The Special Collection Loan was secured by all of the assets owned by Calypso, which included jewelry held by Calypso (the "Calypso Jewelry").

        37.    The Calypso Jewelry was formerly owned by Esmerian and contributed by Esmerian to Calypso prior to the closing of the Special Collection Loan. A substantial amount of the Calypso Jewelry is located in the Chase Vault. The Calypso Jewelry that has not been moved to the Chase Vault is a subject of this action.

        38.    The Special Collection Loan was also secured by a pledge of 100% of the equity in Calypso by Esmerian.

        39.    The Special Collection Loan was also secured by a full recourse unconditional personal guarantee by Esmerian (the "Esmerian Special Collection Guarantee").

        40.    Pursuant to the Acquisition Security Agreement, the Special Collection Loan was also secured by all of the assets owned by Tango, which included jewelry held by Tango (the "Tango Jewelry"). The Tango Jewelry was formally owned by REI and contributed by REI to Tango pursuant to the grant of the security interest Tango.

41.     REI is an affiliate of Calypso and a corporation majority-owned and/or controlled by Esmerian.  In connection with the Special Collection Loan, REI also granted to Merrill Lynch a negative pledge on certain jewelry (the "Specified REI Jewelry").

42.     The Special Collection Loan was secured by a full recourse guarantee by REI (the "REI Guarantee").

43.     Section 8 of Special Collection Credit Agreement provides, in part, the following Events of Default:

> (a)     The Borrower shall fail to pay any principal of any Loan when due in accordance with the terms thereof or hereof; or the *Borrower shall fail to pay any interest on any Loan*, or any other amount payable hereunder or under the other Loan Documents, within two (2) days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or . . . .

> (d)     The Borrower or any other Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of thirty (30) days; or . . . .

(emphasis added).

44.     Section 9 of Special Collection Security Agreement provides in part:

> [T]he Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Borrower or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), *may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral*, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best,

9

> for cash or on credit or for future delivery without assumption of any credit risk. . . . *The Borrower further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender* at places which the Lender shall reasonably select, whether at the Borrower's premises or elsewhere. . . .

(emphasis added).

45.    Section 2 of the Esmerian Special Collection Guarantee provides in part:

> (a)    The Guarantor hereby, *unconditionally and irrevocably*, guarantees to the Lender and its respective successors, indorsees, transferees and assigns, *the prompt and complete payment and performance by the Borrower when due. . . . of the·Obligations.*
>
> *            *            *
>
> (c)    The Guarantor further agrees to pay any and all reasonable expenses (including, without limitation, all fees and disbursements of counsel) which may be paid or incurred by the Lender in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guarantee.

(emphasis added).  Section 2 of the REI Guarantee includes substantially the same provision as above.

B.    **The Acquisition Loan**

46.    On March 29, 2006, Merrill Lynch extended an additional $110,000,000 of senior financing (the "Acquisition Loan") to a company then-known as Samba 1, Inc. ("Samba"), a corporation wholly-owned and/or controlled by Esmerian, pursuant to a separate credit agreement, the Acquisition Credit Agreement.

47.    Merrill Lynch, Samba, Endymion and Tango as well as two wholly-owned subsidiaries of Samba (the "Samba Subsidiaries"), also entered into the Acquisition Security Agreement.

48.    The Acquisition Loan was secured by certain collateral including all of the assets of Samba and the Samba Subsidiaries.

10

49.     The Acquisition Loan was also secured by a collection of jewelry (the "Endymion Jewelry") contributed by Esmerian to Endymion and the Tango Jewelry.

50.     The Acquisition Loan was also secured by a full recourse unconditional personal guarantee by Esmerian (the "Esmerian Acquisition Guarantee") and a full recourse unconditional guarantee by REI and Tango (the "REI Guarantee").

51.     The Acquisition Loan was also secured by a full recourse unconditional guarantee by Endymion (the "Endymion Guarantee").

52.     The Acquisition Loan was also secured by a full recourse unconditional guarantee by the Samba Subsidiaries.

53.     The Acquisition Loan was also secured by, among other things, a pledge by Esmerian of 100% of the equity in Samba and a pledge by Samba of 100% of the equity in the Samba Subsidiaries.

54.     The Acquisition Loan and the Special Collection Loan thereafter were cross-collateralized. Accordingly, all of the collateral securing the Acquisition Loan also secures the Special Collection Loan and all of the collateral securing the Special Collection Loan also secures the Acquisition Loan.

55.     Specifically, in connection with the Acquisition Loan, on March 29, 2006, the documentation for the Special Collection Loan was amended in order to (i) cause the collateral supporting the Special Collection Loan to secure the Acquisition Loan, (ii) cause the guarantees supporting the Special Collection Loan to guarantee the Acquisition Loan, (iii) permit the debt incurred under and liens granted in connection with the Acquisition Loan to constitute debts and liens under the Special Collection Loan and (iv) cause a default under the Acquisition Loan to trigger a default under the Special Collection Loan.

56.     Section 4.1(c) of the Acquisition Credit Agreement provides:

11

Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (b) of this Section shall be payable from time to time on demand.

57.   Section 4.14 of the Third Amendment to the Acquisition Credit Agreement provides:

The Borrower shall, from time to time (including without limitation upon any occurrence of a Rapid Amortization Event), but subject to Section 7.12(e), deposit into the Debt Service Reserve Account an amount sufficient so that the amount on deposit in the Debt Service Reserve Account shall be equal to the Debt Service Reserve Amount. At such time when any and all Rapid Amortization Events cease to exist, the amount deposited in the Debt Service Reserve Account in excess of the Debt Service Reserve Amount shall be released to the Borrower. Without limitation of the foregoing and notwithstanding the last sentence of Section 7.12(e), on or prior to each of the dates set forth below, the Borrower shall deposit the amount set forth opposite such date:

Date:                    Amount:
. . . .
September 10, 2007   The Excess DSR Amount

For purposes of this Section, "Excess DSR Amount" shall mean an amount equal to the Debt Service Reserve Amount less the amount on deposit in the Debt Service Reserve Account on the date thereof.

58.   Section 9 of the Acquisition Credit Agreement provides in part that an Event of Default occurs and is continuing if:

(a)   The Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or *the Borrower shall fail to pay any interest on any Loan,* or any other amount payable hereunder or under the other Loan Documents . . . , within two (2) days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

\*          \*          \*

(d)   The Borrower or any other Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such

default shall continue unremedied for a period of thirty (30) days; or

(e)    Any Loan Party shall (i) default in any payment of principal of or interest of any Indebtedness (other than the Loans) or in the payment of any Guarantee Obligation, beyond the period of grace (not to exceed thirty (30) days), if any, provided in the instrument or agreement under which such Indebtedness or Guarantee Obligation was created, if the aggregate amount of the Indebtedness and/or Guarantee Obligations in respect of which such default or defaults shall have occurred is at least $500,000; or (ii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or such Guarantee Obligation to become payable; or . . . .

*     *     *

(n)    Any "Event of Default" (as defined in the Special Collection Credit Agreement) shall have occurred and be continuing; or . . . .

(emphasis added).

59.    Section 9 of the Acquisition Security Agreement provides in part that if an Event of Default occurs and is continuing:

[T]he Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Grantors or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), *may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof*, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or

13

> office of the Lender or elsewhere upon such terms and conditions
> as it may deem advisable and at such prices as it may deem best,
> for cash or on credit or for future delivery without assumption of
> any credit risk. . . .   The Grantors further agree, at the Lender's
> request, to assemble the Collateral and make it available to the
> Lender at places which the Lender shall reasonably select, whether
> at the Grantors' premises or elsewhere . . . .

(emphasis added).

      60.    Section 2 of the Esmerian Acquisition Guarantee provides in part:

> (a)    The Guarantor hereby, unconditionally and irrevocably,
> guarantees to the Lender and its respective successors, indorsees,
> transferees and assigns, *the prompt and complete payment and
> performance by the Borrower when due. . . . of the Obligations.*

*    *    *

> (c)    The Guarantor further agrees to pay any and all reasonable
> expenses (including, without limitation, all fees and disbursements
> of counsel) which may be paid or incurred by the Lender in
> enforcing, or obtaining advice of counsel in respect of, any rights
> with respect to, or collecting, any or all of the Obligations and/or
> enforcing any rights with respect to, or collecting against, the
> Guarantor under this Guarantee.

(emphasis added).  Section 2 of the Endymion Guarantee and Section 2 of the REI Guarantee all include substantially the same provision as above.

      61.    On June 22, 2006, the documentation relating to the Acquisition Loan was amended, in part, to (i) increase the working capital revolving credit line by $10,000,000 to $35,000,000 and (ii) extend additional credit in the form of a $10,000,000 tranche B revolving credit facility to finance the purchase price of certain expensive gemstones, jewelry and jeweled objects.  Thereafter, Samba failed to comply with various obligations under the Acquisition Credit Agreement and other loan documents related thereto.

      62.    On August 25, 2006, the documentation relating to the Acquisition Loan was amended to (i) modify certain financial covenants, (ii) provide Samba with a recovery

14

period during which Samba was not required to comply with the financial covenants, (iii) require Samba to deliver a business plan detailing the procedures Samba would implement to cause the financial covenants to be satisfied by the end of the recovery period, (iv) prohibit further borrowings, and (v) waive the existing defaults (the "August 25 Waiver").

63.     Thereafter, Samba defaulted on obligations under the Acquisition Credit Agreement, which had the effect of nullifying the waivers granted by Merrill Lynch in the August 25, 2006 Waiver.

**C.     Foxtrot Security Agreement**

64.     On November 3, 2006, Samba and Merrill Lynch entered into a waiver and side letter (collectively, the "Side Letter") in connection with the Credit Agreements and other loan documents related thereto.

65.     The Side Letter required that (i) Merrill Lynch give Samba a recovery period during which Samba was not required to comply with certain financial covenants, (ii) Samba deposit all delinquent Debt Service Reserve amounts into the Debt Service Reserve Account on or prior to February 28, 2007, (iii) Esmerian fund all working capital shortfalls of Samba, (iv) no further borrowings were allowed, except for borrowings to fund the opening of new stores, (v) Esmerian make a $2,500,000 capital contribution to Samba to prepay the Acquisition Loan on or prior to November 15, 2006, (vi) the Acquisition Loan be prepaid by at least $20,000,000 on or prior to February 28, 2007 and (vii) Samba to deliver five-year projections to Merrill Lynch.

66.     The Side Letter also required that Esmerian provide an additional collection of jewelry (the "Foxtrot Jewelry") as collateral to secure the loans made in connection with the Credit Agreements.

15

67.     Thereafter, Esmerian defaulted on his obligation under the Side Letter, by failing to make the $2,500,000 capital contribution.  This default nullified the waivers previously granted by Merrill Lynch in the Side Letter.  On December 15, 2007, Esmerian made the payment to Merrill on the $2,500,000 capital contribution.

68.     On April 6, 2007, the documentation relating to the Acquisition Loan was amended to (i) reset the financial covenants based on the five-year projections delivered by Samba, (ii) change the dates that payments to the Debt Service Reserve Account were required, (iii) change the dates that contributions of inventory by Esmerian to Endymion were required, (iv) document Foxtrot's grant of a security interest to Merrill Lynch in the Foxtrot Jewelry, and (v) document Foxtrot's guarantee of the loans made in connection with the Credit Agreements. The documentation relating to the Special Collection Loan was also amended to make certain conforming changes.

69.     Section 9 of the Foxtrot Security Agreement provides in part that if an Event of Default occurs and is continuing:

> [T]he Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), *may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof,* and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. . . . *The Grantor further agrees, at the Lender's request, to assemble the Collateral and make it available to the Lender at places which the Lender shall reasonably select,* whether at the Grantor's premises or elsewhere. . . . Without limitation of

the foregoing, the Grantor acknowledges and agrees that in the event the Borrower fails to prepay at least $20,000,000 of Loans pursuant to Section 4.5(e) of the Credit Agreement (such amount or the amount of any deficiency, the "Shortfall Amount"), the Lender shall immediately have the right to liquidate the entire Foxtrot Collection in such manner as the Lender deems appropriate in its sole discretion. A portion of the proceeds from such liquidation in an amount equal to the Shortfall Amount shall be applied to the prepayment of the Loans and, so long as no Event of Default has occurred and is continuing, the excess of such proceeds, if any, less all costs and expenses incurred by the Lender in enforcing its remedies hereunder, including, without limitation, the fees and disbursements of counsel to the Lender, shall be paid to the Borrower.

(emphasis added).

71. Section 2 of the Foxtrot Guarantee provides in part:

(a)   The Guarantor hereby, unconditionally and irrevocably, guarantees to the Lender and its successors, transferees and assigns, *the prompt and complete payment and performance by the Borrower when due. . . . of the Obligations.*

\*     \*     \*

(c)   The Guarantor further agrees to pay any and all reasonable expenses (including, without limitation, all fees and disbursements of counsel) which may be paid or incurred by the Lender in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guarantee. . . .

(emphasis added).

71. On July 11, 2007, REI entered into a security agreement (the "REI Security Agreement") in favor of Merrill Lynch and granted Merrill Lynch a security interest in all of REI's interest in the Endymion Jewelry and the Foxtrot Jewelry. The REI Security Agreement was required by Merrill Lynch because Esmerian did not provide evidence of title showing that the Endymion Jewelry and the Foxtrot Jewelry were correctly transferred to Endymion and Foxtrot, respectively, by Esmerian.

17

72.     Upon information and belief, REI is holding certain collateral in which Merrill Lynch has a security interest (the "REI Jewelry") pursuant to the REI Security Agreement.

**D.     Activities of the Defendants and Loan Parties in Violation of the Loan Documents**

73.     On information and belief, between August and December 2007, certain of the Defendants sold Jewelry Collateral but did not either apply the net sale proceeds to repayment of the Special Collection Loan or the Acquisition Loan or both as required under the Credit Agreements or deposit the net sale proceeds into the collection account of Merrill Lynch as required under the applicable Security Agreement.

74.     Section 3(d) of the Acquisition Security Agreement provides in part:

> *All payments of Receivables, when collected by the Grantors, shall be forthwith deposited by the Grantors in the Collection Account in exact form received,* duly endorsed by the Grantors to the Lender if required, *in the Collection Account as provided in Section 7.12 of the Credit Agreement,* and until so turned over, shall be held by the Grantors in trust for the Lender, segregated from other funds of the Grantors. Each deposit of any such Proceeds shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit. . . . At the Lender's request, the Grantors shall deliver to the Lender all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables and Proceeds of Collateral, including, without limitation, all original orders, invoices and shipping receipts. At any time after the occurrence and during the continuance of an Event of Default upon the request of the Lender, the Grantors will cooperate with the Lender to establish a system of lockbox accounts, under the sole dominion and control of the Lender, into which all Receivables shall be paid and from which all collected funds will be transferred to the Collection Account.

(emphasis added).

18

75.     Specifically, Section 3(c) of the Special Collection Security Agreement provides in part:

> *Any payments of Proceeds arising out of a Consignment, Recovery Event or otherwise out of the sale, auction, lease, transfer, assignment, loan or other disposition of an item or items of Eligible Jewelry* or any interest therein, when collected by the Borrower, *shall be forthwith* (and, in any event, within one (1) Business Day) *deposited by the Borrower in the exact form received*, duly endorsed by the Borrower to the Lender if required, in the Operating Account, and, until so turned over, shall be held by the Borrower in trust for the Lender, segregated from other funds of the Borrower. Each deposit of any such Proceeds shall be accompanied by a report, substantially in the form attached as Annex II to the Credit Agreement, identifying in reasonable detail the nature and source of the payments included in the deposit. . . . . Upon the occurrence of any Default or Event of Default, at the Lender's request, the Borrower shall deliver to the Lender all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Proceeds, including, without limitation; all original orders, invoices and shipping receipts.

(emphasis added).

76.     Thus, by not applying or depositing into the collection account of Merrill Lynch, the net sale proceeds from Jewelry Collateral, one or more of the Defendants violated certain provisions of the Security Agreements.

77.     In November 2007, Merrill Lynch discovered that defendant Esmerian had opened several bank accounts at First Republic Bank in the name of the Loan Parties. These bank accounts were opened without authorization of Merrill Lynch in violation of certain of the Loan Documents. The following accounts were opened without knowledge or authorization of Merrill Lynch:

- Account #: 97900060843
- Account #: 97900063565
- Account #: 97900063573

19

- Account #: 97900063581
- Account #: 97900063599
- Account #: 97900062005

78.    Section 7.12 of the Acquisition Credit Agreement provides in part that

Defendants are obligated:

(a)    Maintain each Operating Account and the Debt Service Reserve Account. *The Loan Parties shall not change any Bank Account, or open any new Bank Account, into which any revenues of the Loan Parties* . . . may be deposited without the prior written consent of the Lender.

(b)    Deposit or cause to be deposited all gross collections, receipts and proceeds from the operation of its business (including any proceeds of any Collateral) into the applicable Operating Account. So long as no Default or Event of Default shall have then occurred and be continuing, each Combined Party shall have access to the funds deposited in the Operating Accounts pursuant to this Section 7.12(b).

(emphasis added).

79.    Section 5(a) of the Acquisition Security Agreement and Section 5(a) of the

Foxtrot Security Agreement both provide in part:

At any time and from time to time, upon the written request of the Lender, and at the sole expense of the Grantor, the Grantor will promptly and duly execute and deliver such further instruments and documents and take such further action as the lender may reasonably request for the purpose of obtaining or preserving the full benefits of this Security Agreement and of the rights and powers herein granted, including, without limitation . . . . (ii) in the case of Deposit Accounts, Letter-of-Credit Rights and any other relevant Collateral, taking any actions (including, without limitation, entering into, and using its best efforts to cause any relevant third party to enter into, one or more Control Agreements) necessary to enable the Lender to obtain "control" (within the meaning of the applicable Uniform Commercial Code) with respect thereto.

Section 5(a) of the Special Collection Security Agreement includes substantially the same

provision as above.

20

80.     The actions of defendant Esmerian in causing certain of the Loan Parties to open bank accounts at First Republic Bank were in violation of Section 7.12(a) of the Acquisition Credit Agreement because Merrill Lynch had not given its prior written consent for these Loan Parties to open such accounts.  Upon information and belief, proceeds from the sale of collateral held by the Loan Parties has been deposited into these accounts or into other accounts unknown to the plaintiff.  As a consequence of the actions of defendant Esmerian, Merrill Lynch was not provided control of these accounts as authorized by Section 5(a)(ii) of the Security Agreements.

81.     Defendant Esmerian and other officers of certain of the Loan Parties have failed to provide Merrill Lynch with updated monthly schedules as to the identity and the location of the Jewelry Collateral since August 2007, including Jewelry Collateral believed to be held by consignees, in violation of the Loan Documents.

82.     Section 6.2(b) of the Special Collection Credit Agreement provides that the Borrower shall furnish to the Lender:

> within five (5) days following the end of each calendar month, *a Status Report updating Schedule 1.1 to reflect any revisions to the information contained therein, including without limitation any sales and changes in location,* certified as true, correct and complete by a Responsible Officer of the Borrower, and including a certification by a Responsible Officer of the Borrower that, to the best of such officer's knowledge, during such month the Borrower has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to be observed, performed or satisfied by it, and that the Borrower has obtained no knowledge of any Default or Event of Default except as specified in such Status Report;

(emphasis added).

21

83.    Section 7.2(c) of the Acquisition Credit Agreement provides in part that the Borrower shall furnish to the Lender:

> within five (5) Business Days following the end of each calendar month, a Borrowing Base Certificate (i) showing (A) the outstanding principal amount of the Loans, (B) the TTM Gross Profit Margin, (C) the Large Precious Stones Gross Profit Margin (D) the value of the Eligible Inventory at the lower of cost or market, (E) the Borrowing Base, together with a calculation thereof, *(F) the Current Value of all items subject to Permitted Consignments, together with a schedule listing such items, their respective Current Values, the name and address of each Permitted Consignee holding such items, (G) the Current Value of all items subject to Permitted Memo-Out Transactions, together with a schedule listing such items, their respective Current Values, the name and address of each Permitted Memo-Out Transferee holding such items, and including a representation regarding additional insurance requirements, (H) the total sales attributable to Memo-In Jewelry, . . . .*

(emphasis added).

84.    By their failure to disclose to Merrill Lynch the current location of Jewelry Collateral, Defendants violated Section 6.2(b) of the Special Collection Credit Agreement and Section 7.2(c) of the Acquisition Credit Agreement.  As a result of the actions of defendant Esmerian and other officers, Merrill Lynch does not know the location of some of the Jewelry Collateral, including Jewelry Collateral believed to be held by consignees.

E.    **Event of Default and Demand for Loan Parties' Jewelry Collateral**

85.    Beginning on or around May 5, 2006, the Loan Parties failed to comply with various provisions in the Credit Agreements and other loan documents related thereto. However, prior to August 2007, the Loan Parties made the periodic interest payments required under the Credit Agreements.

86.    As set forth above, on September 10, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay interest then due on

the Special Collection Loan in the amount of $507,221. Calypso's failure constituted an Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement. On September 20, 2007, Merrill Lynch notified Calypso of the Event of Default and reserved its right to take action under the Security Agreements.

87.    On September 10, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay interest then due on the Acquisition Loan in the amount of $1,166,154. Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement. On September 20, 2007, Merrill Lynch notified Samba of the Event of Default and reserved its right to take action under the Security Agreements.

88.    On September 10, 2007, Samba failed to comply with Section 4.14 of the Acquisition Credit Agreement as it failed to pay the excess Debt Service Reserve amount of approximately $2.0 million. On September 27, 2007, Merrill Lynch notified Samba of this further Event of Default and reserved its right to take action under the Security Agreements.

89.    On September 18 and 20, 2007, the Loan Parties tendered a partial interest payment to Merrill Lynch in an aggregate amount of approximately $750,000. On September 27, 2007, Merrill Lynch acknowledged receipt of the partial interest payment, but provided additional notice of the existing Events of Default and reserved its rights under the Credit Agreements and other loan documents related thereto, as the Loan Parties still owed $923,375 of interest payments and $1,979,902 of payments due on account of the Debt Service Reserve Amount were still due and owing and in default.

90.    On September 28, 2007, at Merrill Lynch's request, Esmerian caused certain of the Loan Parties to transfer approximately $27,000,000 of collateral (based on valuations determined in accordance with the Credit Agreements) to the Chase Vault pursuant to Merrill Lynch's right to collect collateral under the Security Agreements.

91.     On October 10, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay interest then due on the Special Collection Loan in the amount of $526,364.21. Calypso's failure constituted a further Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement. On October 12, 2007, Merrill Lynch notified Calypso of the Event of Default and reserved its right to take action under the Security Agreements.

92.     On October 10, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay interest then due on the Acquisition Loan in the amount of $1,305,650.36. Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement. On October 12, 2007, Merrill Lynch notified Samba of the Event of Default and reserved its right to take action under the Security Agreements.

93.     On November 13, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay additional interest then due on the Special Collection Loan in the amount of $653,424.31. Calypso's failure constituted an Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement.

94.     On November 13, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay additional interest then due on the Acquisition Loan in the amount of $1,417,346.28. Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement.

95.     On December 10, 2007, Calypso failed to comply with Section 3.1(c) of the Special Collection Credit Agreement as it failed to pay additional interest then due on the Special Collection Loan. Calypso's failure constituted an Event of Default pursuant to Section 8(a) of the Special Collection Credit Agreement.

24

96.     On December 10, 2007, Samba failed to comply with Section 4.1(c) of the Acquisition Credit Agreement as it failed to pay additional interest then due on the Acquisition Loan.   Samba's failure constituted an Event of Default pursuant to Section 8(a) of the Acquisition Credit Agreement.

97.     As of December 31, 2007, approximately $7,752,130.01 of interest payments, and the entire payment due on account of the Debt Service Reserve Account of $1,979,902, was due and owing and in default.

98.     On October 12, 2007, due to Esmerian's defaults, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan.  The entire principal and interest thereunder is now due and owing.

99.     Due to the acceleration, the principal amount owed on the Special Collection Credit Agreement is $56,400,957.13 plus accrued but unpaid interest in the aggregate amount of $2,102,913.94 as of December 31, 2007, the total amount owed on the Acquisition Credit Agreement is $121,131,659.08 plus accrued but unpaid interest in the aggregate amount of $5,649,216.07 as of December 31, 2007, and the amount owed on the Debt Service Reserve Account is $1,979,902.   The aggregate amount owed, including unpaid interest, to Merrill pursuant to the Credit Agreements is $185,284,746.22 plus attorneys' fees and costs of collection.

100.    On October 12, 2007, Merrill Lynch made demand upon Esmerian and certain of the Loan Parties for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

101.    On October 12, 2007, Merrill Lynch also made demand of payment of pursuant to the respective Guarantee Agreements including those by Esmerian, Endymion, REI, Tango and Foxtrot.  No payment has been made.

102.   On October 3, 2007, Merrill Lynch and Defendants entered into an Irrevocable Consent Agreement, whereby Defendants, through Esmerian, irrevocably consented to the Merrill Lynch's taking physical possession of, seizing or otherwise exercising control over any property, including Jewelry Collateral, located at Esmerian's office at 610 Fifth Avenue, 4th Floor, New York, New York, in which Merrill Lynch has a security interest pursuant to the Credit Agreements or other Loan Documents.   Defendants agreed that Merrill Lynch could exercise this right immediately and at any time hereafter.

103.   In addition to the Irrevocable Consent Agreement, Merrill Lynch had the right to make demand upon Esmerian and the Loan Parties to assemble and make available to Merrill Lynch collateral held by the Loan Parties, including the Jewelry Collateral upon an Event of Default pursuant to Section 10 of the Special Collection Security Agreement, Section 10 of Acquisition Security Agreement, Section 10 of the Foxtrot Security Agreement and Section 10 of the REI Security Agreement.

104.   After allowing Merrill Lynch to collect some of the collateral, defendant Esmerian have failed to assemble the Jewelry Collateral and make the Jewelry Collateral available to Merrill Lynch.  Merrill Lynch has demanded that Defendants identify the location of each item of the remaining Jewelry Collateral and deliver the same to Merrill Lynch.

105.   Due to the unique and valuable nature of the Jewelry Collateral, the number of small items, its portability, Esmerian's foreign contacts, Esmerian's conduct in recent months of not depositing proceeds of sales from collateral into Merrill Lynch control accounts, the opening of unauthorized bank accounts and the failure to provide control thereof to Merrill Lynch, Esmerian's and other officers' failure to provide updated monthly schedules to Merrill Lynch as to the identity and the location of the Jewelry Collateral, Esmerian's travel outside of the country with jewelry, and the fact that jewelry constituting other collateral as to which

26

Merrill Lynch has a security interest already is outside of New York in Las Vegas, Nevada, unless a receiver and replevin is granted by this Court, it is probable that some or all of the Jewelry Collateral will become unavailable by reason of being transferred, concealed, disposed of, or removed from the State.

## FIRST CAUSE OF ACTION
### (Replevin of the Calypso Jewelry)

106.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

107.    Pursuant to the Special Collection Security Agreement, Calypso granted Merrill Lynch a security interest in the Calypso Jewelry. A substantial amount of the Calypso Jewelry is located in the Chase Vault. The Calypso Jewelry that has not been moved to the Chase Vault and makes up the Jewelry Collateral is the subject of this cause of action.

108.    Merrill Lynch perfected its security interest in the Calypso Jewelry in accordance with the Uniform Commercial Code.

109.    The Credit Agreements and Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Calypso Jewelry.

110.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire principal and interest thereunder is now due and owing. As a result, Events of Default exist and are continuing, and pursuant to the Special Collection Security Agreement, Merrill Lynch is entitled to collect the Calypso Jewelry from Calypso.

27

111.     On information and belief, Calypso is holding Calypso Jewelry to which Merrill Lynch is entitled.  The Calypso Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

112.     Merrill Lynch has demanded that Calypso allow it to collect the Calypso Jewelry.  Calypso has failed to perform its obligations under the Special Collection Security Agreement to assemble the Calypso Jewelry and make it available to Merrill Lynch so that the Calypso Jewelry may be transferred to a secure location under the control of Merrill Lynch.

### SECOND CAUSE OF ACTION
(Replevin of the Endymion Jewelry)

113.     Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

114.     Pursuant to the Acquisition Security Agreement, Endymion granted Merrill Lynch a security interest in the Endymion Jewelry.  The Endymion Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

115.     Merrill Lynch perfected its security interest in the Endymion Jewelry in accordance with the Uniform Commercial Code.

116.     The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Endymion Jewelry.

117.     On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire principal and interest thereunder is now due and owing.  As a result, Events of Default exist and are continuing, and pursuant to the Acquisition Security Agreement and Endymion's pledge of

the Endymion Jewelry, Merrill Lynch is entitled to collect the Endymion Jewelry from Endymion.

118.    On information and belief, Endymion is holding Endymion Jewelry to which Merrill Lynch is entitled.  The Endymion Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

119.    Merrill Lynch has demanded that Endymion allow it to collect the Endymion Jewelry.  Endymion has failed to perform its obligations under the Acquisition Security Agreement to assemble the Endymion Jewelry and make it available to Merrill Lynch so that the Endymion Jewelry may be transferred to a secure location under the control of Merrill Lynch.

## THIRD CAUSE OF ACTION
### (Replevin of the Tango Jewelry)

120.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

121.    Pursuant to the Acquisition Security Agreement, Tango granted Merrill Lynch a security interest in the Tango Jewelry.  The Tango Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

122.    Merrill Lynch perfected its security interest in the Tango Jewelry in accordance with the Uniform Commercial Code.

123.    The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Tango Jewelry.

124.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements.  As a result,

29

Events of Default exist and are continuing, and pursuant to the Acquisition Security Agreement and Tango's pledge of the Tango Jewelry, Merrill Lynch is entitled to collect the Tango Jewelry from Tango.

125.    On information and belief, Tango is holding Tango Collateral to which Merrill Lynch is entitled.   The Tango Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

126.    Merrill Lynch has demanded that Tango allow it to collect the Tango Jewelry.   Tango has failed to perform its obligations under the Acquisition Security Agreement to assemble the Tango Jewelry and make it available to Merrill Lynch so that the Tango Jewelry may be transferred to a secure location under the control of Merrill Lynch.

### FOURTH CAUSE OF ACTION
### (Replevin of the Foxtrot Jewelry)

127.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

128.    Pursuant to the Foxtrot Security Agreement, Foxtrot granted Merrill Lynch a security interest in the Foxtrot Jewelry.   The Foxtrot Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

129.    Merrill Lynch duly perfected its security interest in the Foxtrot Jewelry in accordance with the Uniform Commercial Code.

130.    The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the Foxtrot Jewelry.

131.    On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire

principal and interest thereunder is now due and owing. As a result, Events of Default exist and are continuing, and pursuant to the Foxtrot Security Agreement and Foxtrot's pledge of the Foxtrot Jewelry, Merrill Lynch is entitled to collect the Foxtrot Jewelry from Foxtrot.

132.   On information and belief, Foxtrot is holding Foxtrot Jewelry to which Merrill Lynch is entitled. The Foxtrot Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

133.   Merrill Lynch has demanded that Foxtrot allow it to collect the Foxtrot Jewelry. Foxtrot has failed to perform its obligations under the Foxtrot Security Agreement to assemble the Foxtrot Jewelry and make it available to Merrill Lynch so that the Foxtrot Jewelry may be transferred to a secure location under the control of Merrill Lynch.

### FIFTH CAUSE OF ACTION
#### (Replevin of the REI Jewelry)

134.   Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

135.   Pursuant to the REI Security Agreement, REI granted Merrill Lynch a security interest in the REI Jewelry. The REI Jewelry that makes up the Jewelry Collateral is the subject of this cause of action.

136.   Merrill Lynch duly perfected its security interest in the REI Jewelry in accordance with the Uniform Commercial Code.

137.   The Credit Agreements and the Security Agreements provide that failure to pay interest and other amounts when due constitutes an Event of Default entitling Merrill Lynch to collect collateral that includes the REI Jewelry.

138.   On October 12, 2007, Merrill Lynch gave notice of the Events of Default and acceleration of the loans made in connection with the Credit Agreements, and the entire

principal and interest thereunder is now due and owing.  As a result, Events of Default exist and are continuing, and pursuant to the REI Security Agreement and REI's pledge of the REI Jewelry, Merrill Lynch is entitled to collect the REI Jewelry from REI.

139.    On information and belief, REI is holding REI Jewelry to which Merrill Lynch is entitled.  The REI Jewelry is stored in various locations or with certain consignees or both in locations known and unknown to Merrill Lynch.

140.    Merrill Lynch has demanded that REI allow it to collect the REI Jewelry. REI has failed to perform its obligations under the REI Security Agreement to assemble the REI Jewelry and make it available to Merrill Lynch so that the REI Jewelry may be transferred to a secure location under the control of Merrill Lynch.

### SIXTH CAUSE OF ACTION
**(Appointment of a receiver)**

141.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

142.    Merrill Lynch faces a substantial risk of losing the Jewelry Collateral as a consequence of his recent conduct including (a) Esmerian's failure to make the Jewelry Collateral available to Merrill Lynch as required by the Loan Documents; (b) Esmerian's failure to deposit proceeds of sales from collateral into Merrill Lynch control accounts; (c) opening unauthorized bank accounts over which Merrill Lynch lacks control; and (d) Esmerian's failure to provide updated monthly schedules to Merrill Lynch of the location of the Jewelry Collateral.

143.    The Jewelry Collateral consists of a number of pieces that are small and easily concealed, portable, subject to removal from one place to another without significant effort, and capable of being transferred, concealed, disposed of, or removed from the state, thus placing the Jewelry Collateral beyond the reach of Merrill Lynch.   Some of the Jewelry

Collateral is already outside of New York in Las Vegas and other locations known and unknown to Merrill Lynch.

144.    Pursuant to CPLR § 6401, the appointment of a receiver to take control of the business of the Defendants is necessary and appropriate.

**SEVENTH CAUSE OF ACTION**
**(Guarantee by Esmerian)**

145.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

146.    On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

147.    On October 12, 2007, Merrill Lynch also made a demand of payment to Esmerian under the Esmerian Special Collection Guarantee and Esmerian Acquisition Guarantee.

148.    Esmerian is obligated under the terms of the Esmerian Special Collection Guarantee to pay Merrill Lynch the outstanding balance of the Special Collection Loan.

149.    Esmerian is obligated under the terms of the Esmerian Acquisition Guarantee to pay Merrill Lynch the outstanding balance of the Acquisition Loan.

**EIGHTH CAUSE OF ACTION**
**(Guarantee by Endymion, LLC)**

150.    Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

33

151.   On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Acquisition Loan.  No payment has been made.

152.   On October 12, 2007, Merrill Lynch also made a demand of payment to Endymion under the Endymion Guarantee.

153.   Endymion is obligated under the terms of the Endymion Guarantee to pay Merrill Lynch the outstanding balance of the Acquisition Loan.

## NINTH CAUSE OF ACTION
### (Guarantee by REI)

154.   Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

155.   On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

156.   On October 12, 2007, Merrill Lynch also made a demand of payment to REI under the REI/Tango Guarantee.

157.   REI is obligated under the terms of the REI/Tango Guarantee to pay Merrill Lynch the outstanding balance of the Special Collection Loan and the outstanding balance of the Acquisition Loan.

34

## TENTH CAUSE OF ACTION
### (Guarantee by Tango)

158.   Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

159.   On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Special Collection Loan and the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Special Collection Loan and the Acquisition Loan.  No payment has been made.

160.   On October 12, 2007, Merrill Lynch also made a demand of payment to Tango under the REI/Tango Guarantee.

161.   Tango is obligated under the terms of the REI/Tango Guarantee to pay Merrill Lynch the outstanding balance of the Special Collection Loan and the outstanding balance of the Acquisition Loan.

## ELEVENTH CAUSE OF ACTION
### (Guarantee by Foxtrot)

162.   Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

163.   On October 12, 2007, Merrill Lynch gave notice of the Event of Default and acceleration of the Acquisition Loan, and the entire principal and interest thereunder is now due and owing.  Merrill Lynch has made demand for the payment of the Acquisition Loan.  No payment has been made.

164.   On October 12, 2007, Merrill Lynch also made a demand of payment to Foxtrot under the Foxtrot Guarantee.

165.   Foxtrot is obligated under the terms of the Foxtrot Guarantee to pay Merrill Lynch the outstanding balance of the Acquisition Loan.

35

## TWELFTH CAUSE OF ACTION
### (Accounting)

166.   .Merrill Lynch repeats and realleges the allegations set forth in paragraphs 1 through 105 of the Complaint as if fully set forth here.

167.   .Between October and December 2007, Defendants have sold Jewelry Collateral but did not deposit the proceeds over to Merrill Lynch trust accounts as the Loan Parties were required to do pursuant to the Security Agreements.

168.   In November 2007, Merrill Lynch discovered that defendant Esmerian had opened several bank accounts at First Republic Bank in the name of the Loan Parties.  These bank accounts were opened without authorization of Merrill Lynch in violation of certain of the Loan Documents.

169.   Between August and December 2007, defendant Esmerian and other officers have failed to provide Merrill Lynch with updated monthly schedules as to the identity and the location of the Jewelry Collateral, including Jewelry Collateral believed to be held by the consignees, in violation of the Credit Agreements.

170.   Merrill Lynch seeks an accounting from Defendants of (a) the amount of proceeds from sales of the Jewelry Collateral that have not been previously accounted for; (b) a description, including bank, account number and balance information, of any bank accounts opened without Merrill Lynch's authority; and (c) the identity and the location of each piece of the Jewelry Collateral.

## RELIEF DEMANDED

WHEREFORE, plaintiff Merrill Lynch demand judgment:

(a)      On the first cause of action, declaring that Merrill Lynch is entitled to possession of the Calypso Jewelry that makes up the Jewelry Collateral and to immediate

possession thereof; that the Calypso Jewelry be assembled and made available to Merrill Lynch, and that, in the case possession of any portion thereof cannot be given to Merrill Lynch, that Merrill Lynch have judgment against the Defendants for a sum in the amount of the value thereof with interest thereon according to law;

(b)     On the second cause of action, declaring that Merrill Lynch is entitled to possession of the Endymion Jewelry that makes up the Jewelry Collateral and to immediate possession thereof; that the Endymion Jewelry be assembled and made available to Merrill Lynch, and that, in the case possession of any portion thereof cannot be given to Merrill Lynch, that Merrill Lynch have judgment against the Defendants for a sum in the amount of the value thereof with interest thereon according to law;

(c)     On the third cause of action, declaring that Merrill Lynch is entitled to possession of the Tango Jewelry that makes up the Jewelry Collateral and to immediate possession thereof; that the Tango Jewelry be assembled and made available to Merrill Lynch, and that, in the case possession of any portion thereof cannot be given to Merrill Lynch, that Merrill Lynch have judgment against the Defendants for a sum in the amount of the value thereof with interest thereon according to law;

(d)     On the fourth cause of action, declaring that Merrill Lynch is entitled to possession of the Foxtrot Jewelry that makes up the Jewelry Collateral and to immediate possession thereof; that the Foxtrot Jewelry be assembled and made available to Merrill Lynch, and that, in the case possession of any portion thereof cannot be given to Merrill Lynch, that Merrill Lynch have judgment against the Defendants for a sum in the amount of the value thereof with interest thereon according to law;

(e)     On the fifth cause of action, declaring that Merrill Lynch is entitled to possession of the REI Jewelry that makes up the Jewelry Collateral and to immediate possession

37

thereof; that the REI Jewelry be assembled and made available to Merrill Lynch, and that, in the case possession of any portion thereof cannot be given to Merrill Lynch, that Merrill Lynch have judgment against the Defendants for a sum in the amount of the value thereof with interest thereon according to law;

(f)     On the sixth cause of action, appointing a receiver to take control of the business of the Defendants for the benefit of Merrill Lynch;

(g)     On the seventh cause of action for the amount owed pursuant to the Esmerian Special Collection Guarantee and the Esmerian Acquisition Guarantee and accrued but unpaid interest in the aggregate amount of $185,284,746.22 as of December 31, 2007 plus attorneys' fees and the costs of collection to be assessed against Esmerian;

(h)     On the eighth cause of action for the amount owed pursuant to the Endymion Guarantee and accrued but unpaid interest in the aggregate amount of $126,780,875.15 as of December 31, 2007 plus attorneys' fees and the costs of collection to be assessed against Endymion;

(i)     On the ninth cause of action for the amount owed pursuant to the REI/Tango Guarantee and accrued but unpaid interest in the aggregate amount of $185,284,746.22 as of December 31, 2007 plus attorneys' fees and the costs of collection to be assessed against REI;

(j)     On the tenth cause of action for the amount owed pursuant to the REI/Tango Guarantee and accrued but unpaid interest in the aggregate amount of $185,284,746.22 as of December 31, 2007 plus attorneys' fees and the costs of collection to be assessed against Tango;

(k)     On the eleventh cause of action for the amount owed pursuant to the Foxtrot Guarantee and accrued but unpaid interest in the aggregate amount of $126,780,875.15

as of December 31, 2007 plus attorneys' fees and the costs of collection to be assessed against Foxtrot;

        (l)     On the twelfth cause of action for an accounting ordering the Defendants to provide a detailed accounting to Merrill Lynch with respect to (i) the amount of proceeds from sales of the Jewelry Collateral that have not been previously accounted for; (ii) a description, including bank, account number and balance information, of any bank accounts opened without Merrill Lynch's authority; and (iii) the identity and the location of each piece of the Jewelry Collateral;

        (m)    Granting Merrill Lynch costs and disbursements, including reasonable attorneys' fees and expenses of this action, for the replevin of the Jewelry Collateral, the appointment of a receiver and accounting; and

        (n)     Granting such other and further relief as the Court deems just and proper.

Dated:    New York, New York
           January 2, 2008

                                CADWALADER, WICKERSHAM & TAFT LLP

                                By:  _____
                                     Howard R. Hawkins, Jr.
                                     Ellen M. Halstead

                                Office and Post Office Address:
                                One World Financial Center
                                New York, NY 10281
                                Telephone: (212) 504-6000
                                Facsimile: (212) 504-6666

                                *Attorneys for Plaintiff*

**<u>VERIFICATION</u>**

STATE OF NEW YORK      )
                      : ss.:
COUNTY OF NEW YORK  )

       RYAN BELL, being duly sworn, deposes and says:

    1.    I am a Vice President at Merrill Lynch Mortgage Capital Inc.

    2.    I have read the foregoing Complaint and know the contents thereof.

    3.    The same is true to my own knowledge, except as to matters stated to be alleged on information and belief and, as to those matters, I believe them to be true.

                                                             RYAN BELL

Sworn to before me this
2 day of January 2008

JENNIFER M. REYNOLDS
Notary Public, State of New York
No. 01RE6126937
Qualified in New York County
Commission Expires September 11, 2010